# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Eduardo Ruben Lopez,<br><br>　　　　　Defendant. | Case No. 2:23-cr-00055-CDS-DJA<br><br>**Report and Recommendation** |

Before the Court is Defendant Eduardo Lopez's Motion to Suppress Interview Statements. (ECF No. 168). The Government filed an Opposition (ECF No. 179) to which Lopez filed a Reply (ECF No. 185). The Court finds that the Government has established by a preponderance of the evidence that Lopez's statements were voluntary despite Lopez undergoing a medical procedure the previous afternoon during which procedure he was medicated and provided with prescription medicine. So, the Court recommends that the Motion to Suppress Statements be denied.

## BACKGROUND

On March 15, 2023, a Federal Grand Jury returned a Superseding Indictment charging Lopez with one antitrust count for violating the Sherman Act under 15 U.S.C. Section 1 and five counts of wire fraud in violation of Title 18 U.S.C. Section 1343. About three and a half years before that indictment, Federal Bureau of Investigation ("FBI") agents appeared at Lopez's residence to serve a subpoena and search warrant and conduct a "knock and talk." Lopez spoke to the agents for about two and a half hours, providing statements that are now part of the Government's evidence in this case.

Lopez requests that the Court suppress these statements, arguing that they were not voluntary, knowing, or intelligent because he was under the influence of prescription medication during the interview. Lopez argues that agents never asked him if he had taken any medications

1  or had any medical procedures during the preceding twenty-four hours which would interfere
2  with his ability to communicate. He adds that agents never read him his *Miranda* rights. But,
3  unbeknownst to the agents, Lopez had taken a prescribed dose of a Versed—a central nervous
4  system depressant—and Alprazolam—a prescribed psychotropic medication—for a medical
5  procedure he underwent less than twenty-four hours prior to the interview. As a result of the
6  medication, Lopez asserts that he experienced confusion, memory loss, trouble thinking, and
7  decreased awareness during the interview, all potential symptoms and side effects of these
8  medications. Lopez concludes that the medication made him unable to recount facts accurately
9  and reliably and unable to fully understand the nature and import of the questions agents asked
10 and his answers to them. So, he argues that his statements were involuntary such that they should
11 be suppressed.

12     The Government opposes the motion, arguing that Lopez's interview was non-custodial
13 therefore *Miranda* warnings were not necessary. The Government further argues that Lopez
14 provided no evidence that he was still suffering from the side effects of any medication during the
15 interview. And even if he was, the Government argues that his statements were still voluntary.
16 The Government concludes that the details of the interview prove that Lopez voluntarily
17 participated in it and therefore, the Court should deny his motion to suppress. In reply, Lopez
18 points out many factual discrepancies and requests an evidentiary hearing to address them.

19     The Court conducted an evidentiary hearing on August 6, 2024. The Government called
20 three witnesses: FBI Special Agents Tanaz Korami and Amand Singh who were present and
21 conducted the interview; and Jazmine Lee, an FBI digital forensic examiner who ran the
22 extraction software on Lopez's phone. Lopez called two witnesses: Andrew Edrosa, Lopez's
23 partner of ten years who lives with Lopez and was present for the interview; and Dr. Robert
24 Odell, a pain management doctor who reviewed Lopez's medical records and history, and who
25 provided information about Lopez's medication and its effect. The Court admitted eleven
26 exhibits for the Government, including text messages and calendar entries for events around the
27 time of the interview extracted from Lopez's cell phone, and the consent-to-search form that
28 Lopez executed for the search of his phone. The Court also admitted three defense exhibits: the

FBI report of the interview, a copy of Agent Korami's raw interview notes, and Dr. Odell's report.

## THE EVIDENCE

### I.      Special Agent Korami.

Special Agent Korami testified that she is a seventeen-year veteran of the FBI who has conducted between 150-200 interviews. (ECF No. 250 at 21). She stated that she is aware that certain of the signs that someone is under the influence include slurred speech, confusion, and loss of balance. (*Id.* at 22-23). She assisted Special Agent Singh in conducting the October 30, 2019 "knock and talk" with Lopez, which she described as a non-custodial, voluntary interview. (*Id.* at 25). She explained that she and Singh were also there to serve Lopez a search warrant to search his cell phone and to provide Lopez with a subpoena for documents related to Lopez's business, Community Home Healthcare (CHH). (*Id.* at 35). Korami's assignment was to take notes while Singh interviewed Lopez. (*Id.* at 28).

Korami testified that they arrived at Lopez's residence around 6:30 a.m. and waited until around 7:00 a.m. to knock on the front door. (*Id.* at 24). Lopez opened the door and appeared dressed for the day. (*Id.* at 25). Korami and Singh introduced themselves to Lopez and told him that they were investigating the home health care industry, that they believed Lopez might have information to assist that investigation, and asked Lopez if he would be willing to speak with them. (*Id.* at 24). Korami testified that Lopez had said he was on his way to work, but that he would be willing to speak with them. (*Id.* at 25). Lopez invited them in, offered them something to drink, and sat down with them at the dining room table. (*Id*). Korami testified that Lopez was not in custody, not under arrest, was free to decide not to talk with them, and could have asked them to leave at any time. (*Id.* at 26).

Korami testified that Singh asked Lopez questions about the home health care industry, nurse wages, other leaders in the industry, and Lopez's relationship with these other leaders. (*Id.* at 28). Per Korami, Lopez's answers were clear and concise, his speech was not slurred, and he was fairly specific with his answers. (*Id.* at 29). Lopez provided name and contact information for his competitors from his cell phone upon request and answered questions regarding

reimbursements and financial margins, amongst other things. (*Id.* at 30-31). According to Korami, Lopez was pleasant during the interview, not agitated, and never said he was having trouble understanding the conversation. (*Id.* at 32). Korami and Singh provided documents to Lopez during the interview, which documents Lopez read and about which documents he answered questions. (*Id.* at 33). Korami testified that Lopez appeared to have good recall about events and emails that went back a few years. (*Id.*). Neither Lopez nor Edrosa, who was present for most of the interview, ever mentioned Lopez's medical procedure from the previous day, that Lopez had taken medication, or that it might be affecting him. (*Id.* at 34). Korami testified that she never asked Lopez if he was under the influence because she had no reason to believe he was, given his clarity, conciseness, cordiality and the fact that the interview was "as normal as one can get." (*Id*. at 34, 68).

Korami testified that about ninety minutes into the interview Singh provided Lopez with the search warrant for the cell phone and the subpoena for certain CHH records. (*Id.* at 38). Lopez took them, looked through them, and asked no questions regarding the documents. (*Id.* at 35-36). Korami and Singh explained to Lopez that, instead of taking the phone to conduct the search warrant, Lopez could consent to their search of the phone, which would allow them to search the phone at Lopez's residence. (*Id.* at 37). Lopez indicated his understanding and consented to the search. (*Id.* at 37-38). Singh also handed Lopez the subpoena, explained it and the list of documents it sought, and provided Lopez with the contact information for the Department of Justice (DOJ) attorney assigned to the case. (*Id.* at 38). Lopez said he would have his attorney contact the DOJ attorney. (*Id*.). Singh asked Lopez if he had any questions and Lopez replied no. (*Id.* at 39). Per Korami, Lopez did not appear at all confused by this discussion. (*Id*.).

Korami testified that she contacted the Computer Analysis Response Team (CART) at the end of the interview and forensic examiner Lee arrived around 9:15 a.m. to image the phone. (*Id.* at 40). Korami testified that the extraction took about three hours, that Lee never came into the residence, and Korami took the phone out to Lee's car where the extraction took place. (*Id.* at 40-41). During this time the agents and Lopez chatted about various things, including restaurant

recommendations. (*Id.*). Lopez also talked on the phone and texted during this time, performing work tasks, according to Lopez. (*Id.*). Korami testified regarding some of these messages and a number were admitted into evidence. (*Id.* at 43-57). It appeared from the texts that Lopez had at least two meetings that morning, one involving Lopez giving a presentation to about sixty people. (*Id.*). The texts reflected that Lopez was notifying others that the FBI was at his house and that he would be unable to attend his scheduled meetings. (*Id.*).

## II.     Special Agent Singh.

Special Agent Singh testified he has been with the FBI for fifteen years, led between thirty and forty investigations during that time, and has conducted over 300 interviews. (ECF No. 250 at 102-103). Singh has interviewed people who have been under the influence, and testified that, once he determines an individual is under the influence, he terminates the interview. (*Id.* at 103). He testified that some signs of intoxication are fidgeting, darting eyes, glassy eyes, slurred speech, becoming easily distracted, and an inability to concentrate or recall details. (*Id.* at 104). Singh testified that, on the date of the interview, Lopez was amenable to speaking, quite friendly, and hospitable. (*Id.* at 107). Singh asked Lopez about his business, CHH, his role, his competitors in the industry, nurse pay rates, and his discussions with competitors regarding those rates. (*Id.*). According to Singh, Lopez appeared to understand the questions. (*Id.*).

Singh described the interview proceeding in the same manner as Korami described it. (*Id.* at 108-110). According to Singh, Lopez was articulate in his responses and provided very specific answers regarding nurses' skill level, how they are compensated, and described his discussions with competitors regarding these issues. (*Id.* at 109). Singh did not witness Lopez slurring his speech or other signs of intoxication. (*Id.*). Singh testified that Lopez never fell asleep, never said he was under the influence of medication, and never said he did not understand what was happening. (*Id.* at 110). Singh also testified that Edrosa never said that Lopez was under the influence of medication and never said he felt like Lopez was not understanding the agents' questions. (*Id.*).

Singh also testified that, after Lopez gave his consent for the agents to search the phone and signed the consent form, Lopez gave Singh his phone, who gave it to forensic examiner Lee. (*Id*

at 110-11). Singh testified that the examination took about three hours and that Lee completed it in her vehicle, so she never entered the residence. (*Id.* at 112). While Lee was extracting the data in the car, the agents inside the house chatted with Lopez regarding Las Vegas' climate and restaurants; vehicles; and Lopez's Maserati, its mileage, and its lease terms. (*Id*. at 110-11). Singh testified that Lopez showed no signs of being under the influence, he was not incoherent, never said he could not understand, and Edrosa never mentioned that Lopez looked like he was under the influence. (*Id.* at 113).

### III.    Jasmine Lee.

Jazmine Lee testified that she is a Digital Forensic Examiner for the F.B.I and, in that role, helps seize, collect, and process digital evidence for the FBI (ECF No. 250 at 138-39). She testified that on October 30, 2019, she was called to Lopez's residence to image Lopez's phone. (*Id*). The agents provided her with the mobile device, she plugged the phone into her computer, ran the extraction processing software, and provided the device back to the agents. (*Id*.). Lee testified that this all took place in her vehicle, and while she was not sure how long it took, it "took a while." (*Id.* at 139-140). She testified that she understood her search of Lopez's phone to have been done with Lopez's consent, but acknowledged that she never interacted with or spoke to Lopez. (*Id.* at 140-41).

### IV.    Andrew Edrosa.

Andrew Edrosa testified that he has known Lopez for ten years as his partner and that he has lived with Lopez for ten years. (ECF No. 250 at 148-49). He testified he has seen Lopez in every situation and knows his demeanor, personality, speech, and thought patterns. (*Id.* at 149). He testified that Lopez was injured in a rollover car accident as a teenager and, since then, has required pain management for his back and neck. (*Id.* at 150). Edrosa explained that every few months for the last four or five years, Lopez would have the pain management procedure, and has probably had twenty treatments in the last four years. (*Id.* at 150, 170). Edrosa testified that Lopez always has someone else (usually Edrosa) drive him to and from these procedures because Lopez is drowsy and unable to drive afterward. (*Id.* at 151).

      Edrosa testified that Versed causes Lopez to have drowsiness, slow speech, and an inability to focus, amongst other side effects. (*Id.*). Edrosa testified that Lopez usually takes Alprazolam the night of the procedures, and like Versed, it causes dizziness, slurred speech, and anxiety. (*Id.* at 152). Edrosa testified that Lopez's doctors routinely advise him not to drive, operate machinery, or sign legal documents for twenty-four to forty-eight hours after a procedure as a precaution for the medication's effects. (*Id.* at 152-153). Edrosa testified about the procedure Lopez had on October 29, 2019, but explained that he did not accompany Lopez to it. (*Id.* at 154). Edrosa explained that he saw Lopez after the procedure in the late afternoon and that Lopez was slow, dizzy, and sleepy. (*Id*).

      When agents rang Edrosa and Lopez's doorbell on the morning of October 30, 2019, Edrosa testified that he told Lopez—who appeared quiet and under the influence of his medication—to answer the door. (*Id.* at 156). Edrosa testified that the agents' appearance triggered a past experience where he was falsely arrested by the FBI and wrongly held in jail for two days, making him surprised and nervous to see agents at his door. (*Id*). Edrosa did not elaborate on this or further describe how this affected his actions that morning. According to Edrosa, while Lopez spoke with the two agents, Edrosa sat in a chair adjacent to the table approximately ten to fifteen feet away. (*Id.* at 157-58). Edrosa testified that he was not there for the entire interview because he was checking on his and Lopez's dogs and checking his own phone. (*Id.* at 174). He testified that he heard some of the questions and answers during the interview but did not remember specifics. (*Id.* at 175-176).

      Edrosa testified that two or three hours later a female (whom he did not further describe) arrived from the FBI to copy Lopez's phone. (*Id.* at 159). He testified she came into the house, sat at the dining room table with a laptop, and did something with her laptop to get data from the phone. (*Id.* at 161). He testified that she was there for a couple of hours during which time Lopez was in a daze, looking around, back and forth, and swinging his head, which was not like him. (*Id.*). Edrosa testified that "something was off" with Lopez, and he looked like "medicated Eddie." (*Id.*). Edrosa testified that he never said anything about this to the agents because the

1  experience was triggering to him, and that he was "trapped in [his] head that could happen to
2  [him]," so he "wasn't thinking of that." (*Id.* at 162). Edrosa did not further elaborate on this.
3      On cross examination, Edrosa admitted that he cares deeply about Lopez and wants to make
4  sure that he is not in danger. (*Id.* at 162). He also admitted he did not want to see Lopez get
5  convicted in this case. (*Id.* at 166). He stated he was familiar with CHH, had a financial interest
6  in it, and benefitted from the sale of the business. (*Id.* at 162, 165). Edrosa testified that Lopez
7  was not slurring his words and never fell down, never said he forgot information or did not know
8  what the agents meant, and that there was no sign that Lopez did not understand the questions.
9  (*Id*. at 182-83).

### V.     Dr. Robert Odell.

Dr. Robert Odell testified that he is a trained anesthesiologist who owns Neuropathy and Pain Centers of Las Vegas. (ECF No. 250 at 201-202). He testified that he trained as an anesthesiologist in the early 1980's, worked his way into pain management in the early 2000's, and in 2018 transitioned entirely to pain management. (*Id.*). Dr. Odell generally described the medications that Lopez was prescribed and their usual side effects on patients who take them, including mental and physical impairments. (*Id.* at 202-207). Dr. Odell described the instructions doctors typically give to patients taking the medication. (*Id.* at 204). These include that the patient not operate a motor vehicle, operate machinery, or make legal decisions within twenty-four hours of taking the medication because of the medication's effects, otherwise known as the "twenty-four hour rule." (*Id.* at 204). Dr. Odell explained that the twenty-four hour rule is a standard instruction intended to protect the patient. (*Id.*). Finally, Dr. Odell testified that if a patient takes multiple medications of similar type, the medications have an additive effect, compounding the medications' potency. (*Id.* at 207).

Dr. Odell testified that he never met nor examined Lopez and that he had only reviewed Lopez's medical records, including the records detailing the procedure Lopez underwent on October 29, 2019. (*Id.* at 207). Dr. Odell described the procedure as a nerve "block" in Lopez's neck, intended to deaden the nerve endings and relieve pain. (*Id.* at 209). Dr. Odell testified that Lopez received three doses of Versed at two cubic centimeters each for a total of six cubic

centimeters, to deaden any pain Lopez may experience from the procedure. (*Id*. at 208). The procedure started at 3:00 p.m. and Dr. Odell described it as a short procedure. (*Id*. at 209). Dr. Odell testified that the 24-hour rule would have applied in this scenario given the medication that Lopez's doctors administered during the procedure and to allow the medication to dissipate sufficiently for safe cognitive and motor function. (*Id*. at 210). Dr. Odell testified that he would advise a person taking these medications to avoid the activities prohibited by the 24-hour rule—even if they felt fine—because the patient cannot make an accurate self-assessment about their cognitive abilities. (*Id.* at 213).

On cross-examination Dr. Odell testified that different people are affected differently by medication. (*Id.* at 215). He testified that he never spoke to anyone about Lopez's interview and did not review the FBI report documenting it. (*Id.* at 214). He testified that because the interview took place within 24 hours of Lopez ingesting the medication, "it's generally accepted as true that [Lopez]… may not appear to have been suffering from impairment but he could have been." (*Id.* at 215). Dr. Odell conceded that he could not say for sure because he was not present at Lopez's interview. (*Id.*). Dr. Odell testified about the half-life of the medication taken by Lopez and described it as "short," essentially twenty minutes. (*Id.* at 217). With a half-life of twenty minutes, Dr. Odell testified that after 100 minutes, only 1/32 of the original drug amount (or 3%) would be in Lopez's system. (*Id.* at 218-19). He added that it is possible that all the Versed was gone from Lopez's body by the time of the interview. (*Id.* at 226). He also testified that the more frequently a person ingests the drug, the more their body acclimates to it. (*Id.* at 223-24). So, given his understanding of Lopez's use of the medication, Dr. Odell testified that the more Lopez uses, the less effect it would have on him. (*Id.* at 223-224). Finally, Dr. Odell testified that if Lopez was not slurring his words during the interview, falling asleep, or expressing confusion, it is less likely that he was impaired. (*Id.* at 221).

## DISCUSSION

The Fifth Amendment requires suppression of statements made during a custodial interrogation unless the defendant has been apprised of, and validly waives, his rights to silence and/or the presence of an attorney under *Miranda v. Arizona*, 384 U.S. 436 (1966). For a waiver

to be effective, it must be made knowingly and voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). A confession made in a drug or alcohol induced state, or even while when in the hospital, on medication, and in pain, may be deemed voluntary if it remains the product of a rational intellect and a free will. *See United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002) rev'd on other grounds 540 U.S. 31 (2003) (holding statements voluntary though defendant was under the influence of narcotics and alcohol where he "was able to understand the circumstances, follow instructions, and answer questions"); *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (citations omitted) (holding statements voluntary even though defendant was in the hospital suffering from "an apparent drug overdose" inasmuch as his injuries "did not render him unconscious or comatose"); *United States v. Martin*, 781 F.2d 671, 673-74 (9th Cir. 1985) (holding statements voluntary though defendant was under the influence of Demerol—a pain medication—and in pain at the time of interrogation). The government bears the burden of establishing voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). In determining voluntariness, the Court analyzes whether "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *U.S. v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) (citing *U.S. V. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).

Here, the Court finds that the Government has carried its burden of showing by a preponderance of the evidence that Lopez's statements during the October 30, 2019 interview were voluntarily. As a preliminary matter, the interview at issue was not a custodial interrogation such that *Miranda* warnings were required. Lopez was not in custody and nothing regarding the circumstances of the interview would suggest otherwise. While Lopez referenced the agents' failure to provide a *Miranda* warning in his motion, Lopez did not pursue the issue at the evidentiary hearing and did not argue that the agents' failure to advise him of *Miranda* somehow contributed to the involuntariness of his statements. The lack of a *Miranda* warning is therefore not relevant to the Court's analysis.

The Court also does not find that Lopez's medical procedure the day before the interview, together with the medication he took, made it such that his statement was involuntary. While

Edrosa testified that he believed Lopez to be experiencing the medication's effects that morning, Edrosa's testimony demonstrated that his memory may not have been reliable. Edrosa testified that he was scared the morning that the FBI appeared at his door, their appearance having triggered a stressful memory for him. His fear was so acute that he failed to mention Lopez's medicated state to agents, because he was "trapped in [his] head." Edrosa's memory of how Lee scanned Lopez's phone also differed from Korami, Singh, and Lee's memory. While Korami, Singh, and Lee each testified that Lee stayed in her car to scan the phone, Edrosa testified that she came inside. But when asked to describe Lee during his testimony, Edrosa only stated that she was female, without providing further identifying characteristics that could be expected from someone who sat with another person for a few hours. Additionally, Edrosa has an interest in protecting Lopez—his partner of ten years—and financially benefitted from Lopez's sale of CHH, which sale forms the basis for some of the charges against Lopez. Ultimately, the Court is not convinced by Edrosa's testimony that Lopez was under the influence of medications such that his statements were involuntary.

Additionally, while Dr. Odell testified that the medications Lopez took could cause him to be impaired, Dr. Odell also conceded that likely very little of the medication was still in Lopez's system, that Lopez had probably developed a tolerance to the medication, and that he could not say for sure whether Lopez was impaired because he was not present at the interview. Dr. Odell described the twenty-four-hour rule in general terms, as a standard instruction that doctors typically provide to patients receiving medication like Lopez received. But just because Lopez may have received a general warning regarding his abilities to drive, operate machinery, or sign legal documents does not mean that he was actually incapable of doing any of those things.

Lopez's own actions during the interview demonstrated that he believed himself capable of completing complex tasks despite his medicated state. The Government introduced evidence that, while agents were at Lopez's house, Lopez was conducting work on his phone and rescheduling meetings. This evidence demonstrates that Lopez had anticipated presenting at a meeting in front of about sixty people that morning, but had to cancel the presentation because the FBI arrived at his house. Lopez also told agents that he was on his way to work when they

arrived, demonstrating that he believed himself capable of working and potentially driving himself to work. Dr. Odell's testimony that some individuals may be unaware that they are experiencing the effects of their medication does not convince the Court that Lopez had scheduled meetings and prepared for work all while unaware that he was incapacitated. This is because Dr. Odell also testified that the medications' effects diminish over time and may not appear as strongly in people who have built up a tolerance to them. Lopez fits within these parameters, having taken the medications the evening before and having used the medications for many years. Additionally, Lopez's familiarity with the medications and their effects on him lead to the conclusion that Lopez should have known his limits when on the medications. Had he believed he would still be feeling their effects the next morning, it is not likely that he would have scheduled intensive work such as a presentation in front of a large group of people.

Moreover, Korami and Singh described Lopez as behaving the way one would expect of someone not under the influence. While Korami and Singh were not as familiar with Lopez as Edrosa, they are experienced FBI agents who have conducted hundreds of interviews. Both agents knew the signs of impairment and Singh testified that he had conducted interviews with impaired interviewees before, stopping the interview each time. But neither agent recognized the signs of impairment in Lopez. Instead, the interview proceeded smoothly and, during moments when interview questions ceased, Lopez was capable of performing other work and chatting cordially with the agents.

Even if the Court were to consider that Lopez was experiencing the side effects of his medications while talking with agents, those side effects did not render his statements involuntary. By everyone's accounts—including Edrosa's—Lopez was conscious, responded to questions rationally, understood the circumstances surrounding the interview, and followed instructions. Considering the totality of the circumstances, Lopez's will was not overborne. And his statements were voluntary. The Court recommends denying Lopez's motion to suppress statements.

///

///

**RECOMMENDATION**

**IT IS THEREFORE RECOMMENED** that Lopez's Motion to Suppress Statements (ECF No. 168) be **DENIED.**

**NOTICE**

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: August 26, 2024

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE