UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | Case No. 2:23-cr-00055-CDS-DJA |
| Plaintiff | Omnibus Order Overruling Defendant's Objections and Adopting the Reports and Recommendations of the Magistrate Judge, and Denying the Appeal and Affirming the Magistrate Judge's Order |
| v. | |
| Eduardo Ruben Lopez, | |
| Defendant | [ECF Nos. 165, 166, 168, 237, 245, 269, 275, 277, 288, 297] |

This is an antitrust and wire fraud criminal action brought by the Department of Justice against defendant Eduardo Ruben Lopez. As set forth in the superseding indictment, Lopez is charged with violating Title 15, United States Code, Section 1 (the Sherman Act) and five counts of wire fraud, in violation of Title 18, United States Code, Section 1343. Superseding Indictment, ECF No. 49. Pending before the court are Lopez's objections[1] to the order and to the reports and recommendations issued by United States Magistrate Judge Daniel J. Albregts addressing Lopez's motions: (1) to sever (ECF No. 165); (2) to dismiss the wire fraud counts (ECF No. 166); and (3) to suppress his statements (ECF No. 168). The court addresses each of the objections in turn. For the reasons set forth herein, the court overrules Lopez's objections and denies the appeal.

I.  **Legal standard**

A party may file specific written objections to the findings and recommendations of a United States magistrate judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(C); LR IB 3-2. Upon the filing of such objections, the Court must conduct a de novo analysis of the legal determination of those portions of the report to which objections are made. *Id.* The Court may

---

[1] The objections are docketed at ECF No. 275 (motion to dismiss), ECF No. 277 (motion to sever), and ECF No. 288 (motion to suppress). The government filed responses to Lopez's objections. ECF Nos. 296 (motion to sever); ECF No. 295 (motion to dismiss wire fraud counts); ECF No. 300 (motion to suppress statements).

accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C); LR IB 3-2(b). The district court reconsiders the magistrate judge's decision of a pretrial matter under a "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a); LR IB 3-1(a) ("A district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case under LR IB 3-1, when it has been shown the magistrate judge's order is clearly erroneous or contrary to law."). However, "a district court may not reject the factual findings of a magistrate judge on a motion to suppress without conducting a de novo evidentiary hearing." *United States v. Ridgway*, 300 F.3d 1153, 1155 (9th Cir. 2002) (citing *United States v. Bergera*, 512 F.2d 391, 392–94 (9th Cir. 1975)). That is because "[t]he reviewing court may not simply substitute its judgment for that of the deciding court." *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).

The "clearly erroneous" standard applies to a magistrate judge's factual findings, whereas the "contrary to law" standard applies to a magistrate judge's legal conclusions. *See, e.g., Grimes,*, 951 F.2d at 240. A magistrate judge's finding is "clearly erroneous" if the district judge has a "definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). "[R]eview under the 'clearly erroneous' standard is significantly deferential." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993).

Further, a magistrate judge's order on a pre-trial motion is subject to a lower standard of review (contrary to law standard) than reports and recommendations (de novo review). *Compare* LR IB 3-1(a) *with* LR IB 3-2(b). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *United States v. Desage*, 229 F. Supp. 3d 1209 (D. Nev. 2017) (quotation omitted); *see also Grimes*, 951 F.2d at 241 (finding that under the contrary to law standard, the district judge reviews the magistrate judge's legal conclusions de novo).

## II. Discussion

### A. Lopez's objections to the report and recommendation denying his motion to dismiss the wire fraud counts (ECF No. 275) are overruled.

Judge Albregts issued a report and recommendation (R&R-1) that I deny Lopez's motion to dismiss the wire fraud counts in the superseding criminal indictment, finding that as asserted, the charges properly allege that Lopez deprived Solace Healthcare Nevada, LLC of money, and that Lopez made misrepresentations that went to the nature of the bargain of the sale between Lopez and Solace. *See* R&R-1, ECF No. 237 at 3. Lopez raises several objections to R&R-1. Obj., ECF No. 275. The government opposes the objections. Opp'n, ECF No. 295.

#### *1. Lopez alleges that the R&R adopts the government's constructive amendment of the allegation in the superseding indictment in violation of Fifth Amendment.*

Lopez argues that the R&R-1 inappropriately adopted a "new" theory (fraud in the inducement) and the elements of that theory without citing any allegations supporting that theory in the superseding indictment. ECF No. 275 at 5–6. He sets forth allegations he claims are part of the government's "new" fraud elements. *See id.* at 12. Lopez argues that this language is not in the superseding indictment, fails to allege anything about whether the buyer purchased the company it wanted, and does not allege there were any misrepresentations about quality or price. *Id.* He contends this "new" theory, coupled with the lack of these allegations, suggests this theory was never presented to the grand jury. *Id.*

The government responds by addressing the standard for determining if an indictment can survive a dismissal motion. ECF No. 295 at 8 (citing *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009) (discussing the requirements of a sufficient indictment)). It argues that the superseding indictment sufficiently alleges the wire fraud counts, that it tracks the wire fraud statute language, and that it is not required to set forth its theory of the case nor list its supporting evidence to prove the crime alleged. *Id.* at 9 (citing *United States v. Musacchio*, 968 F.2d

3

782, 787 (9th Cir. 1991)). Thus, the government argues that the magistrate judge appropriately denied Lopez's motion to dismiss the wire fraud counts. *Id.* at 8.

As a threshold matter, there are two issues with this objection. First, the argument that the government constructively amended the superseding indictment was not properly before the magistrate judge. *See* R&R-1, ECF No. 237 at 1–2 ("[B]ecause Lopez raised his argument regarding constructive amendment for the first time in reply, leaving the Government without the ability to respond, the Court declines to opine on this argument and does not base its recommendation on it."). Lopez's argument is improper because he is attempting to raise an argument in the first instance before this court that was never properly presented to Judge Albregts. "[A] party generally may not raise new arguments for the first time in an objection" to a magistrate judge's order. *See Lang v. Comm'r of SSA*, 2023 U.S. Dist. LEXIS 37965, at *10–11 (D. Ariz. Mar. 7, 2023).[2]

Putting aside that this is an inappropriate objection, Lopez fails to cite any authorities in support of his objections to the alleged "new theory of the case." Local Rule IB 3-2 states that "[a]ny party wishing to object to a magistrate judge's finding and recommendations . . . must file and serve specific written objections with supporting points and authorities." Although not grounds to overrule the objection in its totality, it is difficult to see how any party could demonstrate that the magistrate judge's determinations were clearly erroneous or contrary to the law without supporting authorities. That indeed is the case here.

---

[2] Lopez's later filed a motion to determine whether the government constructively amended the indictment. ECF No. 297. Having considered that motion, I deny it as premature. "A constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime." *Lazarenko*, 564 F.3d at 1034. Thus, for a constructive amendment to attach, "jury instructions must diverge materially from the indictment and evidence must have been introduced at trial that would enable the jury to convict the defendant for conduct with which he was not charged." *United States v. Alvarez-Ulloa*, 784 F.3d 558, 570 (9th Cir. 2015) (internal quotation marks omitted). As this case as not yet gone to trial, the indictment cannot have been constructively amended.

The Ninth Circuit has long held that an indictment will survive a motion to dismiss where it contains the elements of the charged offense in sufficient detail to enable the defendant to prepare his defense; to ensure the defendant that he is being prosecuted according to facts presented to the grand jury; to enable him to plead double jeopardy; and to inform the court of the alleged facts so it can determine the sufficiency of the charge. *See United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994) (quoting *United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988)); *see also United States v. Flanagan*, 126 F. Supp. 2d 1284, 1292–93 (C.D. Cal. 2000) (same). In determining the sufficiency of an indictment, the court does not examine whether the government can prove its case. *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993) (quoting *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982), *cert. denied*, 460 U.S. 1086 (1983)). And "[a]n indictment tracking the language of the statute is usually adequate because statutes usually denounce all the elements of the crime." *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976).

Here, a side-by-side comparison of the language in the superseding indictment and the wire fraud statute is instructive:

| THE SUPERSEDING INDICTMENT | THE WIRE FRAUD STATUTE |
|---|---|
| "Eduardo Ruben Lopez, a/k/a/ 'Edward Lopez,' did knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations and promises." | "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." |
| Superseding Indict., ECF No. 49 at ¶44. | 18 U.S.C. § 1343. |

The allegations plainly track the language of the statute. The Ninth Circuit has repeatedly recognized that an "indictment that sets forth the charged offense in the words of the statute itself is generally sufficient." *United States v. Ely*, 142 F.3d 1113, 1120 (9th Cir. 1997) (quoting *Musacchio*, 968 F.2d at 787). Further, "the government [is] not required to allege its theory of the case or list supporting evidence to prove the crime alleged." *Musacchio*, 968 F.2d at 787 (citing

5

*Buckley*, 689 F.2d at 897.).[3] Accepting the facts alleged in the superseding indictment as true, and applying well-established law interpreting Rule 12(b), the magistrate judge's determination that Lopez's motion to dismiss should be denied is neither contrary to the law nor clearly erroneous, so Lopez's objection is overruled.

### 2. *Lopez's remaining objections are overruled.*

Lopez lodges several other objections, attacking the charging language of the superseding indictment or, again, seemingly challenging the theory of the government's case, arguing the indictment is inconsistent with Ninth Circuit precedent. *See* ECF No. 275 at 19–25. First, Lopez argues that the superseding indictment inappropriately charges an overbroad theory of the case. *Id.* at 19–20; 24–25. Lopez argues that like *United States v. Milheiser*,[4] the alleged misrepresentations in the superseding indictment "could not have affected the nature of the bargain because the buyer obtained the benefit of the bargain" based on the purchase agreement between Lopez's company and Solace. *Id.* at 19. The government responds that the magistrate judge correctly determined that Lopez's misrepresentations "went to the nature of the bargain of the sale of his company because it went to the quality and other essential aspects of the transaction like potential liability." ECF No. 295 at 12–18 (citing R&R-1, ECF No. 237 at 7).

The *Milheiser* court found that the government had charged an overbroad theory of fraud because it did not require the jury to find that the defendants deceived the victims of the nature of the bargain. 98 F.4th at 938. While not required to, the court sets aside the fact that this is another challenge to the sufficiency of the government's evidence, making this an improper objection, and addresses the objection. The issue in *Milheiser* is not present here based on the allegations in the superseding indictment. The superseding indictment alleges that Lopez made

---

[3] Because the government is not required to allege its theory of the case, and Lopez merely asserts that the government is advancing a "fraud in the indictment theory," this objection also fails (*see* ECF No. 275 at 17–19). The proper procedure for raising "[a] challenge to the sufficiency of the government's evidence . . . is a motion for judgment of acquittal under Rule 29." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993). Moreover, the magistrate judge's rejection of this argument was neither contrary to the law nor clearly erroneously. Accordingly, this objection is also overruled.

[4] 98 F.4th 935, 938 (9th Cir. 2024).

6

several false representations during the due-diligence process (ECF No. 49 at 10–13) and that misrepresentations "intended to, and did, deceive Company G, and caused Company G to wire transfer the cash purchase price for Company F to Lopez." *Id.* at 14 ¶ 42. Thus, unlike *Milheiser*, the allegations here do require a two-step determination: first, that Lopez made false representations, and second, that those representations went to the nature of the bargain. Stated otherwise, and as Judge Albregts determined, "Lopez's misrepresentations went to the nature of the bargain of the sale of his company because it went to the quality and other essential aspects of the transaction like potential liability." R&R-1, ECF No. 237 at 7. Judge Albregts's reasoning as to how *United States v. Tarallo*[5] and *United States v. Bruchhausen*[6] are respectively applicable and distinguishable from the facts of this case, is sound. Unlike *Bruchhausen* where the victim did receive full price for the products that were at issue, here Solace allegedly did not receive the full sale price of the business. *See* ECF No. 237 at 6. And like *Tarallo* where the defendant "used the misrepresentation to secure investments in businesses whose value and operations were fictitious", Lopez "used his misrepresentation to secure Solace's purchase of a company" (ECF No. 237 at 7) by misleading the company's potential scope of liability.

Lopez also contends that Judge Albregts failed to apply the Supreme Court's reasoning in *Ciminelli v. United States*, which abrogated the Second Circuit's longstanding "right-to-control theory" of fraud. ECF No. 275 at 7; 598 U.S. 306, 309 (2023). Under that theory, a defendant could be found guilty of wire fraud if they schemed to deprive the victim of "potentially valuable economic information" "necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 308. Ciminelli was tried and convicted under that theory: as charged, Ciminelli harmed the victim's right to control because the victim was "deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Id.* at 311. At trial, the jury was instructed that "economically valuable information" was "information that

---

[5] 380 F.3d 1174 (9th Cir. 2004).
[6] 977 F.2d 464, 468 (9th Cir. 1992).

affect[ed] the victim's assessment of the benefits or burdens of a transaction or relates to the quality of goods or services received or the economic risks of the transaction." *Id.* The jury was further instructed that the term "property" in 18 U.S.C. § 1343 "include[d] intangible interests such as the right to control the use of one's assets." *Id.* at 311. The Supreme Court overturned the conviction, holding that the "right-to-control" theory was "inconsistent with the structure and history of the federal fraud statutes," *id.* at 315, and "the wire fraud statute reaches only traditional property interests," *id.* at 316. Lopez argues that the government has criminalized a civil dispute, in direct conflict with *Ciminelli.* ECF No. 275 at 22.

Again, this argument requires the court to determine the sufficiency of the indictment and is improper for a motion to dismiss. As already set forth above, the superseding indictment sufficiently alleges the wire fraud charges. Nonetheless, this court agrees with Judge Albregts determination this case is distinguishable from *Ciminelli.* R&R-1, ECF No. 237 at 6. Here, unlike *Ciminelli*, the government is not basing the wire fraud charges on a right-to-control theory: the United States avers the object of Lopez's fraud was money (ECF No. 295 at 11), not the right to control. Lopez's objection that Judge Albregts failed to apply *Ciminelli* is overruled.

Lopez also contends that the Purchase Agreement provides for civil liabilities, so this action is improper. ECF No. 275 at 22. But the Ninth Circuit has made clear that the availability of civil remedies does not immunize fraudulent conduct from criminal prosecution. *See United States v. Ali*, 620 F. 3d 1062, 1071 (9th Cir. 2010) (The Ninth Circuit rejecting defendants' argument that a dispute stemming from a contractual breach was not grounds for wire fraud, holding the "fact that [a party] may have brought a civil contract claim against Defendants does not immunize Defendants' conduct from criminal prosecution if that conduct meets the criminal statutes as well."); *United States v. Buras*, 633 F.2d 1356, 1360 (9th Cir. 1980) (The Ninth Circuit affirmed a district court refusal to instruct a jury that the Government could have availed itself of a civil remedy in a tax case because "the availability of a civil remedy is irrelevant to the issue of criminal liability."). Lopez has not demonstrated that the magistrate judge's report and

recommendation was clearly erroneous or contrary to the law, so I overruled each of Lopez's objections. R&R-1 is adopted in full and Lopez's motion to dismiss the wire fraud counts is denied.

### B. Lopez's appeal of the order denying his motion to sever (ECF No. 277) is denied.

On August 13, 2024, Judge Albregts issued an order denying Lopez's motion to sever. Order, ECF No. 245. Therein, Judge Albregts explains that the offenses in the superseding indictment were properly joined under Rule 8(a) because they are of the same or similar character, there is overlapping evidence between them, they are based on the same act or transaction, and are they connected with or constitute parts of a common scheme or plan. *Id.* at 3–7. Judge Albregts also addressed, and rejected, each argument lodged by Lopez as to why the antitrust count should be severed from the others. *Id.* at 9–11. Lopez appeals the entire order, arguing it is contrary to law and clearly erroneous for multiple reasons. Appeal, ECF No. 277. The government opposes the appeal. Opp'n, ECF No. 296.

Judge Albregts's analysis in denying Lopez's motion to sever is sound. The Ninth Circuit has determined that a defendant appealing a denial of severance "bears the burden of proving such 'clear,' 'manifest' or 'undue' prejudice from the joint trial, that [it] violates one of his substantive rights, so that the prejudice is of 'such a magnitude that the defendant was denied a fair trial.'" *United States v. Vasquez-Velasco*, 15 F.3d 833, 845–46 (9th Cir. 1994) (citing *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1209 (9th Cir. 1991) (quoting *United States v. Conners*, 825 F.2d 1384, 1391 (9th Cir. 1987))). Lopez has not met this high burden. The presentation of evidence always presents risk of prejudice. But here, that risk is not so severe as to deny Lopez a fair trial. Accordingly, I see nothing clearly erroneous or contrary to the law in the order, so Lopez's appeal is denied. Judge Albregts's order denying severance is affirmed in full.

  **B. Lopez's objections to the report and recommendation that his motion to suppress statements be denied (ECF No. 288) are overruled.**

  Judge Albregts issued a report and recommendation that Lopez's motion to suppress his statements should be denied. R&R-2, ECF No. 269. Lopez objects to R&R-2, arguing that the magistrate judge's determination that Lopez's statement was voluntary is flawed and therefore R&R-2 must be overruled. Obj., ECF No. 288. The government opposes the objections, arguing in sum, that the record demonstrates that Lopez's statement was voluntary. Opp'n, ECF No. 300. Having conducted a de novo review of the record, I adopt the report and recommendation of the magistrate judge in full and deny Lopez's motion to suppress his statement.

   *1. Relevant background*

  On October 30, 2019, FBI Special Agents (SA) Tanaz Korami and Anand J. (AJ) Singh interviewed defendant Eduardo Lopez at his home in Las Vegas, Nevada. H'rg. tr., ECF No. 250 at 23:24–24:2; 106:1–5. They arrived at Lopez's home at around 6:30 in the morning but waited until approximately 7:00 am to knock on his door. *Id.* at 24:5–7; 106:2–3 ("[the interview] began shortly before 7:00 am"). SA Korami testified that Lopez opened the door, greeted the agents, and invited them into his home. *Id.* at 24:25–25:4. SA Singh testified that Lopez answered the door dressed for work, and that Lopez remarked he was about to leave for work. *Id.* at 106:16–18.

  SA Korami is a seventeen-year veteran of the Bureau, who has conducted an estimated "150 to 200" interviews of potential defendants or witnesses during her career. ECF No. 250 at 21:8–22:4. SA Korami's testified that she has also interviewed individuals who showed signs they were under the influence of medication or alcohol. *Id.* at 23:9–15. SA Korami indicated that some of those signs include "[s]lurred speech, confusion, [and] loss of balance." *Id.* at 23:17. SA Singh has been an FBI Special Agent for fifteen years. ECF No. 250 at 102:16–17. SA Singh testified that during his career he has conducted more than 300 interviews, to include some individuals who were under the influence of medication, alcohol, or drugs. *Id.* at 103:14–16. SA Singh testified that some of the characteristics of individuals who appear to be under the

influence or otherwise impaired include "fidgeting, darting eyes, glassy eyes" and "slurred speech, easily distracted individuals, or [individuals who have] just inability to concentrate or recall detail." *Id.* at 104:15–20.

When agents knocked on the door to Lopez's residence, Lopez opened the door and the agents identified themselves. ECF No. 250 at 24:8–13. Lopez greeted the agents, invited them inside, and offered the agents a couple of bottles of water or coffee. *Id.* at 25:11–19; 107:7–10.

The agents testified that they conducted a non-custodial, knock-and-talk, interview of Lopez, stating that he was not under arrest or in-custody at the time of the interview. *Id.* at 25:20–25; 104:23–105:8. Lopez was advised about why the agents were present, which Lopez seemed to understand. *Id.* at 26:5–9; 107:16–23. Lopez discussed his healthcare agency, nurses and nurse wages, among other subjects. *Id.* at 26:8–10; 107:22–108:22. Lopez did not slur his words during the interview (*id.* at 26:14–15; 32:10–11; 39:6–8; 109:10–11), appeared coherent (*id.* at 108:8–10), and was "clear," "concise," and "answered the questions" he was asked. *Id.* at 28:19–20; *see also id.* at 34:18–22; 64:3–11. Lopez did not complain about not feeling well and did not seem agitated. *Id.* at 32:12–17; 63:22–23. SA Korami testified that no one asked Lopez if he was under the influence of any medication because he "was not exhibiting any signs of being altered in any way." *Id.* at 34:14–22; 64:18–65:16; 109:6–11; 113:23–114:2. SA Korami further testified that Lopez was "fairly specific" in his responses to interview questions and at no time did Lopez ever state that he did not understand the question or something similar. *Id.* at 29:8–13; 31:20–32:9; 109:10–110:18. During the interview, Lopez was able to provide the names of business competitors: at some point, he pulled out his cellphone and provided the names and contact information to the agents. *Id.* at 30:1–18. Lopez was also able to answer questions about financials related to his business (*id.* at 30:19–31:19; 108:1–22) and was able to recall dates, as well as information contained in certain documents and what the documents were related to. *Id.* at 32:20–34:2.

Lopez was shown a copy of a search warrant for Lopez's cellphone that agents had obtained, and he reviewed it. *Id.* at 35:21–25. SA Korami did not recall Lopez having any questions about the warrant but did testify that Lopez did not express a lack of understanding as to what the warrant was for. *Id.* at 36:1–5. The agents also testified that Lopez consented to a search of his phone.[7] *Id.* at 36:8–9; 111:9–14. Lopez was also provided a copy of a subpoena for certain documents. *Id.* at 38:10–15; 111:1–5. SA Korami testified that Lopez was asked if he had any questions about the subpoena. *Id.* at 38:24–39:1. Lopez responded that if he did, he would have his attorney reach out to the DOJ attorney listed on the subpoena. *Id.* SA Singh had no recollection of any questions being directed to Lopez's counsel. *Id.* at 134:11–12.

The CART examiner (the person who downloaded Lopez's phone) arrived around 9:12 in the morning. *Id.* at 39:16–17. The agents and Lopez sat around "chitchatting" while the download was taking place in the examiner's vehicle outside Lopez's house. *Id.* at 39:21–41:4; 112:11–113:13. While the download was occurring, SA Korami asked Lopez if he had any recommendations for a dinner restaurant. *Id.* at 39:24–40:5. Also, during the download, Lopez indicted that he had some work items to take care of and asked the agents if he could do so. *Id.* at 41:23–42:1. The agents told him "absolutely." *Id.* at 42:1.

The government introduced several exhibits that came from Lopez's cellphone download during the hearing. SA Korami testified about certain calendar items in Lopez's phone, to include an indication that Lopez planned to have business meetings on the day the agents interviewed him, as well as the following day. *Id.* at 48:18–52:5. Lopez's cellphone extraction also showed Lopez sending emails during his interview with agents, to include questions about a potential home loan (*id.* at 52:20–53:6), as well as sending business related emails and text messages (*id.* at 54:6–57:17; 90:20–92:18).

---

[7] The agents also testified they explained the how the download ("extraction") of his phone would work and that it would take several hours. Tr. at 36:14–37:21. Lopez did not express that he did not understand what agents were explaining to him. *Id.* at 37:21. A copy of the consent to search form, signed by Lopez, was introduced during the hearing as Exhibit 11. *Id.* at 58:9–12.

Lopez introduced the agents to his partner, Andrew Edrosa. *Id.* at 27:6–15. At no time during the interview did Lopez or Edrosa advise that Lopez had taken medication that was impacting his ability to understand what was going on. *Id.* at 34:6–13; 110:11–18.

During cross-examination by Lopez's attorneys, the agents admitted that they do not have specialized medical training, and that they would have no way to know if Lopez had taken any medication before the interview. *Id.* at 66:13–69:13; 73:12–13; 114:16–115:21; 121:10–13. SA Korami testified that she did not document that Lopez was experiencing any cognitive issues because she would only document that if it was observed, which was not the case with Lopez. *Id.* at 70:23–71:6. SA Singh testified he did not ask Lopez if he was under the influence of any medication. *Id.* at 116:1–3.

FBI Information Technology Specialist Senior Digital Forensic Examiner Jazmine Lee also testified during the evidentiary hearing. Examiner Lee testified that she was called to Lopez's residence on October 30, 2019, to conduct an image of Lopez's phone. *Id.* at 139:1–13. Upon arrival, she was handed Lopez's phone and she conducted the extraction in her vehicle. *Id.* at 139:12–20. She could not recall how long it took to complete the download. *Id.* at 139:23–140:2. Examiner Lee further testified that she did not meet, nor did she have any interactions or conversations with, Lopez on October 30, 2019. *Id.* at 140:5–12; 144:19–21. During cross-examination, Examiner Lee testified that she was provided the passcode for Lopez's phone and iTunes password. *Id.* at 144:4–9.

Edrosa was also called to testify during the hearing. He testified that Lopez has been his partner for approximately ten years. *Id.* at 148:23–149:2. Edrosa testified that he knows Lopez was involved in a roll-over car accident as a teenager and as a result, Lopez is required to undergo medical procedures to manage pain in Lopez's neck and back every couple of months (*id.* at 150:4–11), and that Lopez underwent one of these procedures during the afternoon of October 29, 2019. *Id.* at 153:14–17. Edrosa testifies that he drives Lopez to the procedure because he is unable to drive home afterward, and that Lopez is instructed not to drive, operate

machinery, or sign legal documents for a period of twenty-four to forty-eight hours following the procedure. *Id.* at 150:7–153:7. Edrosa further testified that Lopez ingests a medication called "Versed" and that the side effects of that medication are drowsiness, slowed speech, an inability to focus, amongst others. *Id.* at 151:6–21. He further testified that Lopez also takes "Norco" and alprazolam. *Id.* at 152:1–2. Edrosa indicated that Lopez received "Versed" as part of the October 29, 2019, medical procedure, and that Lopez ingested alprazolam following the procedure. *Id.* at 153:23–25. Edrosa testified that Lopez experiences the same side effects every time he undergoes the procedure, which includes dizziness, sleepiness, and tiredness. *Id.* at 154:13–14. Edrosa could not recall when he observed Lopez exhibits those side effects after the October 29, 2019, procedure. *Id.* at 154:15–17.

Edrosa also testified regarding what he recalled happening when the agents appeared at their home for the interview on October 30, 2019. He testified that the agents arrived around 7:00 a.m., having observed them on the Ring doorbell. *Id.* at 155:1–18. He further testified that Lopez was quiet that morning, and that he appeared under the influence of medication. *Id.* at 156:3–8. Edrosa stated that he was "triggered" when the FBI agents appeared at their door because he was previously falsely arrested by FBI agents. *Id.* at 156:16–157:7. Edrosa explained that he failed to advise the agents about Lopez's medical procedure because he had been triggered. *Id.* at 162:1–6. Edrosa testified that Lopez answered the door and asked him to help put the dogs away, which Edrosa did. *Id.* at 157:10–13. He stated that the agents went into the dining area and interviewed Lopez. *Id.* at 158:11–12. Edrosa stated that during the interview Lopez was in a "daze," looking around and swinging his head. *Id.* at 161:14–18. Two or three hours after the agents arrived, a female also came to the home with a laptop and sat at the table with Lopez and the agents. *Id.* at 159:19–160:7. He also stated that Lopez was yawning during the interview but did not fall asleep. *Id.* at 182:20–24.

Edrosa was cross-examined. During that portion of his testimony, Edrosa stated that he has a financial interest in Lopez's business, Community Home Health, *id.* at 164:2–166:15, and that he and Lopez also own other companies together. *Id.* at 167:9–13. When questioned about whether he sent emails regarding the due diligence period for the sale of Solace, Edrosa could not recall if he sent any, and could not explain why the initials "EA" would appear on any due diligence paperwork. *Id.* at 169:17–20. Edrosa further stated that he was unaware that Lopez had a meeting where he was going to present to sixty people on October 30, 2019, and that he thought Lopez was going to stay home that day. *Id.* at 170:19–171:4. He also stated he did not know that Lopez had a planned meeting with Nevada Health Plan on the morning of October 30. *Id.* at 180:4–7.

He could not recall if Lopez took any medications the morning of October 30. *Id.* at 172:20–24. Edrosa stated that he listened to some of Lopez's interview and was googling some of the things being discussed, such as "antitrust." *Id.* at 175:3–176:4. Edrosa was cross-examined about whether he remembered certain questions being asked of Lopez: he could not recall any of those questions but did recall the word "antitrust." *Id.* at 175:23–177:11. He said that he was neither confused nor upset about agents being at his home, even though he was triggered. *Id.* at 178:9–14. He testified that Lopez never told the agents "I don't know what you mean" or "I forgot" or "I can't recall" during the interview. *Id.* at 183:3–10. Edrosa stated that the female who imaged Lopez's phone arrived around 11:00 am and the process took several hours. *Id.* at 185:4–22; 194:1–6. He further stated that the imaging took place inside their home. *Id.* at 185:15–17; 194:10–12.

The last witness to testify at the hearing was Dr. Robert Odell, who owns the Neuropathy and Pain Center of Las Vegas. *Id.* at 201:10–14. Odell, an anesthesiologist by training, has been working in interventional pain management since 2018. *Id.* at 201:15–22. Dr. Odell testified about his familiarity with the anesthetic, Versed, which he described as "a short-acting benzodiazepine," which is "a class of drugs including midazolam, Versed, and several others that

are mostly anxiolytics . . . [which] have the – they have the effect of causing the . . . patient to be relaxed." *Id.* at 202:23–203:5 (cleaned up). He also testified about potential side effects associated with Versed, which include agitation, depression, diminished mentation, somnolence, and impaired memory. *Id.* at 203:11–15. Dr. Odell stated that Versed "acts like alcohol," so it impacts motor function and cognitive abilities. *Id.* at 204:1–9. He advised that the "24-hour rule" applies to Versed, which he described as a "generic rule applied to . . . [g]enerally accepted as true that almost all drugs are [] gone from the system -- completely gone from the system in 24 hours." *Id.* at 204:10–23 (cleaned up). When asked if it can take longer than twenty-four hours for the drugs like Versed to be gone from a person's system, Odell testified "no." *Id.* at 204:24. He further testified that patients who are given Versed are "not supposed to operate a motor vehicle or any machinery, make any legal decisions, testify in court, things of that nature" for twenty-four hours. *Id.* at 205:4–8.

In terms of his experience with patients who have taken Versed, Dr. Odell testified that some forget who they are, and others have experienced "anterograde amnesia" where they forget some details of the procedure, but that these experiences do not happen very often. *Id.* at 205:22–206:6. Dr. Odell also testified about Lopez's documented use of alprazolam, which he stated was prescribed for chronic anxiety. *Id.* at 206:18–19. He further testified that taking midazolam and alprazolam doubles the effect of the drugs. *Id.* at 207:1–6.

Dr. Odell further testified that he had not met Lopez prior to the evidentiary hearing in this case, nor did he interview or conduct any medical analysis on Lopez. *Id.* at 207:7–22; 226:3–8. He explained that his testimony is based on his review of certain materials related to Lopez's October 29, 2019, procedure. *Id.* at 207:12–14. Those records revealed that Lopez's procedure started at 3:00 p.m. on October 29th, and that he was given "6 milligrams in 2 milligram boluses," as well as a second set of "diagnostic medial branch blocks at the neck." *Id.* at 208:14–209:13. Dr. Odell testified that he would not recommend any individual be interviewed by law enforcement within twenty-four hours of undergoing Lopez's procedure. *Id.* at 210:24–211:2. He

16

also stated, without additional testing, it is not always clear that someone is impaired after undergoing the same procedure as Lopez. *Id.* at 212:10–22. He stated that, in his opinion, any statement Lopez made on October 30, 2019, was made with Lopez still being impaired from his medical procedure. *Id.* at 213:13–17.

During cross-examination, Dr. Odell testified that he was aware Lopez was interviewed by the FBI the day following his medical procedure but was unaware that Lopez's partner was present for the interview. *Id.* at 214:4–17. He did not speak with Edrosa about what happened during the interview. *Id.* at 214:18–20. He testified that because Lopez was interviewed within twenty-four hours of undergoing the medical procedure he could have been suffering from impairment, and that Lopez might not have known he was impaired. *Id.* at 214:24–215:9. He testified that the FBI's representation that Lopez was able to answer questions coherently would not affect his opinion that Lopez was impaired at the time he was interviewed. *Id.* at 220:8–11. Dr. Odell further testified that the fact that Lopez was not slurring his speech nor falling asleep during his FBI interview would make it less likely that he was suffering from impairment at the time. *Id.* at 221:4–16.

### 2. Discussion

"A voluntary statement is one that is the product of a rational intellect and free will." *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992). A defendant's statement to law enforcement "may not be admitted if because of mental illness, drugs, intoxication, the statement was not the product of a rational intellect and a free will." *Id.* at 565. In determining the voluntariness of a statement, a court considers the "totality of the circumstances," including "both the characteristics of the accused and the details of the interrogation." *Id.* at 564–65; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "No one factor is determinative." *Kelley*, 953 F.2d at 564. The government bears the burden of establishing voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

A statement made in a drug or alcohol induced state, or even while when in the hospital, on medication, and in pain, may be deemed voluntary if it remains the product of a rational intellect and a free will. *See United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002), *rev'd on other grounds*, 540 U.S. 31 (2003) (holding statements were voluntary though defendant was under the influence of narcotics and alcohol when he "was able to understand the circumstances, follow instructions, and answer questions'). The Ninth Circuit has held that when the person giving consent is neither "unconscious or comatose," where the person's answers are coherent and responsive, and where the person remembers basic facts, the consent may be voluntary and knowing even if the person is under the influence of narcotics. *See United States v. George*, 987 F.2d 1428, 1431 (9th Cir. 1993); *see also United States v. Martin*, 781 F.2d 671 (9th Cir. 1986) (holding statements voluntary though defendant was under the influence of Demerol and in pain at the time of interrogation).

Having conducted a de novo review of the record, I find that the government has met its burden demonstrating the voluntariness of Lopez's statement to FBI agents on October 30, 2019, so I overrule Lopez's objections to the report and recommendation that I deny his motion to suppress. Obj., ECF No. 288. Contrary to Lopez's argument that Judge Albregts's conclusion is "fundamentally flawed,"[8] the record demonstrates that on the morning Lopez was interviewed, he answered the door dressed as if he was going to work. Lopez, who was not in custody at the time he was interviewed, was able to answer questions clearly and coherently: Lopez did not have any trouble understanding the questions he was asked, nor did he give answers that were inconsistent with other evidence or unclear. And evidence from Lopez's cellphone shows that he: (1) was able to send work related emails during his interview; (2) was able to send email asking about qualifying for a certain type of loan; and (3) to cancel previously scheduled work engagements. As to the previously scheduled work engagements, the evidence shows that Lopez was scheduled to make a presentation to approximately 60 people on the same day he was

---

[8] Obj., ECF No. 288 at 13.

interviewed. Stated otherwise, despite having to undergo a medical procedure the day before his interview, he still planned to go to work, and conduct a large presentation. The evidence shows Lopez's statement was voluntary and the product of a rational intellect and a free will. Dr. Odell's testimony does not change this conclusion. Even if Lopez was somewhat impaired because he was under the influence of Versed, alprazolam, or both—which is not conclusively established—the evidence still demonstrates that Lopez's statement was voluntary. *Clabourne v. Lewis*, 64 F.3d 1373, 1379 (9th Cir. 1995) ("The fact that Clabourne was under the influence of a medication does not alone render his confession involuntary."); *United States v. Lewis*, 833 F.2d 1380, 1384 (9th Cir. 1987) (holding statement was voluntary despite the fact that defendant had recently returned from surgery on her shoulder, was in pain, and had recently received a general anesthetic); *United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) (holding statement was voluntary even though defendant took Tylenol with codeine the morning of the day he made the statement, felt tired and groggy, and his hands shook uncontrollably). Accordingly, I adopted the R&R-2 and its findings, so Lopez's motion to suppress is denied.

### III.    Conclusion

IT IS HEREBY ORDERED that Lopez's objection to Magistrate Judge Albregts's report and recommendation that I deny his motion to dismiss the wire fraud counts **[ECF No. 275] is OVERRULED. R&R-1 [ECF No. 237] is ADOPTED in full**. Lopez's motion to dismiss the wire fraud counts **[ECF No. 166] is DENIED.**

IT IS FURTHER ORDERED that Lopez's appeal of the order denying his motion to sever **[ECF No. 277] is DENIED**. The order **[ECF No. 245] is AFFIRMED in full**, so Lopez's motion to sever **[ECF No. 165] is DENIED.**

IT IS FURTHER ORDERED that Lopez's objection the report and recommendation that his motion to suppress be denied **[ECF No. 288] is OVERRULED. R&R-2 [ECF No. 269] is ADOPTED in full**, so the motion to suppress **[ECF No. 168] is DENIED.**

IT IS FURTHER ORDERED that Lopez's motion to determine whether the government has constructively amended the indictment [ECF No. 297] is DENIED.

Dated: November 20, 2024

_____
Cristina D. Silva
United States District Judge