PETER S. CHRISTIANSEN, ESQ. (#5254)
pete@christiansenlaw.com
WHITNEY J. BARRETT, ESQ. (#13662)
wbarrett@christiansenlaw.com
CHRISTIANSEN TRIAL LAWYERS
710 S. 7th Street, Suite B
Las Vegas, Nevada 89101
Telephone:    (702) 240-7979
Facsimile:    (866) 412-6992

*Attorneys for Mark Krotoski, Esq.*



**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDUARDO "EDWARD" LOPEZ,<br><br>Defendant | CASE NO.:    2:23-CR-00055-CDS-DJA<br><br><br>**MARK KROTOSKI, ESQ.'S RESPONSE TO ORDER TO SHOW CAUSE [ECF NO. 693]** |

Attorney Mark Krotoski, Esq., by and through his undersigned counsel, Peter S. Christiansen, Esq. and Whitney J. Barrett, Esq., of Christiansen Trial Lawyers, respectfully submits his response to the Court's June 17, 2025 Order to Show Cause ("Order"). ECF No. 693.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Upon retention by Mr. Krotoski, the undersigned conducted an extensive review into the facts giving rise to the Court's Order to Show Cause ("Order") (ECF No. 693).[1]  This review included interviews with persons involved in Mr. Lopez's trial, as well as a review of the relevant portions of the trial transcript, email communications, telephone records, text communications, exhibits, and court docket entries. As discussed in greater detail herein, Mr. Krotoski personally apologizes to the Court for any oversight and lack of clarity that he may have contributed to the

---

[1] The undersigned greatly appreciates the Court graciously allowing additional time to provide this Response.

events discussed below. Exhibit A, Krotoski Declaration. Mr. Krotoski most respectfully submits
that the Court should not impose sanctions against him for the following reasons:

- On the Mistrial Motion, the inclusion of Exhibit 151 instead of Exhibit 151-R was an oversight and not an intentional misrepresentation or attempt to mislead.  While not required, a correction has been made to clarify this issue.  ECF No. 706.

- Mr. Krotoski did meet and confer with the government in good faith. He requested written information of the meeting between the government's expert and defense expert, Ms. Stuckwisch, which was never provided. The records show that he also made multiple efforts prior to the meet and confer to connect with Ms. Stuckwisch, who did not respond to his contact efforts until after the meet and confer concluded.  He directed the production of the materials, which were provided to the government within ten minutes of receipt from the expert.

- While Mr. Krotoski used a poor choice of words in communicating with the government concerning the unavailability of the expert, who was unreachable through the day on Saturday, April 5, 2025, his statement that she was unreachable and they were addressing a work product issue was accurate. Mr. Krotoski takes full responsibility for his choice of words in the email to the government which caused unnecessary misunderstanding. Although Nevada Rules of Professional Conduct ("RPC") 3.3 applies to statements made to a tribunal, Mr. Krotoski recognizes that it is important to correct and clarify his statements on this issue. *See* note 8, *infra*; ECF No. 707.  The facts and records show that Mr. Krotoski pursued multiple steps to request the written information and connect with the expert and he produced the files, even with work product, within ten minutes of receipt.

- With respect to the exclusion of Ms. Stuckwisch raised in the Rule 33 Motion, the context, history, argument, trial transcript citations and cases cited pertain to witness exclusion on discovery grounds. Mr. Krotoski did not intend to mislead the Court with the filing, which was intended to be a challenge to the sanction by the Court. While not required a correction has been made to the motion citing to the Court's ruling setting forth the basis for the exclusion of the expert witness, Ms. Stuckwisch.  ECF No. 708.

- On other issues, any representation that sentencing counsel has been hindered in obtaining discovery from Mr. Krotoski is contrary to the facts and records.  Mr. Krotoski informed sentencing counsel that the government's discovery has been hosted by a third-party since the beginning of the case and advised how they could obtain access.  Mr. Krotoski provided requested materials and additional materials that were not requested to assist in mitigating Mr. Lopez's sentence.

As a dedicated attorney and officer of the court, Mr. Krotoski has profound respect for the
judiciary and the rule of law. Krotoski Declaration, ¶¶ 6. He holds himself to the highest ethical

1    standards in every aspect of his practice and honors the oath he took as an attorney—not merely

2    as a formality, but as a solemn commitment to fairness, truth, and the proper administration of

3    justice. *Id*. In more than 36 years of practice, Mr. Krotoski has never been sanctioned, held in

4    contempt, or had an Order to Show Cause issued in any case. *Id*. at ¶ 8. This response is offered

5    with humility, accountability, and unwavering respect for the Court. *Id*. at ¶ 9.

6         Under the progeny of Ninth Circuit precedent, which is consistent with RPC 3.3, Mr.

7    Krotoski respectfully submits that there is no basis to impose sanctions against him because he

8    did not act with the intent to mislead the Court or to obtain an advantage in the underlying case,

9    or with the requisite subjective bad faith or intent. Krotoski Declaration, ¶5. However, if the Court

10   is inclined to make a recommendation for sanctions under Local Rule IA 11-7, the undersigned,

11   on behalf of Mr. Krotoski, respectfully requests oral argument, followed by review by the Chief

12   Judge as required under Local Rule IA 11-7(g).

**II.**

**LEGAL STANDARD FOR SANCTIONS**

15        As the Supreme Court has noted on the authority of the court to impose sanctions,

16   "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."

17   *Chambers v. Nasco*, 501 U.S. 32, 44 (1991) (citations omitted); *Yagman v. Republic Ins.*, 987

18   F.2d 622, 628 (9th Cir. 1993) (same).[2] As the Ninth Circuit has noted, "[s]anctions not only may

19   have a severe effect on the individual attorney sanctioned, potentially damaging the attorney's

20   career, reputation and livelihood, but they also may deter future parties from pursuing colorable

21   claims.[3]" *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008).(cleaned up; citation

22   omitted).  For these reasons, "sanctions should be reserved for the rare and exceptional case where

---

[2] The Order expressly relies on the Court's inherent authority.  *See* ECF No. 693, at 1:19-22 (citing *Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001); *Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989)).

[3] Mr. Krotoski's reputation has been affected by the Court's Order, which has been discussed in various legal publications. Professional colleagues have asked about the publications.  *See*, *e.g.*, Exhibit 2, Barrett Declaration, ¶24.

3

CHRISTIANSEN
— T R I A L   L A W Y E R S —

1    the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an

2    improper purpose." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997)

3    (internal citations omitted).

4         Subjective bad faith supported in the record is required to impose sanctions.  *See, e.g.*,

5    *Roadway Express, Inc. v. Piper*, 447 U. S. 752, 765 (1980); *Yagman*, 987 F.2d at 628 (reversing

6    sanctions order where "[t]here is no indication in the record" that counsel "acted in bad faith or

7    intended to mislead the court"); *Zambrano*, 885 F.2d at 1478 ("To insure that restraint is properly

8    exercised, we have routinely insisted upon a finding of bad faith before sanctions may be imposed

9    under the court's inherent power."); *Gypsum Res., LLC v. Clark Cnty.*, 2:19-CV-00850-GMN-

10   EJY, 2023 WL 7351967, at *2 (D. Nev. Sept. 29, 2023) (noting requirement of a "subjective …

11   finding of bad faith or improper purpose"); *Goldwater Bank, N.A. v. Elizarov*, No. 5:21-cv-00616,

12   2023 WL 3433430, at *5 (C.D. Cal. May 3, 2023) ("The imposition of sanction under the court's

13   inherent powers generally requires a finding of subjective bad faith or improper purpose.") (citing

14   *Fink*, 239 F.3d at 992).

15        As the Ninth Circuit has noted, inadvertence or negligence does not support sanctions.  *In*

16   *re Dyer*, 322 F. 3d 1178, 1196-97 (9th Cir. 2003) ("Mere ignorance or inadvertence is not enough

17   to support a sanction award under the inherent authority.") (citing *Fink*, 239 F.3d at 992-93

18   (summarizing precedent that inadvertence is not enough)).  Even "reckless misstatements of law

19   and fact" must be "coupled with an improper purpose, such as an attempt to influence or

20   manipulate proceedings in one case in order to gain tactical advantage in another case." *Fink*,

21   239 F.3d at 994.

22         The Order is also based on Local Rule IA 11-7(a).  *See* ECF No. 693, at 1:19-22.  This

23   Local Rule establishes a process for the recommendation of sanctions by a District Court Judge

24   which are then reviewed and determined by the Chief Judge.  *See* Local Rule IA 11-7(g).

25        The Order refers to Nevada RPC 3.3.  *See* ECF No. 193, at 2:7. RPC 3.3, applies to

26   statements made to the tribunal, and provides, in relevant part: "(a)  A lawyer shall not knowingly:

27   (1)  Make a false statement of fact or law to a tribunal or fail to correct a false statement of

28   material fact or law previously made to the tribunal by the lawyer."  Under Rule 3.3(c), the duties

1  under section (a) "continue to the conclusion of the proceeding."  The District of Columbia Rule
2  of Professional Conduct 3.3 and California Rule of Professional Conduct 3.3, have comparable
3  standards.

**III.**

**RESPONSE TO ORDER TO SHOW CAUSE**

**A.    THE OVERSIGHT IN ATTACHING UNREDACTED EXHIBIT 151 INSTEAD OF EXHIBIT 151-R TO THE MOTION FOR MISTRIAL (ECF NO. 654).**

The first ground in the Order directs Mr. Krotoski to address the fourth motion for mistrial,[4] in which the defense objected to the government's closing argument using a privilege log about a privileged communication with Mr. Lopez's counsel concerning a search warrant. *See* ECF No. 654, at 5:2-4 (Mistrial Motion). The Order focuses on the "arguments about exhibit 151-R in Lopez's fourth motion for mistrial." ECF No. 693, at 8:10-11.

The attachment of Exhibit 151, instead of Exhibit 151-R, to the Mistrial Motion was an oversight. Krotoski Declaration, ¶¶ 10-11.  Exhibit 151 was an email from Mr. Lopez to himself listing his attorney contacts, including his "antitrust counsel."  *See* ECF No. 654-4 (Exhibit D). Exhibit 151-R, which redacts counsel's names and was introduced into evidence, should have been attached instead. *See* Krotoski Declaration, ¶¶ 10-11; *compare* ECF No. 706-1 (Exhibit 151-R) *with* ECF No. 654-4 (Exhibit 151).

Exhibit 151 is cited twice in the Mistrial Motion, both times in the background section. There was no attempt by the defense team to argue that the unredacted email (a privileged communication) was shown to the jury. ECF No. 654, at 11-12. Rather, the motion focused on the government's closing argument relying on the privileged communication in which Mr. Lopez was seeking advice concerning a search warrant, as reflected in the redacted privilege log (Exhibit 204). *See* ECF No. 654, at 7:22-8:24, 10:9-14:24 (quoting ECF 650, at 93:7-94:1); ECF No. 665, at 1:4-10 (same). A later reference in the Mistrial Motion to the same email does not refer to the exhibit number or indicate that the unredacted version was shown to the jury. *Id*. at 11-12.  The

---

[4] The Order references a Fourth Motion for Mistrial at ECF No. 654, but a review of the document indicates ECF No. 654 is titled Third Motion for Mistrial.

1    Mistrial Motion also expressly refers to the redaction order, ECF No. 654, at 7:11-21, as further

2    confirmation that there was no intent to mislead or subjective bad faith.

3         The government also recognized the oversight and confirmed for the record that the

4    redacted version, Exhibit 151-R, was shown to the jury.[5]  *See* ECF No. 664, at 2 n.4. The

5    government understood the context and the defense argument, and it did not impute an intent to

6    mislead by defense counsel concerning the exhibit. The reply brief on the Mistrial Motion, also

7    makes no reference to Exhibit 151.  *See* ECF No. 665.

8         The inadvertent attachment of Exhibit 151 was not "material" under Rule 3.3(a)(1), given

9    the limited discussion of it, reference to the Court's redaction order, and the government's

10   correction. The Ninth Circuit has held that sanctions are not warranted based on an oversight,

11   simple negligence, or inadvertence.  *See*, *e.g.*, *Zambrano v. City of Tustin,* 885 F.2d 1473, 1484

12   (9th Cir. 1989) (vacating sanctions where "there is no indication in the record that counsel were

13   guilty of anything more than simple negligence"); *see also In re Dyer*, 322 F. 3d at 1196-97

14   ("Mere ignorance or inadvertence is not enough to support a sanction award under the inherent

15   authority."); *Fink v. Gomez*, 239 F.3d 989, 992-93 (9th Cir. 2001) (citing *Zambrano*, 885 F.2d at

16   1485, vacating sanctions where for counsel's negligent failure to comply with local court rule

17   requirement for admission to the district court bar).

18        Here, the inclusion of Exhibit 151 instead of Exhibit 151-R was nothing "more than an

19   oversight or ordinary negligence." *Zambrano*, 885 F.2d at 1483. There was no effort "to mislead

20   the court," subjective bad faith, or "improper purpose." *Yagman v. Republic Ins.*, 987 F.2d 622,

21   628 (9th Cir.1993) (reversing sanctions order where "[t]here is no indication in the record" that

22   counsel "acted in bad faith or intended to mislead the court"); *see also Fink*, 239 F.3d at 994

23   (noting need for "an improper purpose, such as an attempt to influence or manipulate proceedings

24   in one case in order to gain tactical advantage in another case"); *Gypsum Res.,*,  2023 WL

25   7351967, at *2 (noting requirement of a "subjective … finding of bad faith or improper purpose");

26

27   ───────────────

28   [5]  Mr. Krotoski has corrected the inadvertent reference and attachment of Exhibit 151 through
     the filing of an Errata that includes Exhibit 151-R. ECF No. 706.

6

*Goldwater Bank,* 2023 WL 3433430, at *5 (same); *see also* ECF No. 703, ¶¶ 5, 11, 19, 21 (Armeni Declaration); ECF No. 704, ¶ 12 (Braverman Declaration); Krotoski Declaration, ¶¶ 10-14. Lastly, Mr. Krotoski has corrected the record through the filing of an Errata. ECF No. 706.

**B.    GOOD FAITH MEETING AND CONFERRING AFTER MULTIPLE REQUESTS TO OBTAIN WRITTEN INFORMATION AND OTHER MATERIALS FROM THE EXPERT**

The Court directs Mr. Krotoski to explain "his failure to meet and confer in good faith as ordered on April 4, 2025, regarding the later-stricken expert witness." ECF No. 693, at 8:8-11-12.

The undersigned's review demonstrates that Mr. Krotoski did meet and confer with the government in good faith, as ordered by the Court.  While no appointment to meet had been set for the weekend meeting at the conclusion of trial on Friday, April 4, 2025, Mr. Krotoski made multiple attempts to contact defense expert, Suzanne Stuckwisch ("Ms. Stuckwisch"), throughout the day on Saturday, April 5, 2025. Barrett Declaration, ¶ 5. He also requested that Ms. Stuckwisch provide written information of her meeting with the government's expert, which took place on April 4, 2025, so he could understand the issues and prepare for the then-unscheduled meeting.  Exhibit 3, Stuckwisch Declaration, ¶ 6; Krotoski Declaration ¶ 25.

By way of background, during the *Daubert* hearing on April 4, 2025, the government's questions to Ms. Stuckwisch focused on the process she used to generate charts and exhibits through a Tableau program.  ECF No. 627, at 56-58.  The Court then directed: "So I'm going to require that there be a conversation or an explanation." *Id.* at 58:22-23; *see also id.* at 59:7-9 (same). In ordering the meet and confer, the Court left coordination to the parties and did not impose a deadline, explaining that it must happen before the *Daubert* hearing with Ms. Stuckwisch would resume. *Id.* at 59:23-60:3. Later that day, the government advised the Court that Ms. Stuckwisch and the government's economist expert, Ms. Grinberg, met and conferred, but that there were "some outstanding items that we're going to try to work through over the weekend."  ECF No. 628, at 72:10-16. Mr. Krotoski was not present at the meet and confer between Ms. Stuckwisch and Ms. Grinberg. Krotoski Declaration, ¶ 20.  Mr. Krotoski confirmed

1  his optimism and intent that the issues would be resolved promptly so as to allow Ms.

2  Stuckwisch's testimony to immediately resume. ECF No. 628, at 73:7-19. On April 4, 2025, no

3  appointment was set for the meet and confer over the weekend and the government did not clarify

4  what the "outstanding items" were at this point. Krotoski Declaration, ¶¶ 22-24.  During their

5  meeting, Ms. Grinberg and Ms. Stuckwisch did not agree on a time that Ms. Stuckwisch would

6  provide further information over the weekend. Stuckwisch Declaration, ¶ 4.

7       In the limited time between the conclusion of the trial day and Ms. Stuckwisch's departure

8  for the airport, Mr. Krotoski and Ms. Stuckwisch met briefly at the courthouse where Ms.

9  Stuckwisch provided high-level points from the expert meeting and confirmed that most issues

10  were resolved. *Id*. at ¶ 5; Krotoski Declaration ¶ 23. The discussion concluded with Mr. Krotoski

11  asking Ms. Stuckwisch to provide him with written information of her meeting with Ms. Grinberg

12  to educate Mr. Krotoski of the specific issues that were discussed in advance of his meet and

13  confer with the government, which had not yet been scheduled, but was supposed to take place

14  sometime over the weekend. Stuckwisch Declaration, ¶ 6.  That evening, Ms. Stuckwisch flew

15  from Las Vegas to San Francisco, California, landing at approximately 11:00 p.m., and arriving

16  home at approximately 11:30 p.m. *Id*. at ¶ 7.

17       Based on his prior practice and experience with Ms. Stuckwisch, Mr. Krotoski expected

18  to talk with Ms. Stuckwisch as soon as she accessed her computer server and reviewed the

19  materials that she did not have in Las Vegas. Krotoski Declaration, ¶¶ 27, 32. On Friday, April 4,

20  2025, Ms. Stuckwisch did not inform Mr. Krotoski of her "weekend schedule including a

21  previously set medical appointment."[6] ECF No. 666-3 ¶ 15; Krotoski Declaration ¶ 27. Ms.

22  Stuckwisch did not identify any conflicts in her schedule over the weekend. Stuckwisch

23  Declaration, ¶¶ 7-8.  As with any expert during trial, Mr. Krotoski reasonably assumed Ms.

24  Stuckwisch would prioritize the matter and be available to respond to issues concerning the trial

25

26

27

28

---

[6] Ms. Stuckwisch did not inform Mr. Krotoski of her previously scheduled medical appointment until the morning of April 7, 2025, just before the trial resumed.  Stuckwisch Declaration, ¶ 18.

CHRISTIANSEN
TRIAL LAWYERS

1  especially after she had testified in court and was directed to meet with the government expert to

2  identify and resolve any outstanding issues.  Krotoski Declaration, ¶¶ 27, 29.

3         As more fully outlined below, Mr. Krotoski made several unsuccessful attempts to reach

4  Ms. Stuckwisch beginning the morning of April 5, 2025, including by email, telephone calls and

5  voice mail messages to her cell phone and her residence, and text messages in advance of his

6  meet and confer with the government. Barrett Declaration, ¶ 5; *see also* ECF No. 666-3 ¶ 15;

7  Exhibit D; Stuckwisch Declaration ¶ 9; Krotoski Declaration, ¶ 31. When Mr. Krotoski met and

8  conferred with the government at 3:45 p.m., the parties discussed a number of issues, including

9  the summaries and witnesses to be called.  Krotoski Declaration ¶ 35; ECF No. 704, ¶ 7 n.1

10  (Braverman Declaration).  The defense had updated the summaries based on comments from the

11  Court and to address objections from the government. Krotoski Declaration, ¶ 35.  Mr. Krotoski

12  also confirmed that he would contact Ms. Stuckwisch and would provide an update after he

13  reached her. *Id*. Ms. Stuckwisch did not respond to Mr. Krotoski's various messages until a text

14  message at 3:56 p.m., followed by a brief initial call at 4:05 p.m., after the meet and confer had

15  concluded, at which time she indicated she had been out all day. ECF No. 666-3, at ¶ 15;

16  Stuckwisch Declaration ¶ 10-11; Krotoski Declaration, at ¶ 36.

17         It was not until 6:43 p.m. on April 5, 2025, that Ms. Stuckwisch discussed the merits of

18  the issue with Mr. Krotoski for the first time.  Stuckwisch Declaration ¶ 13; Krotoski Declaration

19  ¶ 39. During a follow-up telephone call at 7:32 p.m. with Mr. Krotoski and Mr. Braverman, Ms.

20  Stuckwisch advised that she was still looking through her server for the relevant data and advised

21  that some of the material contained work product. Krotoski Declaration, ¶ 41; Stuckwisch

22  Declaration ¶ 14; ECF No. 704, ¶ 7 (Braverman Declaration). Mr. Krotoski and Mr. Braverman

23  directed her to provide the information immediately so it could be produced to the government,

24  despite the inclusion of work product.  Krotoski Declaration, ¶ 41; Stuckwisch Declaration ¶ 14;

25  ECF No. 704, ¶ 7 (Braverman Declaration). The material was received from Ms. Stuckwisch in

26  two emails at 10:51 p.m. and 10:52 p.m., which Mr. Krotoski immediately downloaded and

27  provided to the government by secure file transfer at 11:01 p.m. Exhibit E; Exhibit F; Exhibit G.

28

The foregoing does not support a subjective finding of bad faith where it is undisputed from the records that that Mr. Krotoski requested written information about Ms. Stuckwisch's meeting with the government, which was never provided, and earnestly endeavored to contact Ms. Stuckwisch prior to speaking with the government on the afternoon of Saturday, April 5, 2025. He also he had a productive discussion with the government notwithstanding her unavailability, and thereafter promptly forwarded the materials from Ms. Stuckwisch within ten minutes of receipt. *Id*.; *see also* Krotoski Declaration, ¶ 35; *see also Gypsum Res.,*, 2023 WL 7351967, at *2 ("[T]he imposition of sanctions requires a subjective, rather than objective, finding of bad faith or improper purpose."); *Goldwater Bank,* 2023 WL 3433430, at *5 (same); *see also In re Dyer,* 322 F.3d at 1197 ("With regard to the inherent sanction authority, bad faith or willful misconduct consists of something more egregious than mere negligence or recklessness.").

## C.    MR. KROTOSKI'S STATEMENT TO THE GOVERNMENT REGARDING THE EXPERT'S UNAVAILABILITY, WHILE AN UNFORTUNATE POOR CHOICE OF WORDS, WAS CORROBORATED BY RECORDS CONFIRMING HIS CONTINUED EFFORTS TO REACH HER AND OBTAIN THE INFORMATION

The Order directs Mr. Krotoski to address a "lie to the government regarding that witness's alleged unavailability." ECF No. 693, at 8:8-12-13. Mr. Krotoski regrets using the words "has been traveling today" in his email to the government and recognizes he should have phrased his email differently. Krotoski Declaration, ¶¶ 50; 56. Mr. Krotoski was making every effort to obtain the information from Ms. Stuckwish on Saturday, April 5, 2025, and her unavailability throughout the day was something he did not anticipate. Krotoski Declaration, ¶ 57. Based on their working relationship and history, and their brief meeting on April 4, 2025, he wanted to hear from Ms. Stuckwisch concerning her review of the materials on the computer server and discuss the merits once she completed her analysis. *Id*. At the time of the email, he had already been working more than 12 hours that day and was also impaired by his aggravated

1  respiratory and sinus illness,[7] a relevant factor in considering his subjective intent. *See* Krotoski

2  Declaration, ¶ 51.

3     Mr. Krotoski did not knowingly make a false statement concerning Ms. Stuckwisch's

4  unavailability on Saturday, April 5, 2025, as confirmed by the context of the entire message and

5  the facts and records.[8] The fact that Ms. Stuckwisch "was unreachable" through the day was an

6  accurate representation and the statement as to the reason underlying her unavailability does not

7  support the imposition of sanctions. Nonetheless, in an abundance of caution, an Errata to address

8  and clarify this issue has been filed.  *See* ECF No. 707.

9     As background, as expected in the middle of trial, on Saturday, April 5, 2025, Mr.

10  Krotoski had a full day already scheduled to address and juggle a range of trial issues.  Mr.

11  Krotoski's trial preparation started around 6:30 a.m. that day, and in the time before his first email

12  to Ms. Stuckwisch, he met with other witnesses, conferred with counsel representing other

13  witnesses, discussed trial strategy with co-counsel, had client communications, reviewed and

14  updated summary exhibits, reviewed and updated expert demonstratives, reviewed expert

15  exhibits, communicated with another expert, reviewed transcripts of trial witnesses, prepared and

16  filed a status update (ECF No. 629), was preparing witness outlines, and was party to other

17  telephone calls—in addition to exchanging a number of emails.  During the day he sent and

---

[7] *See* ECF No. 627, at 28:8-16 (April 4, 2025) (referring to "raspy voice"); *id.*, at 69:22-25 - 70:1-13 (April 4, 2025) (same); ECF No. 628, at 4:14-25 (April 4, 2025) (Court not "100 percent" and recommending "A little dose of Vitamin C."); *id.*, at 73:4-7 (April 4, 2025) (reference to tea offered by the Court during a break); ECF No. 638, at 23:3-8 (April 7, 2025) (Court noting "Mr. Krotoski appears today still to have some voice and sinus issues.").

[8] The Order cites to RPC 3.3.  *See* ECF No. 193, at 2:7, 8:9, 9:6.
     RPC 3.3 pertains to candor toward the tribunal, providing that "[a] lawyer shall not knowingly … [m]ake a false statement of fact or law **to a tribunal** or fail to correct a false statement of material fact or law previously made **to the tribunal by the lawyer**."  (Emphasis added.)
     RPC 3.3 does not apply to the statement which was made to the government, and not the Court, as part of an update that work product issues were being addressed and an update would follow.  *See* ECF No. 630-2, at 2. Nonetheless, as noted, an Errata has been filed to clarify this important issue.  *See* ECF No. 707.

11



1    received more than 140 emails, had more than 35 case telephone calls, in addition to Teams

2    meetings, and waited to learn more from Ms. Stuckwisch following her computer server review.

3    *See* Barrett Declaration, ¶ 19 (summarizing review of records and trial activities); Krotoski

4    Declaration, ¶ 33.  His aggravated respiratory and sinus illness impacted his energy level. *See*

5    note 6, *supra*; Krotoski Declaration ¶ 51.

6         Phone records, emails and text messages on April 5, 2025, confirm numerous attempts by

7    Mr. Krotoski to reach Ms. Stuckwisch to discuss the information requested by the government.

8    She was unreachable to discuss the merits until the evening. The records show:

9         1.   11:46 a.m.: email to Ms. Stuckwisch asking to set a time to speak, unanswered

10        2.   12:40 p.m.: email to Ms. Stuckwisch asking for a summary of the meeting with
              Ms. Grinberg, unanswered

11

12        3.   2:30 p.m.: call and voice message left on Ms. Stuckwisch's mobile phone

13        4.   2:58 p.m.: call to Ms. Stuckwisch's mobile phone, unanswered

14        5.   3:00 p.m.: email to Ms. Stuckwisch asking for a return call, unanswered

15        6.   3:11 p.m.: call and voice message left on Ms. Stuckwisch's mobile, unanswered

      7.   3:14 p.m.: call to Ms. Stuckwisch's home, unanswered
16
          8.   3:15 p.m.: text message to Ms. Stuckwisch asking her to call before the meet and
17             confer with the government, unanswered

18        9.   3:45 p.m.: Meet and confer with the DOJ with Sam Braverman

19        10.  3:55 p.m.: text message to Ms. Stuckwisch asking for the data

          11.  3:56 p.m.: text response from Ms. Stuckwisch, "I just got these messages.  Am
20             trying to find a quiet place to call you back."

21        12.  4:05 p.m.: first contact of the day with Ms. Stuckwisch during an approximately
              six-minute telephone call, explaining she has been out during the day and could
22             not access her computer server

23        13.  5:08 p.m.: email from DOJ asking for excel versions of updated summary exhibits,
              as discussed during meet and confer

24        14.  5:46 p.m.: call to Ms. Stuckwisch's mobile, unanswered

25        15.  5:47 p.m.: call to Ms. Stuckwisch's home, unanswered

26        16.  5:47 p.m.: text message to Ms. Stuckwisch asking her to call, unanswered

27        17.  6:43 p.m.: call to Ms. Stuckwisch, she is just starting to review the materials on
              her computer server

28        18.  6:58 p.m.: DOJ email asking for Ms. Stuckwisch's data

                                        12

19. 7:01 p.m.: forward DOJ email to Ms. Stuckwisch concerning data

20. 7:32 p.m.: call with Ms. Stuckwisch and Sam Braverman, expressing importance of providing and sending the data promptly

21. 7:53 p.m.: email to DOJ noting Ms. Stuckwisch had been traveling and was unreachable (ECF No. 630-2)

22. 8:14 p.m.: email from DOJ outlining specific materials requested from Ms. Stuckwisch discussed during the expert meeting

23. 8:30 p.m.: forward DOJ email to Ms. Stuckwisch outlining specific materials discussed during the expert meeting

24. 9:30 p.m.: meeting with Ms. Stuckwisch asking again for the data to send to DOJ

25. 10:36 p.m.: text message to Ms. Stuckwisch asking her, "can you send the files now? We need to get them out."

26. 10:51 p.m.: email from Ms. Stuckwisch attaching files

27. 10:52 p.m.: email from Ms. Stuckwisch attaching remaining files

28. 11:01 p.m.: file transfer to DOJ with Ms. Stuckwisch's materials

*See* Barrett Declaration, ¶¶ 5-17; Krotoski Declaration, ¶ 31.

Mr. Krotoski recognizes the appearance of his poor word choice in sending his email to the government at 7:53 p.m. stating, "Ms. Stuckwisch has been traveling today and was unreachable. We need to sort an important work product issue…. I will provide an update once we resolve the work product issues." ECF No. 630-2. Although he had briefly spoken with Ms. Stuckwisch in the 20 minutes beforehand, she had previously been out during the day, and she was still looking for the files sought by the government. Stuckwisch Declaration, ¶¶ 10; 16.

Mr. Krotoski intended to communicate to the government that Ms. Stuckwisch had been unavailable and was unreachable most of the day. He acknowledges he should have used the term "unavailable most of the day" instead of "traveling," and that he should have clarified that he had just spoken to her and learned that she was still reviewing the data files.[9] Apart from the poor

---

[9] An Errata has been filed to correct the reference as follows: "Ms. Stuckwisch has been unavailable for most of the day and was unreachable. After speaking briefly with Ms. Stuckwisch for the first time around 4:05 p.m., she needed to return home to review the materials on her computer server, a work product issue was identified, and she was told to provide the materials as soon as possible." *See* ECF No. 707.

word choice, the facts confirm his multiple efforts to obtain information from Ms. Stuckwisch and that she was unreachable and unavailable through a majority of the day.

In the end, Ms. Stuckwisch sent the files at 10:51 and 10:52 p.m., which Mr. Krotoski promptly downloaded and sent to the DOJ by secure file transfer at 11:01 p.m. *See* Exhibit E; Exhibit F; Exhibit G. The Court's concern with Mr. Krotoski's representations to the government that Ms. Stuckwisch had been traveling appears rooted in a mistaken belief that Mr. Krotoski was somehow intentionally delaying turning the data over to the government. The email, telephone and text communications demonstrate just the opposite.  He pursued all avenues to contact Ms. Stuckwisch to obtain the information and did not expect that he could not reach her. Stuckwisch Declaration,  ¶ 9; Krotoski Declaration, ¶ 31.

While a poor word choice, Mr. Krotoski did not knowingly make a false statement of fact. Ms. Stuckwisch testified that she "was traveling into the city" and "didn't realize that…[she] would not have cell service the entire time" (ECF No. 638, at 21:15-19). That said, Mr. Krotoski appreciates that the recipient of his email would not necessarily construe the word traveling with its literal meaning of "going from one place to another,"[10] particularly under the circumstances. Other than the poor word choice, his email to the government accurately reported that Ms. Stuckwisch "was unreachable," the defense was addressing "an important work product issue," and he would "provide an update once we resolve the work product issues."  ECF No. 630-2.  Ms. Stuckwisch confirms she was unreachable and non-responsive to his requests. Stuckwisch Declaration, ¶ 9; Exhibit D. The fact she was "unreachable" is independently corroborated by his multiple email, telephone and text messages. Barrett Declaration, ¶ 5. Further, Mr. Krotoski produced the data notwithstanding its inclusion of work product within minutes after Ms. Stuckwisch sent the files so as to prevent further delay.[11]

---

[10] https://www.dictionary.com/browse/travel.

[11] The information forwarded to the DOJ on the morning of Sunday, April 6, 2025 was a code used to scrape the pdf's of the Maxim wage data. The defense elected not to rely on the Maxim statements at trial. ECF No. 638, at 9:7-20.

1    Sanctions are not warranted based on the improper terms, particularly since it is

2  undisputed that Mr. Krotoski pursued all avenues to reach Ms. Stuckwisch, while contending with

3  a serious respiratory and sinus illness which was aggravated over the weekend, and he had already

4  worked about 12 hours by the time of the email during a long trial preparation day.  The record

5  and facts do not demonstrate an effort "to mislead the court" by Mr. Krotoski and do not support

6  a finding of subjective bad faith.  *See, e.g.*, *Yagman*, 987 F.2d at 628 (reversing sanctions order

7  where "[t]here is no indication in the record" that counsel "acted in bad faith or intended to

8  mislead the court"); *see also Fink*, 239 F.3d at 994 (noting need for "an improper purpose, such

9  as an attempt to influence or manipulate proceedings in one case in order to gain tactical

10  advantage in another case"); *Gypsum Res.,*, 2023 WL 7351967, at *2 (noting requirement of a

11  "subjective … finding of bad faith or improper purpose"); *Goldwater Bank,* 2023 WL 3433430,

12  at *5 (same).  Under these circumstances, the conduct is not sanctionable.  Finally, any negligence

13  in the words used late at night after a long day does not warrant sanctions.  *See, e.g.*, *Zambrano,*

14  885 F.2d at 1484 (negligence does not support sanctions); *see also In re Dyer*, 322 F. 3d at 1196-

15  97 (inadvertence does not support sanctions).

16  **D.    CANDOR TO THE COURT IN DEFENDANT'S RULE 33 MOTION**

17    The Order contends there was a "lack of candor in the Rule 33 motion regarding the reason

18  proposed expert witness Suzanne Stuckwisch was stricken." ECF No. 693, at 8:13-14. A review

19  of the transcript reveals that after Ms. Stuckwisch was stricken, Mr. Braverman lodged a brief

20  objection to the ruling on behalf of the defense.  ECF No. 638, at 25:6-11.

21    The Court's ruling at trial, which explained the discovery basis for excluding the expert,

22  was cited in the Rule 33 motion. *See* ECF No. 668, at 6:20-21 (citing ECF No. 638, at 22:17–

23  24:16).  The cited portion of the trial transcript includes the Court's ruling that "pursuant to

24  subsection (d)(2)(C) and (D) [of Fed. R. Crim. P. 16], Ms. Stuckwisch's testimony, she'll be

25  prohibited from providing her proposed expert testimony during the course of this trial." ECF

26  No. 638, at 24:14-16.

27    Mr. Krotoski, along with his trial co-counsel, had no intention of misleading the Court or

28  making any misrepresentations as to the basis for Ms. Stuckwisch's exclusion from trial.  Mr.

15

1    Krotoski thought that citing the transcript pointed directly to the basis for the witness exclusion.

2    *See* Krotoski Declaration, ¶¶ 61-65; ECF No. 704, ¶ 11 (Braverman Declaration); ECF No. 703,

3    ¶ 18 (Armeni Declaration). Furthermore, because there was only a brief objection

4    contemporaneous with her exclusion, Mr. Krotoski and his co-counsel concluded it was it

5    important to make a fulsome record regarding the issue in post-trial briefing on behalf of Mr.

6    Lopez. Krotoski Declaration, ¶ 63.

7        The Ninth Circuit found that sanctions are unwarranted under similar circumstances. *See*

8    *Yagman*, 987 F.2d at 628. In *Yagman*, the district court imposed sanctions due to the

9    "characterization of the certiorari petition" in a recusal motion, where there was a finding of bad

10   faith. The Ninth Circuit vacated the imposition of sanctions where, "taken as a whole," it was

11   clear that the recusal motion was based on the certiorari petition, and bad faith could not be

12   supported in the record.  *Yagman*, 987 F.2d at 628.

13       Here, similar to *Yagman*, taken as a whole, the context, history, argument, trial transcript

14   citations and cases cited in support of the Rule 33 Motion are based on witness exclusion on

15   discovery grounds.  The record and facts do not lead to the conclusion that there was any

16   subjective bad faith or an effort "to mislead the court" in the Rule 33 Motion. *Yagman*, 987 F.2d

17   at 628 (reversing sanctions order where "[t]here is no indication in the record" that counsel "acted

18   in bad faith or intended to mislead the court"); *Gypsum Res.,*, 2023 WL 7351967, at *2 (noting

19   requirement of a "subjective … finding of bad faith or improper purpose"); *Goldwater Bank,*

20   2023 WL 3433430, at *5 (same); *see also* ECF No. 704, ¶ 11 (Braverman Declaration); ECF No.

21   703, ¶¶ 19-20 (Armeni Declaration).  Based on the record and context, sanctions are not warranted

22   on this fourth ground.  Nevertheless, to clarify this issue, Mr. Krotoski has made a correction

23   citing to the Court's ruling setting forth the basis for the exclusion of the expert witness, Ms.

24   Stuckwisch. *See* ECF No. 708.

25   / / /

26   / / /

27   / / /

28   / / /

16

**E.    OTHER ISSUES RAISED IN THE COURT'S ORDER**

**1.    The Government's Discovery has Been Hosted on a Third-Party Relativity Database Since April 2023 And Access Was Disabled to the Trial Team After the Conclusion of the Trial in April 2025**

The Order refers to a recent status hearing on June 10, 2025, which Mr. Krotoski did not attend. ECF No. 693, at 8 n.7. Pursuant to the docket, at least "a portion of the hearing was sealed," ECF No. 695, at 1:9-10, and the hearing transcript is not publicly available. ECF No. 695. It remains unknown what representations were made and by whom, but that "the court understands Lopez's new counsel is having challenges obtaining discovery from [Mr.] Krotoski." ECF No. 693, at 8 n.7.[12]

The database containing the government's voluminous discovery, which exceeds 1.5 million documents, was never stored on a computer or server controlled by Mr. Krotoski's computer or his law firm; instead, it has always been hosted on a third-party Relativity platform pursuant to an April 24, 2023 Engagement Agreement signed by Mr. Lopez. *See* Exhibit I, Stanton Declaration, at ¶¶ 5-7; *see also* ECF No. 638, at 47:10-14.  Pillsbury is not a signatory to the Engagement Agreement. Mr. Krotoski's prior law firm signed the agreement.  Pillsbury's access to the Relativity platform was disabled after trial. Stanton Declaration ¶¶ 10-11.

Mr. Lopez's sentencing counsel was informed on April 29, 2025, and again in early May, that case discovery was hosted on a Relativity database. His sentencing counsel were also provided contact information to obtain access directly. *See* Exhibit J. Mr. Krotoski provided the records requested by sentencing counsel that he had access to at his law firm, and he provided prompt guidance to sentencing counsel on how to obtain access to the third-party Relativity database. *See* Krotoski Declaration, ¶¶ 67-71. In fact, Mr. Krotoski and his firm have provided records beyond what sentencing counsel requested to assist in the mitigation of Mr. Lopez's sentence. *See* Exhibit K.  More recently, Mr. Krotoski separately asked the third party vendor to provide the records to sentencing counsel. *See* Exhibit L.

---

[12] As a matter of due process, Mr. Krotoski is unable to defend against statements made by others at a hearing in which he did not participate.

17

In sum, Mr. Krotoski assisted and advised Mr. Lopez and sentencing counsel early on the steps to obtain access to the hosted database containing the government's discovery, including on the following: (a) Sentencing counsel was informed that Mr. Lopez had signed an Engagement Agreement with the third-party provider for the hosting and other services; (b) Sentencing counsel confirmed on May 7, 2025, and June 9, 2025, that they contacted the third-party vendor to obtain access to the Relativity database; (c) Sentencing counsel was also informed that Pillsbury did not access, and no longer had access to the Relativity database since the conclusion of trial; (d) Sentencing counsel was told that following the trial Pillsbury no longer had access to the Relativity database hosted by a third-party provider and access was disabled. See Exhibit J; Exhibit K. This information should have been provided to the Court and the government to address any issues at the status hearing.  Further, access by Pillsbury members was disabled after trial, and if they attempt to access the platform, a notice that the account has been disabled appears.  Stanton Declaration, ¶ 10.

Sentencing counsel was also told that neither Mr. Krotoski nor Pillsbury had a hard drive backup of the government's discovery hosted on the Relativity database, or a second hosted version of the more than 1.5 million documents, because it would have generate duplicate costs to have the same data on two platforms. The government's data needs to be hosted on an indexing and search platform, like Relativity, which hosts the data and allows for identifying key records among the voluminous productions.  *See* Exhibit J; Exhibit K; *see also* Stanton Declaration ¶ 7.

On June 25, 2025, the government filed a Notice Regarding the Status of Discovery ("Notice") stating that sentencing counsel does not have access to the Relativity database. ECF No. 699. The Notice further states sentencing counsel informed the government that it "has been unable to obtain discovery from trial counsel," and that "trial counsel no longer has the discovery in this matter (original productions or backups) and that the discovery is now in the sole possession of Alvarez & Marsal…." *Id*., at 2:1-3; 2:6-9. The Notice is misleading, in that it infers Mr. Krotoski has somehow impeded Mr. Lopez's new counsel from accessing discovery.  This statement is contrary to the facts and efforts of Mr. Krotoski promptly assisting and advising

sentencing counsel how to obtain access to the government's discovery of more than 1.5 million documents hosted by the third-party vendor.

Additionally, the Notice states that Mr. Krotoski "declined to confer" with the government "and instead directed the government to work with sentencing counsel." ECF No. 699, at 2:3-6. Upon receipt of the government's email on June 18, 2025, Mr. Lopez and sentencing counsel were promptly notified. Krotoski Declaration, ¶ 71. The represented party rule requires the government to communicate with Mr. Lopez's present counsel.[13] Additionally, sentencing counsel directed Mr. Krotoski to inform the government that they should work with sentencing counsel on this issue. Mr. Krotoski complied with the sentencing counsel's directive. *Id.*; *see also* Exhibit K.

The records and facts show that Mr. Krotoski has assisted and advised Mr. Lopez's sentencing counsel early on in obtaining access to the discovery for their use in addressing sentencing issues for Mr. Lopez. After he learned about the incorrect information in the Notice, Mr. Krotoski also asked the third-party provider to give sentencing counsel access to the Relativity database, "so they can review the data and identify evidence in support of mitigation of Mr. Lopez's sentence" after he learned about the incorrect information provided in the government's Notice. Exhibit K. Pillsbury has also provided what limited discovery and other materials were saved to its servers. *Id*. These are incomplete and limited to the product of discrete searches used to develop select issues for trial, and they would need to be placed on another search platform to be fully accessible; nevertheless, sentencing counsel can use them in addressing sentencing issues for Mr. Lopez. Finally, the records confirm that Mr. Krotoski has facilitated the transfer of records to sentencing counsel starting in and since April 2025.

**2. Witness Attendance**

The Order refers to a delay in the trial proceedings in "retrieving witnesses." ECF No. 693, at 4:12-14. Neither the Order nor the trial transcript in the Order identifies any specific examples. *Id*. (citing ECF No. 639, at 22-23).

---

[13] *See* Nevada Rule of Professional Conduct 4.2.

19

A review of the record led the undersigned to identify one example in which one witness was unexpectedly delayed due to "parking issues." ECF No. 628:30:1-17. While this witness received specific directions to arrive at the courthouse in a timely manner from another member of the trial team who was covering this witness, under these circumstances, witness delay does not support or warrant sanctions. *See* ECF No. 703, ¶ 25 (Armeni Declaration). As noted by Ms. Armeni, when the pace of the trial accelerated, her office promptly contacted the witness to come to the courthouse. Multiple calls were made to the witness. *Id.* As noted at trial, the witness encountered "parking issues." Based on these efforts, and the "parking issues," there was no intent to delay or interfere with trial proceedings.

### 3. Brackets Used to Indicated When the Prosecutor Pointed to Defense Counsel During Closing Argument

The Order refers to "other troubling arguments in the motion for mistrial" including that "[Mr.] Krotoski adds information into citations to the trial transcript utilizing brackets that are not in the actual transcript." ECF No. 693, at 7:7-8.

Consistent with common practice in quoting transcripts, the use of brackets was an aid in the argument to identify at which point in the government's closing argument the pointing occurred, not to suggest that bracketed language was reflected in the transcript.[14] As to the veracity of the arguments surrounding the physical pointing's occurrence, other members on the defense team and those in the audience also observed it. *See* ECF No. 704, ¶ 13 (Braverman Declaration); ECF No. 703, ¶¶ 22-23 (Armeni Declaration). The issue was noted in the Mistrial Motion to preserve it for the record. *Id.* Under these circumstances, there was no false statement of fact to the Court in the Mistrial Motion by the use of the brackets.

---

[14] Brackets are an accepted form to provide context, clarify or explanation to quoted material in a trial transcript or legal materials. *See, e.g.*, Style Manual, U.S. Government Printing Office, at 197, § 8.19 (2008) (noting the use of brackets in "transcripts, congressional hearings, the Congressional Record, **testimony in courtwork**, etc., to enclose **interpolations that are not specifically a part of the original quotation**, corrections, **explanations**, omissions, editorial comments, …") (emphasis added); *The Chicago Manual* of *Style* at 267, § 6.104 (15th ed.) (2003) ("In quoted matter, … square brackets enclose editorial interpolations, **explanations**, translations of foreign terms, or corrections.") (emphasis added).

20

**F.    BACKGROUND REGARDING MR. KROTOSKI**

Mr. Krotoski has been practicing law for more than 36 years.  He has a long career of public service and is committed to pro bono work and assisting others.

Mr. Krotoski began his legal career as a law clerk for two federal judges.  According to Mr. Krotoski, both Judges asked him to extend his clerkships based on the quality of his work, collegiality and high standards.  Krotoski Declaration, ¶ 80.  He first clerked for Chief Judge William A. Ingram in the Northern District of California.  He then clerked for Judge Procter R. Hug, Jr., on the U.S. Court of Appeals for the Ninth Circuit, in Reno, Nevada.  *Id*.

Following his clerkships, Mr. Krotoski served as one of four Special Assistant Attorneys General for the California Attorney General in Sacramento, California, where he focused on criminal justice and policy issues.  He was counsel of record on ten amicus briefs filed in the U.S. Supreme Court on the merits and certiorari petition stage focused on criminal justice issues.  *Id*. at ¶ 81.

For nearly 20 years, Mr. Krotoski served as a federal prosecutor, first in the U.S. Attorney Office for the Eastern District of California and then the Northern District of California.  In the Northern District of California, he served as Deputy Criminal Chief and Chief of the Criminal Division where he supervised all criminal cases and encouraged high professional and ethical standards in the U.S. Attorney's Office.  *Id*. at ¶ 82.

Mr. Krotoski then served as the National Coordinator for the Computer Hacking and Intellectual Property Program for the U.S. Department of Justice in Washington, DC.  In this position, he led cybercrime efforts across the country, prosecuted cases, led training for prosecutors and agents at the National Advocacy Center, and assisted on policy issues.  *Id*. at ¶ 83.

Mr. Krotoski then served as the Assistant Chief for the National Criminal Enforcement Section in the Antitrust Division where he supervised international and domestic cartel investigations, led investigations and prosecuted cases with other teams.  *Id*. at ¶ 84.

Mr. Krotoski enjoyed his extended public service in different government offices.  He particularly enjoyed serving as a supervisor who encouraged and sought to inspire the highest

1   professional and ethical standards. He received awards in three separate offices for his work and
2   leadership. *Id*. at ¶ 85.

3        For the past ten and a half years, Mr. Krotoski has served in private practice assisting
4   companies and individuals on criminal and civil investigations and litigation. *Id*. at ¶ 86. In
5   private practice, Mr. Krotoski has focused on annual pro bono service. *Id*.He has twice been
6   recognized by his firm for his pro bono work. *Id*. Some of his pro bono cases have included
7   representing an international humanitarian organization in a federal criminal bribery investigation
8   which led to the bribery conviction of an individual for coordinating a bid-rigging scheme to bid
9   on contracts procured by NGOs and funded by government to humanitarian aid. *Id*. In another
10  case, he led a team in obtaining a civil judgment against a treasurer of a non-profit school
11  organization for embezzling funds. *Id*. He has represented non-profit organizations targeted in
12  cyberattacks in addressing regulatory inquiries, notification requirements and remediation. *Id*. He
13  represented a senior citizen in a cyber fraud case which resulted in the loss of a large amount of
14  money and assisted the government in identifying the perpetrator. *Id*. On a number of occasions,
15  Mr. Krotoski has dedicated more than 100 hours annually – exceeding a target of 20 hours per
16  year. *Id*.In some years, Mr. Krotoski has provided hundreds of hours of pro bono work in the
17  service of others because he believes it is a privilege to assist others in need. *Id*.

18       According to Mr. Krotoski, he enjoys the practice of law and assisting others in addressing
19  investigation and litigation issues. *Id*. at ¶ 87.
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

1

## IV.

## **<u>CONCLUSION</u>**

Mr. Krotoski, through his undersigned counsel, respectfully requests that based on the record and applicable case law, the Court find that he has shown cause why he should not be sanctioned. Should the Court be inclined to make a recommendation for sanctions under Local Rule IA 11-7, the undersigned, on behalf of Mr. Krotoski, respectfully requests oral argument, followed by review by the Chief Judge as required under Local Rule IA 11-7(g).

Respectfully submitted this 17th day of July, 2025.

CHRISTIANSEN TRIAL LAWYERS



PETER S. CHRISTIANSEN, ESQ.
Nevada Bar No. 5254
WHITNEY J. BARRETT, ESQ.
Nevada Bar No. 13662
710 S. 7th Street, Suite B
Las Vegas, Nevada 89101
Telephone: (702) 240-7979
Facsimile: (866) 412-6992



23

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5 and LR-5.1, I certify that I am an employee of CHRISTIANSEN TRIAL LAWYERS, and that on this 17th day of July, 2025, I caused the foregoing document entitled **MARK KROTOSKI, ESQ.'S RESPONSE TO ORDER TO SHOW CAUSE [ECF NO. 693]** to be filed and served via the Court's CM/ECF electronic filing system upon all registered parties and their counsel.

_____
An employee of Christiansen Trial Lawyers