# EXHIBIT "A"

# EXHIBIT "A"

**DECLARATION OF MARK KROTOSKI, ESQ.**

I, MARK L. KROTOSKI, declare as follows:

1. I am an attorney admitted to practice law in the State of California and the District of Columbia and in this action as *pro hac vice* in the United States District Court for the District of Nevada.

2. I am a partner with Pillsbury Winthrop Shaw Pittman LLP, and represented Defendant Edward Lopez in the above-captioned action, along with co-counsel, through post-trial motions. The following facts are within my personal knowledge.

3. I respectfully submit this Declaration in response to the Court's Order to Show Cause ("Order"). ECF No. 693. I wish to respond to the serious allegations in the Order and clarify the facts and circumstances surrounding the events and my actions, words and intent during the trial.

4. To assist me in answering the Court's Order, I have reviewed my time entries, trial activities, briefs, meetings, emails, phone records, and texts. I have also read the responses of Paola Armeni, Esq., ECF No. 703, Richard Donaghue, Esq., ECF No. 702, and Sam Braverman, Esq., ECF No. 704, to this Court's Order.

5. I am grateful for the opportunity to clarify and address the Court's concerns in this Declaration. I can assure the Court that I never acted with bad faith or an intent to mislead the Court, or delay or impede the proceedings, or obtain an unfair advantage in this matter.

6. I have a profound respect for the judiciary and the rule of law. I hold myself to the highest ethical standards in every aspect of my practice and honor the oath I took as an attorney—not merely as a formality, but as a solemn commitment to fairness, truth, and the proper administration of justice.

7. My respect for the Court is based in part on my prior clerkships to Chief Judge William A. Ingram, of the Northern District of California and Judge Procter Hug, Jr., of the U.S. Court of Appeal for the Ninth Circuit, in Reno, Nevada.

8. In more than 36 years of practice, I have never been sanctioned, held in contempt, or had an Order to Show Cause issued in any case.

1

9. This response is offered with humility, accountability, and unwavering respect for the Court.

A. **THE OVERSIGHT IN ATTACHING EXHIBIT 151 INSTEAD OF EXHIBIT 151-R TO THE MOTION FOR MISTRIAL**

10. The motion for a mistrial ("Mistrial Motion"), which focused on the closing argument of government counsel, erroneously attached and referred to Exhibit 151 instead of the redacted version, Exhibit 151-R.  *See* ECF No. 654.

11. I regret and personally apologize for this oversight and error in including the unredacted version with the motion instead of the redacted version.

12. Based on the context of the exhibit and argument, there was no intent to mislead or misrepresent that the government showed the unredacted version to the jury.

13. The reference to Exhibit 151 in the Mistrial Motion was in the background section. *Id*. at 5 n.1, 6:8-10.  The heart of the argument of the Mistrial Motion focused on the government's use of the privilege log during its closing argument to the jury to "infer the defendant knew of this search warrant when he sent it to his antitrust lawyer…."  ECF No. 665, at 1:5 (citing ECF 650, at 16-23).

14. The inclusion and reference to Exhibit 151 instead of Exhibit 151-R was not a knowing false statement of fact, under Nevada Rule of Professional Conduct 3.3(a)(1), but an oversight and error. The District of Columbia Rule of Professional Conduct 3.3 and California Rule of Professional Conduct 3.3, have comparable standards.

15. In order to clarify the issue and to provide for a clear record, I have corrected the oversight and error by filing an Errata with the correct Exhibit 151-R.  *See* ECF No. 706.

16. I ask the Court to please accept my personal apology for the oversight and error by using and referring to Exhibit 151 instead of Exhibit 151-R in the original Mistrial Motion.

/ / /

/ / /

/ / /

/ / /

**B. MY GOOD FAITH MEETING AND CONFERRING AFTER MULTIPLE REQUESTS TO OBTAIN WRITTEN INFORMATION AND OTHER MATERIALS FROM THE EXPERT**

17. I would like to provide background concerning the materials requested and ultimately provided by defense expert, Suzanne Stuckwisch ("Ms. Stuckwisch"), and my meeting and conferring with the government.

18. Under the circumstances, I can assure the Court that I acted in good faith in meeting and conferring with the government.

19. On Friday, April 4, 2025, the Court halted the testimony of Ms. Stuckwisch and ordered a meet and confer concerning her opinions before testimony could resume. ECF No. 627.

20. While trial continued for the day, I understand Ms. Stuckwisch and the government's expert, Ms. Grinberg, had a meet and confer. I was not present during the meeting.

21. Later that day, the government reported to the Court that there were "some outstanding items that we're going to try to work through over the weekend." ECF No. 628. The government did not clarify what those items or issues were, however I was optimistic that the issues would be resolved promptly so that Ms. Stuckwisch could resume her testimony on Monday morning.

22. As further detailed below, as of Friday, April 4, 2025, no meet and confer between the defense and the government had been scheduled.

23. After the trial concluded for the day, I met briefly with Ms. Stuckwisch at the courthouse. Ms. Stuckwisch only had a few minutes to talk before departing for her flight at the Las Vegas airport. Ms. Stuckwisch provided a general overview of her meeting with Ms. Grinberg.

24. I generally understood, as the government also conveyed to the Court (ECF Nos. 630, 630-2), that Ms. Stuckwisch had agreed to provide the government with additional wage data information and materials.

25. I asked Ms. Stuckwisch to provide me written detailed information so I could prepare for the then-unscheduled meet and confer with the government, and she explained that she needed to review materials on her computer server for our discussion. Ms. Stuckwisch

reported to me that she did not have these materials with her. I asked her to locate them as soon as possible and report to me the results of her review. Otherwise, we could have reviewed and provided these materials to the government on April 4, 2025.

26. Since I did not attend the expert meeting, I wanted to have a full understanding of what transpired and the areas of focus. This background information was essential to ensure any expert issues and materials were fully addressed in the meeting with the government.

27. Ms. Stuckwisch did not inform me of her weekend schedule at that time, nor did I ask. Based on my prior practice and experience with Ms. Stuckwisch, I expected to hear from her and receive information later that evening or the following morning.

28. I understood that Ms. Stuckwisch would need some time to locate and review the materials she discussed with the government's expert before we discussed the merits.

29. I did not convey a deadline to Ms. Stuckwisch, and I recognize I should have conveyed the importance of providing the information to me promptly instead of expecting she would prioritize the matter or otherwise volunteer scheduling conflicts, after she had testified in court and met with the government's expert.

30. When I did not hear from her by late morning on Saturday, April 5, 2025, I sent Ms. Stuckwisch an email requesting the information regarding her meet and confer with Ms. Grinberg. I made several follow-up requests to Ms. Stuckwisch by email, telephone, and text message that day in order to learn the results of her review of the data and the details of what was stated during her meeting with the government's expert.

31. My phone and email records demonstrate the following:
   a. 11:46 a.m.: email to Ms. Stuckwisch asking to set a time to speak, unanswered
   b. 12:40 p.m.: email to Ms. Stuckwisch asking for a summary of the meeting with Ms. Grinberg, unanswered
   c. 2:30 p.m.: call and voice message left on Ms. Stuckwisch's mobile phone
   d. 2:58 p.m.: call to Ms. Stuckwisch's mobile phone
   e. 3:00 p.m.: email to Ms. Stuckwisch asking for a return call, unanswered
   f. 3:11 p.m.: call and voice message left on Ms. Stuckwisch's mobile, unanswered
   g. 3:14 p.m.: call to Ms. Stuckwisch's home, unanswered

    h. 3:15 p.m.: text message to Ms. Stuckwisch asking her to call before the meet and confer with the government, unanswered

    i. 3:45 p.m.: Meet and confer with the DOJ with Sam Braverman

    j. 3:55 p.m.: text message to Ms. Stuckwisch asking for the data

    k. 3:56 p.m.: text response from Ms. Stuckwisch, "I just got these messages. Am trying to find a quiet place to call you back."

    l. 4:05 p.m.: first contact of the day with Ms. Stuckwisch during an approximately six-minute telephone call, explaining she has been out during the day and could not access her computer server

    m. 5:08 p.m.: email from DOJ asking for excel versions of updated summary exhibits, as discussed during meet and confer

    n. 5:46 p.m.: call to Ms. Stuckwisch's mobile, unanswered

    o. 5:47 p.m.: call to Ms. Stuckwisch's home, unanswered

    p. 5:47 p.m.: text message to Ms. Stuckwisch asking her to call, unanswered

    q. 6:43 p.m.: call to Ms. Stuckwisch, she is just starting to review the materials on her computer server

    r. 6:58 p.m.: DOJ email asking for Ms. Stuckwisch's data

    s. 7:01 p.m.: forward DOJ email to Ms. Stuckwisch concerning data

    t. 7:32 p.m.: call with Ms. Stuckwisch and Sam Braverman, expressing importance of providing and sending the data promptly

    u. 7:53 p.m.: email to DOJ noting Ms. Stuckwisch had been traveling and was unreachable (ECF No. 630-2)

    v. 8:14 p.m.: email from DOJ outlining specific materials requested from Ms. Stuckwisch discussed during the expert meeting

    w. 8:30 p.m.: forward DOJ email to Ms. Stuckwisch outlining specific materials discussed during the expert meeting

    x. 9:30 p.m.: meeting with Ms. Stuckwisch asking again for the data to send to DOJ

    y. 10:36 p.m.: text message to Ms. Stuckwisch asking her, "can you send the files now? We need to get them out."

    z. 10:51 p.m..: email from Ms. Stuckwisch attaching files

    aa. 10:52 p.m.: email from Ms. Stuckwisch attaching remaining files

    bb. 11:01 p.m.: file transfer to DOJ with Ms. Stuckwisch's materials

32. Based on my experience, working relationship and history with Ms. Stuckwisch, she always responded promptly and professionally to case needs and let me know when she completed her analysis for our discussion. Ms. Stuckwisch had always been prompt, responsive and professional on similar past requests and issues.

33. I had a full trial preparation schedule Saturday morning with trial witnesses and preparing the summaries to meet and confer with the government. My day began at approximately 6:30 a.m. and continued until after 11 p.m. I was also battling a respiratory and sinus illness at the time.

34. At the time of the meet and confer at 3:45 p.m., I did not have a detailed understanding of what transpired at the expert meeting. Ms. Stuckwisch had not provided the written information of her meeting with Ms. Grinberg, as I had requested. Ms. Stuckwisch had not responded to my requests for the information by email, telephone, voice mail messages and texts until after the meet and confer meeting with the government. For this reason, it remained unclear to me what the specific issues were or what review of the materials was required and what were the specific next steps.

35. The meet and confer with the government covered other issues including an update on the summary exhibits and witnesses to be called by the defense. I told the government that I would contact Ms. Stuckwisch and would provide an update after I reached her.

36. At 3:56 p.m., Ms. Stuckwisch responded for the first time to my prior texts and other messages during the day to reach her to discuss the details of her meeting with the expert before the meet and confer meeting. Ms. Stuckwisch responded, "I just got these messages. Am trying to find a quiet place to call you back."

37. At 4:05 p.m., we spoke briefly for the first time all day. Ms. Stuckwisch said she was out during the day and did not receive my prior messages. She had not accessed her computer server. I instructed her to review the data files on her server as quickly as possible and contact me once she had done so we could discuss the issues.

38. When I did not hear from Ms. Stuckwisch, I called her cell phone and residence at 5:46 p.m. and 5:47 p.m. and then sent a text message, asking her to call me.

39. Ms. Stuckwisch did not make contact until 6:43 p.m., about two hours and 40 minutes following our first brief call. At this point, Ms. Stuckwisch had accessed her computer server and was reviewing the materials pertaining to the expert meet and confer that took place on Friday, April 4, 2025, in Las Vegas.

1      40.     I directed her to locate the files sought by the government, which I understood included my firm's work product.

41.     During a follow-up call at 7:32 p.m. with Mr. Braverman present, Ms. Stuckwisch advised that she was still looking through her server for relevant data. Mr. Braverman and I directed her to provide the information immediately so it could be produced to the government, despite the inclusion of work product.

42.     At 10:51 pm, Ms. Stuckwisch broke up the files and emailed two Maxim earning statement files.

43.     At 10:52 pm, Ms. Stuckwisch emailed a spreadsheet containing tabs for CHHC and other company wage information.

44.     Due to the large file size, I downloaded each of the files and emailed them to the government via secure file share at 11:01 pm.

45.     Over the course of the weekend, I was most preoccupied with making contact with Ms. Stuckwisch and obtaining information from her, as opposed to the reasons underlying her unavailability.

46.     On Monday morning, April 7, 2025, Ms. Stuckwisch informed me for the first time that she had a prior mammogram which had been previously scheduled for Saturday, April 5, 2025. I did not know Ms. Stuckwisch would be unreachable during Saturday, April 5, 2025.

47.     Under these circumstances, the meet and confer with the government was conducted in good faith. I informed the government that a work product issue was under review and the materials were produced shortly after receiving them from Ms. Stuckwisch.

**C.    MY STATEMENT TO THE GOVERNMENT REGARDING THE EXPERT'S UNAVAILABILITY, WHILE AN UNFORTUNATE, POOR CHOICE OF WORDS, WAS CORROBORATED BY RECORDS CONFIRMING MY CONTINUED EFFORTS TO REACH HER AND OBTAIN THE INFORMATION**

48.     On April 5, 2025, at 7:53 p.m., I sent an email to the government stating, "Ms. Stuckwisch has been traveling today and was unreachable. We need to sort an important work

1  product issue…. I will provide an update once we resolve the work product issues." ECF No.
2  630-2.

3      49.    My email contained a poor choice of words. I intended to communicate that Ms.
4  Stuckwisch had been unavailable most of the day and was unreachable.

5      50.    Instead, I should have stated, "Ms. Stuckwisch has been unavailable for most of
6  the day and was unreachable. After speaking briefly with Ms. Stuckwisch for the first time
7  around 4:05 p.m., she needed to return home to review the materials on her computer server, we
8  then identified a work product issue, and she was told to provide the materials as soon as possible.

9      51.    At the time of the email, I had worked more than 12 hours during the day while
10 my respiratory and sinus illness had intensified. My energy and thought processes were impacted
11 by this illness. Nonetheless, I take full responsibility for drafting and sending my email.

12     52.    The email, telephone records, voice mail messages, and text messages confirm my
13 efforts to contact Ms. Stuckwisch to address the expert issues so that we could address the
14 outstanding issues from the expert meeting. Ms. Stuckwisch confirmed in her text response that
15 she had not seen my prior messages.

16     53.    I was not able to have a meaningful discussion with Ms. Stuckwisch concerning
17 her review of the data files until around 6:43 p.m. in the evening. We discussed a work product
18 issue, and a decision was made to produce the materials with the work product.

19     54.    Because of the amount of information that was provided to Ms. Stuckwisch, I
20 understand that it took her time to search her server to identify the correct files.

21     55.    Within ten minutes of receipt of the files from Ms. Stuckwisch, I produced them to
22 the government.

23     56.    While my email accurately stated that Ms. Stuckwisch "was unreachable" during
24 the day, as confirmed by my email and phone records, I should not have stated "traveling" was
25 the reason underlying her unavailability.

26     57.    In the past, when I tried to reach Ms. Stuckwisch over several hours or a large part
27 of the day and was unable to connect with her, it was because she was traveling locally or to some
28 other city, and could not receive email, telephone or other messages. Ms. Stuckwisch would later

1   contact me after she received my messages and had cellphone or wi-fi service. My impression

2   that she was traveling because she was unreachable was mistaken.

3       58.    My email also accurately reported that "an important work product issue" was

4   identified and being addressed, and that we would "provide an update once we resolve the work

5   product issues."

6       59.    While the statement was not made to the Court, to clarify this issue and for a clear

7   record, I believe it is important to correct the statement, and have taken steps to do so by filing an

8   Errata. *See* ECF No. 707.

9       60.    I personally apologize for causing this issue. I did not act with bad faith or in an

10  attempt to mislead the court or my opposing counsel.

11  **D.    CANDOR TO THE COURT IN DEFENDANT'S RULE 33 MOTION**

12      61.    There was no intent to mislead the Court on the basis for the exclusion of Ms.

13  Stuckwisch.

14      62.    I understood that by citing to the trial transcript in which the Court issued its ruling

15  excluding Ms. Stuckwisch, that the Rule 33 Motion was clear as to the basis for relief being

16  sought.

17      63.    Additionally, I believed it important for the record to include argument concerning

18  Ms. Stuckwisch's exclusion in post-trial briefing on behalf of Mr. Lopez because a complete

19  record as to the defense's objection was not made contemporaneous with the Court's ruling.

20      64.    To the extent the Rule 33 motion was not clear as to why Ms. Stuckwisch was

21  excluded, a correction citing to the Court's ruling has been made. *See* ECF No. 708.

22      65.    I personally apologize for any misunderstanding I have created on this issue.

23  **E.    THE GOVERNMENT'S DISCOVERY HAS BEEN HOSTED ON A THIRD-PARTY RELATIVITY DATABASE**

24      66.    The approximately 1.5 million documents in the government's discovery have

25  been stored on a Relativity database hosted by Alvarez & Marsal Disputes and Investigation

26  Services, LLC ("A&M") pursuant to an Agreement with Mr. Lopez dated April 23, 2023.

27      67.    After first being contacted by sentencing counsel in April 2025, I provided

28  materials they requested and advised how they could obtain the government's discovery of

1 approximately 1.5 million documents from A&M directly, which has hosted them since April 2023. The 1.5 million documents are not stored on Pillsbury's servers, and my team was unable to access them through Relativity following the trial when the accounts were disabled. I advised sentencing counsel of this by email dated April 29, 2025.

68. To assist in the mitigation of Mr. Lopez's sentence, my firm has provided the limited materials on our server, although they were not requested by sentencing counsel.

69. I was therefore surprised by the Order stating that "the court understands Lopez's new counsel is having challenges obtaining discovery from [Mr.] Krotoski." ECF No. 693, at 8 n.7. Then, the government filed a Notice stating that sentencing counsel informed the government that it "has been unable to obtain discovery from trial counsel," and that "trial counsel no longer has the discovery in this matter (original productions or backups) and that the discovery is now in the sole possession of Alvarez & Marsal…." *Id.*, at 2:1-3; 2:6-9.

70. While I was not at the status conference hearing in June 2025 and was not privy to communications between sentencing counsel and the government, I can assure the Court that I have provided materials and guidance to sentencing counsel on how to obtain access to the government's discovery starting in and after April 2025. My emails and letters summarize my efforts. Sentencing counsel further confirmed that they were talking with the third-party vendor by email dated May 7, 2025.

71. When the government unexpectedly emailed me on June 18, 2025 to discuss production to sentencing counsel, I immediately notified Mr. Lopez. I thought it was unusual that the government was not communicating directly with sentencing counsel representing Mr. Lopez. As sentencing counsel directed, I informed the government that they should communicate directly with sentencing counsel.

72. Sentencing counsel has advised that Mr. Lopez has authorized the A&M Agreement, email communications, and Letter regarding this issue to be submitted to the Court as part of my response to the Order. These materials are included as exhibits to the Declaration of Whitney Barrett and David Stanton.

73. If the Court has other questions on this issue, I would be happy to address them.

## F.   AGGRAVATED RESPIRATORY AND SINUS ILLNESS AT TRIAL

74. As the Court is aware, during trial I came down with an aggravated respiratory and sinus illness that impacted by ability to function and use my voice.

75. In the courtroom, my voice became rough and gravelly sounding. My normal voice was altered and I strained so that I could speak over my muted voice. My energy level was depleted.

76. On the weekend of April 5-6, 2025, I became very ill, operating with low energy, needing to take periodic naps, and difficulty breathing. I pressed on due to the need to meet with trial witnesses and proceed with trial on Monday morning, April 6, 2025.

77. Co-counsel Sam Braverman graciously obtained Vitamin C and juice to relieve my symptoms.

78. The illness and its impact on me persisted for much of the remainder of the trial.

## G.   MY PROFESSIONAL BACKGROUND

79. I have been practicing law for more than 36 years. I have a long career of public service and am committed to pro bono work and assisting others.

80. I began my legal career as a law clerk for two federal judges. Both Judges asked me to extend my clerkships based on the quality of my work, collegiality and high standards. I first clerked for Chief Judge William A. Ingram in the Northern District of California, and then clerked for Judge Procter R. Hug, Jr., on the U.S. Court of Appeals for the Ninth Circuit, in Reno, Nevada.

81. Following my clerkships, I served as one of four Special Assistant Attorneys General for the California Attorney General in Sacramento, California, where I focused on criminal justice and policy issues. I was counsel of record on ten amicus briefs filed in the U.S. Supreme Court on the merits and certiorari petition stage focused on criminal justice issues.

82. For nearly 20 years, I served as a federal prosecutor, first in the U.S. Attorney's Office for the Eastern District of California and then the Northern District of California. In the Northern District of California, I served as Deputy Criminal Chief and Chief of the Criminal

1    Division where I supervised all criminal cases and encouraged high professional and ethical

2    standards in the U.S. Attorney's Office.

3        83.    I then served as the National Coordinator for the Computer Hacking and

4    Intellectual Property Program for the U.S. Department of Justice in Washington, DC.  In this

5    position, I led cybercrime efforts across the country, prosecuted cases, led training for prosecutors

6    and agents at the National Advocacy Center, and assisted on policy issues.

7        84.    I then served as the Assistant Chief for the National Criminal Enforcement Section

8    in the Antitrust Division where I supervised international and domestic cartel investigations, led

9    investigations and prosecuted cases with other teams.

10       85.    I enjoyed my extended public service in different government offices.  I

11   particularly enjoyed serving as a supervisor, encouraging and seeking to inspire the highest

12   professional and ethical standards.  I received awards in three separate offices for my work and

13   leadership.

14       86.    For the past ten and a half years, I have served in private practice assisting

15   companies and individuals on criminal and civil investigations and litigation.  In private practice,

16   I have provided annual pro bono service.  I have twice been recognized by my firm for my pro

17   bono work.  Some of my pro bono cases have included representing an international humanitarian

18   organization in a federal criminal bribery investigation which led to the bribery conviction of an

19   individual for coordinating a bid-rigging scheme to bid on contracts procured by NGOs and

20   funded by government for humanitarian aid.  In another case, I led a team in obtaining a civil

21   judgment against a treasurer of a non-profit school organization for embezzling funds.  I have

22   represented non-profit organizations targeted in cyberattacks in addressing regulatory inquiries,

23   notification requirements and remediation.  I represented a senior citizen in a cyber fraud case

24   which resulted in the loss of a large amount of money and assisted the government in identifying

25   the perpetrator.  On a number of occasions, I have dedicated more than 100 hours annually –

26   exceeding a target of 20 hours per year. In some years, I have provided hundreds of hours of pro

27   bono work in the service of others because I believe it is a privilege to assist others in need.

28

87. I truly enjoy the practice of law and assisting others in addressing investigation and litigation issues.

88. I was very saddened and shocked to receive the Court's Order and read the Court's view of me.

89. Several publications based on the Order have been publicly circulated online, impacting my reputation, something that I have worked hard to establish over my many years in practice. The articles have also included a link to the Order, which has since found its way into the hands of professional colleagues who have contacted me over this matter.

90. From the moment I first appeared as a guest in the District of Nevada, I endeavored to act nothing less than professional and courteous to the Court and counsel. As stated above, I hold myself to the highest ethical standards, and believed I did so in my representation of Mr. Lopez. I take responsibility for all of my actions, but wish to impress upon the Court that I never intended to mislead the Court or make any misrepresentations. I am available and willing to answer any questions the Court may have of me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: July 17, 2025

By    */s/ Mark L. Krotoski*
        Mark L. Krotoski