IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Case No. 2:23-cr-00055-CDS-DJA |
| | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| Eduardo Ruben Lopez, | § | |
| | § | |
| *Defendant* | § | |

Expert Report

Roberto J. Cavazos Ph.D.
Mikhail V. Pevzner Ph.D. (CPA, licensed in Maryland)

September 8, 2025

employstats
ECONOMICS • STATISTICS

**Introduction**

1. We have been retained through Defense counsel by Mr. Eduardo Lopez in the matter referenced above to determine if the value of the firm "Community Home Health Care, LLC" he sold to Solace Pediatric Home Care was affected by his failure to disclose his being under criminal investigation at the time of sale.

*Roberto J. Cavazos, Ph.D.*

2. Dr. Cavazos is a professional economist with over 30 years of experience. He holds a BA, MPA, and PhD from the University of Texas. He has been a faculty member at The University of Texas at San Antonio, Florida International University, and Carnegie Mellon University. He is currently the Analytics Practice Lead at EmployStats, a boutique consulting firm engaging in economic and statistical analysis in litigation matters. He is also on the faculty of the University of North Texas, G. Brint Ryan College of Business. His research has received global attention and has been cited in *The Wall Street Journal*, *Harvard Business Review*, Forbes, CNBC, *The Times* of London, CBS, among many others. He has written and published two books, one with well-known litigation economist Dr. Dwight Steward, *Big Data Analytics in U.S. Courts: Uses, Challenges, and Implications,* written in the Fall of 2019. He has published several peer-reviewed articles and government reports. He has been a testifying expert on personal injury, wrongful death, business damages, wage and hour, and other matters in state and federal

courts in California, Texas, North Carolina, Pennsylvania, Washington, New Jersey, New York, Ohio, Oklahoma, Louisiana, Maryland, Virginia, and the District of Columbia.

*Mikhail Pevzner, Ph.D., CPA (Licensed in Maryland).*

3. As an economist, Dr. Pevzner has provided expert reports and deposition testimony on economic losses involving lost business profits in numerous disputes that have spanned across a variety of industries. Dr. Pevzner holds a Ph.D. and M.S. in Business Administration from Washington University in St. Louis and a B.S. in Business from the University of Minnesota. Currently, he is a full-time chaired tenured Professor of Accounting at the University of Baltimore, where he teaches courses in accounting, auditing, financial statement analysis, business valuation, corporate finance, and business economics, and is a licensed CPA in the State of Maryland. Dr. Pevzner is also an adjunct professor of finance at Georgetown University's McDonough School of Business where he teaches courses on corporate finance and financial regulation. Dr. Pevzner has served as a full-time visiting economist at the U.S. Securities and Exchange Commission and in the Financial Industry Regulatory Authority. His empirical research focuses on financial accounting, corporate finance, and auditing. He has co-authored over 40 published research and policy articles in accounting and finance journals.

employstats
ECONOMICS • STATISTICS

4. Case-specific documents are listed in Exhibit A. Texts and treatises are listed in Exhibit B. Our CVs are attached under separate cover as Appendix A.

5. Our compensation is not contingent upon the outcome of this case. We are billed at the rate of $595 per hour. We reserve the right to modify this report should new information or other facts become available.

**Structure of Report**

6. This report consists of our report's objectives, followed by a summary of opinions underlying this matter. This is followed by a description of the data used, our approach, and the methodologies utilized to perform the analysis. And lastly, we will present the results of our analysis.

**Report Objectives**

7. We have been asked by Defense Counsel to assess the valuation of Community Home Health Care, LLC (Community) as it relates to the sale to Solace Pediatric Home Health Services (Solace) by its owner Mr. Edward Lopez[1].

[1] We note that formally, Community Home Health Care Services, LLC (referred to in the Membership Interest Purchase Agreement as the “Company” was sold by its owner Community Health Care, LLC (referred to in the Membership Interest Purchase Agreement as the “Seller”) which in turn was owned by Mr. Lopez (referred to in the Membership Interest Purchase Agreement as the “Principal” (Exhibit A, No. 1, p. 1). In economic substance, this is a sale of Community Home Health Care LLC by Mr. Lopez to Solace. This is reinforced by the fact that the Membership Interest Purchase Agreement has a non-complete clause that prevents Mr. Lopez from competing in the Las Vegas geographical area for the next five years (Exhibit A, No. 1, pp. 20-21)

8. We understand that we are opining on whether the selling price of Community reflected a fair market value for the firm as discussed in more detail herein.

**Summary of Opinions**

9. Based on our review of information and analysis we found no evidence of economic damage suffered by Solace due to Mr. Lopez's failure to disclose his being under criminal investigation.

10. Our analysis finds that the purchase price of Community was below that of the median documented purchase transactions we identified for firms in the growing home health sector.

11. Our analysis finds that purchaser Solace did not overpay in the purchase of Community based on Solace's financial statement information and Solace's purchase-related documents made available to us as of the time of sale (December 2021) and subsequent information related to the working capital true-up adjustment that (finalized in 2025) the selling price from June 20, 2022 (Exhibit A, Nos.1-9).

**Valuation Analysis Methodology**

*Methodology Overview*

12. In valuation analysis, fair market value (FMV) refers to the "Standard of Value" normally used in assessing the fairness of business transactions. It is defined as "the amount at which the property would change hands between a willing buyer

and a willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts" (Exhibit B, No. 3, p.107).

13. Our analysis follows well-accepted valuation techniques of merger and acquisition transactions as detailed in the business valuation literature (Exhibit B).

14. We use the two most used approaches in valuing an acquisition, which are the 1.) Market Approach (also known as "Guideline Merged and Acquired Company Method"[2]) and 2.) The Income Approach (also known as "Discounted Future Economic Income Method")[3]. These methods are described below.

*The Market Approach*

15. At a very general level, the market approach is a method of business valuation that determines a company's value by comparing it to similar companies (peers) that have been sold or are publicly traded. The core idea of the method is simply expressed in the question: What are investors currently paying for similar businesses? Price in this approach (and in many transactions including that in the present matter) is determined by "multiples" with a multiple being that firms revenue multiplied by some value. For instance, a hypothetical firm with revenue

[2] See., e.g., Exhibit B, No. 2, Chapter 12, Exhibit B, No. 3, Chapter 10

[3] See., e.g., Exhibit B, No. 2, Chapter 9, Exhibit B., No. 3, Chapter 5 . The valuation theory also utilizes "Asset" approach whereby tangible and intangible assets are individually valued within the company (see, e.g., Exhibit A, No. 1, pp. 1073-1074); however, we do not have such data for Community Services, LLC and thus cannot utilize this approach.

employstats
ECONOMICS • STATISTICS

of one million dollars selling for a multiple of 7, would sell for seven million dollars. We discuss this approach in more detail below.

16. The Market Approach estimates the value of an acquisition through comparison with similar companies bought or sold in the past. This is done by calculating "multiples" from past deals-such as price-to-revenue, price-to-EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), or price-to-operating cash flow- and using them as benchmarks for valuation.

17. The application of the EBITDA multiple in the market approach is a standard method for valuing a business. It starts with a measure of operating profitability called EBITDA — Earnings Before Interest, Taxes, Depreciation, and Amortization — which strips away differences in financing, tax structures, and non-cash accounting charges so you can compare businesses on a cleaner, apples-to-apples basis. Then, it looks at what similar companies have sold for (or are trading for in public markets) as a multiple of their EBITDA. If comparable businesses in your industry typically sell for 10× EBITDA, and your EBITDA is $5 million, that suggests a market value of about $50 million.

18. Furthermore, transaction-based multiples assume that the acquirer gets the controlling interest in the target company. Thus, past transaction multiples are benchmarks to assess the fairness of the acquisition price of Community[4] ("the

[4] "Using the guideline merged and acquired company method, the analyst arrives at an indicated value for a controlling interest." (See: https://www.bvresources.com/products/faqs/dealstats )

target company"). Conceptually, this is analogous to using "price per square foot" in real estate to value a property. By multiplying the target company's key financial figure (e.g., EBITDA) by the corresponding industry multiple, a company's price can be estimated (Exhibit B, No. 1, p. 1073).

19. The price of the transaction between Solace and Mr. Lopez was derived by applying an EBITDA-based multiple (Exhibit A, No. 1). EBITDA-based transaction multiples are commonly used in medical and related practices' valuations, in private equity acquisitions of healthcare practices (Exhibit B, No.4, p. 2).

20. EBITDA is a popular company performance metric because it is considered a proxy of a company's operating cash flows. It has also gained popularity for its operational focus, comparability, and the target's ability to service future debt (Exhibit B, No. 4, p.2). Furthermore, "The most widely used invested capital valuation multiple is the MVIC/ EBITDA multiple, because it eliminates the possible distortion in differing depreciation policies among companies" (Exhibit B. No. 5, p.125).[5][6]

21. The effectiveness of the Market Approach hinges on identifying comparable transactions. These transactions should be from the same or closely related

---

[5] For example, if the median enterprise value/market value of invested capital (EV/MVIC)—defined as the sum of market value of equity and debt—to EBITDA multiple for a set of comparable firms is 9x, then a firm with $1 million in EBITDA would be valued at approximately $9 million (9 × $1,000,000).

[6] MVIC is the abbreviation for Market Value of Invested Capital.

employstats ECONOMICS • STATISTICS

industries, involve similar sized companies, and have occurred within a comparable time frame. Comparable earnings profiles and growth trajectories are also important.

*The Income Approach*

22. The Income Approach consists of forecasting the target company's future earnings or cash flows and discounting them to present value using a discount rate that reflects the risk and uncertainty associated with those future cash flows. This is most commonly done through a form of Discounted Cash Flow (DCF) analysis.

23. The Income Approach is used to determine what a business is going to earn for its owners or investors in the years ahead and what its value is at present.

24. The income valuation approach projects future free cash flows (Exhibit B, No. 10, p. 432), which are the operating cash flows left over after paying all expenses, taxes, and necessary reinvestments for each future year. In this Report, we follow the accepted valuation literature's industry practice to develop these forecasts for five years out and then assume that Community entered a "stable growth" period of constant growth rate which allows us to estimate its "terminal value"[7]. Those future amounts are then "discounted" back to the present using a discount rate

[7] See, e.g., https://corporatefinanceinstitute.com/resources/valuation/dcf-formula-guide/ ; Accessed on August 20, 2025; See also, Exhibit B, No.3 , p. 466

employstats
ECONOMICS • STATISTICS

which reflects both the time value of money and the riskiness of the cash flows (Exhibit B, No. 10, p. 431)[8]. The result is the present value of future cash flow.

25. EBITDA approximates free cash flow, assuming the target company does not make any additional capital expenditures.[9] Therefore, we will be using the estimates of future EBITDA in our models as projections of future free cash flow for Community.

26. Unlike the Market Approach, which uses comparable past transaction prices to assess the fairness of the transaction, the Income Approach (also known as Discounted Cash Flows or DCF Method) relies on historical company data, known macroeconomic trends, and other relevant publicly available information to forecast a target company's risk-adjusted future cash flows and derive its value from those projections.[10]

27. The primary advantage of the Income Approach is its ability to explicitly quantify the effect of specific variables such as projected income growth, inflation, GDP trends, and cash flow risk on the target's value. The Income Approach modeling allows the valuator to "reverse engineer" the purchase price because it allows the analyst to explicitly identify factors that affect the firm value, such as expected income growth rates and discount rates. In contrast, the Market Approach does not

---

[8] We calculate terminal value using Gordon Growth formula in the sixth year of operations, and the output of this formula is further discounted six years to arrive to the present value at the time of the acquisition. See Exhibit B, No. 10 , p. 446 for definition of Gordon Growth formula.
[9] See, e.g., https://www.wallstreetprep.com/knowledge/ebitda-vs-cash-flow/ ; Accessed on August 12, 2025
[10] See, e.g., https://corporatefinanceinstitute.com/resources/valuation/valuation/; Accessed on August 20, 2025

employstats
ECONOMICS • STATISTICS

permit the direct isolation of these factors from observed transaction prices, leaving such valuations potentially influenced by market-wide biases, including overly optimistic sentiment. A principal limitation of the Income Approach is that its results depend on assumptions and inputs that are necessarily judgment-based and subjective. Therefore, our conclusions of value could change if the assumptions are changed.

28. However, when taken together, the target's value estimates from the Market Approach and Income Approach will provide for more holistic and hopefully less biased target value estimates. This is why the valuation literature recommends that the valuator considers "the pros and cons of each approach" (Exhibit B, No. 3, p. 675).

**Data Used in Analysis**

29. To perform our analysis, we rely on data provided by counsel listed in Exhibit A. This data includes case documents, reports used in the acquisition of Community performed by independent third parties, and financial data. The data provided to us by counsel is extensive and is listed in its entirety in Exhibit A. Those data sources we used in our analysis are as standard practice cited where they are relied upon.

30. Data from outside and industry data, such as databases commonly used for valuation, are noted in footnotes. We describe the outside source of data in detail (not provided as case information) that is used to support our market approach analysis.

employstats
ECONOMICS • STATISTICS

*Data Specific to Market Approach*

31. For transactions between private firms such as Solace and Community, there is data available from transaction data aggregators, such as Business Valuation Resources (BVR).[11] We use BVR historical transaction data compiled in the DealStats database to support our analysis.

32. Specifically, BVR provides the DealStats database, which describes itself as a "...new generation of private and public company transaction comparable for valuation and M&A professionals. DealStats is a state-of-the-art platform that boasts the most complete financials on acquired companies in both the private and public sectors"[12]. BVR, DealStats data is collected from business brokers. The data is anonymous and provides information on an acquired target's industry, revenues, and profits, which thus enables market approach analysis.

33. According to BVR, "Every transaction in DealStats is rigorously reviewed by BVR's dedicated team of financial analysts in real time. Whether you are valuing a business, deriving a sale price, benchmarking performance, or conducting fairness opinion research, you won't find more complete and trustworthy comparable data in any other source."

34. DealStats has a positive reputation as a valuation data source. For example, one university library describes it as follows: "DealStats is a robust online database

[11] https://www.bvresources.com/
[12] https://www.bvresources.com/products/dealstats

that boasts the most complete financial details available on 29,300+ acquired private companies, with up to 149 data points that include six valuation multiples and 13 financial ratios. Each transaction includes detailed data to apply the market approach, derive a selling price, benchmark performance, or perform a fairness opinion analysis and BVR analysts rigorously review every transaction to ensure the most trustworthy data”[13]. A business brokerage publication describes DealStats as follows: “DealStats can be incredibly powerful, as it is information-rich and dense. DealStats has existed for over 20 years serving our industry. In addition to containing transaction comps on sold businesses, DealStats includes financial statements, consideration details and structure, selling price multiples, financial ratios, and a good deal more. Updated daily, DealStats creates valuation and pricing multiples to value and price companies and includes multi-analyst review and deal approval.”[14]

**Analysis Using the Market Approach**

35. Community is a home healthcare company. Specifically, Solace’s *Acquisition Summary,* prepared as part of the transaction states that “Community Home Healthcare is a Home Health Agency providing PDN, therapy, and caregiver services to pediatric and adult patients in southern Nevada” (Exhibit A, No. 5, page 1).

[13] https://library.uncw.edu/eresources/dealstats
[14] https://businessbrokeragepress.com/2023/10/what-are-the-tools-of-the-trade/

employstats
ECONOMICS • STATISTICS

36. According to the Membership Interest Purchase Agreement (hereafter "Purchase Agreement") between the parties (Exhibit A, No. 1, p.3, emphasis added), the "Closing Purchase Price" was defined as "$12,506,250, *minus* any outstanding indebtedness as of immediately prior to Closing, minus any unpaid Transaction Expenses as of immediately prior to Closing, plus the Working Capital Adjustment Amount, minus the Escrow Amount". Because the final purchase price calculation requires an exclusion of any additional debt, $12,506,250 represents Community's "Enterprise Value", which is the basis for calculation of EBITDA-based multiples (See Exhibit B, No. 9, p. 52, Exhibit B, 10, p.454).

37. Further, the Purchase Agreement defines "Initial TTM[15] EBITDA" as $1,725,000 (Exhibit A, No. 1. p.6). In finance, TTM stands for "Trailing Twelve Months" also known as "Last Twelve Months or LTM," which is a company's financial performance over the most recent twelve months[16].

38. Dividing Closing Purchase Price (Enterprise Value) of $12,506,250 by Initial TTM EBITDA yields an acquisition multiple of 7.25.

39. The specific multiple of 7.25 was originally formulated in the Acquisition Proposal from Solace Pediatric Home Care to Community Home Healthcare, LLC, dated September 10, 2021 (hereafter "Acquisition Proposal", Exhibit A, No. 2, page 1). Specifically, the Acquisition Proposal states: "Our proposal reflects an

---

[15] TTM is the abbreviation for trailing twelve months, which refers to the revenue earned during the preceding twelve months.
[16] See, e.g., Exhibit A, No. 9, p.15

employstats
ECONOMICS • STATISTICS

enterprise valuation (the "Enterprise Value") for the Company equal to 7.25 multiplied by the earnings before interest, taxes, depreciation, and amortization ("EBITDA") of the Company for the twelve-month period ended June 30, 2021, which amount shall be reviewed and validated by a quality of earnings report (the "Q of E") performed by a third party accounting firm selected by Solace (the "Initial TTM EBITDA"). The Enterprise Value assumes a cash-free and debt-free balance sheet, adequate working capital consistent with past practices in order to fund normal operations, is inclusive of any net operating losses and other positive tax attributes (including any basis step-up resulting from the Transaction), and assumes that the Company utilizes the accrual method of accounting for tax purposes".

40. DealStats multiples use MVIC as an estimate of Enterprise Value, commonly known as "Market Value of the Invested Capital," i.e., combined total value of equity and debt which is commonly used to calculate transaction multiples under the Market Approach, such as in DealStats database.[17]

41. Riveron Consulting's Quality of Earnings Report (Exhibit A, No.3, p.7) calculated adjusted EBITDA of $1,722,000 as of November 5, 2021, which is $3,000 lower than the Initial TTM EBITDA used in the Purchase Agreement. The same report

[17] Per DealStats: "MVIC is the total consideration paid to the seller and includes any cash, notes, and/or securities that were used as a form of payment plus any interest-bearing liabilities the buyer assumed. The MVIC price includes the noncompete value and the assumption of interest-bearing liabilities and excludes: (1) the real estate value; (2) any earnouts (because they have not yet been earned and they may not be earned); and (3) the employment/consulting agreement values". See also Exhibit B, No.1 p. 324. .

calculates TTM adjusted net working capital as $29,000 and net debt (long term debt minus cash holdings) of $113,000 (Exhibit A, No. 3, p. 32).

42. The Purchase Agreement provides for a True Up Payment calculation period as "twelve-month period commencing on July 1, 2021, and ending on the later of (a) June 30, 2022, or (b) the last day of the twelfth calendar month following July 1, 2021, that is not an Elected COVID Restriction Month as permitted by Section 1.5(b) so that the calculation period shall consist of twelve Routine Months." (Exhibit A, No 1, p. 8).

43. The True Up Payment was finalized in "Determination Report of Auditor M. Timothy Renjilian" dated March 6, 2025 (Exhibit A, No. 4, hereafter "Auditor Report").

44. Thus, the total consideration received by Mr. Lopez was the sum of the Closing Purchase Price and True Up Payment. We refer to this as "Final Price."

45. According to the Auditor Report, the Post-Closing TTM EBITDA was $1,907,152, and True Up Payment was $910,762, and Working Capital Adjustment (additional payment for working capital) was $35,266 (Exhibit A, No. 4, p. 3).

Corresponding **Final Enterprise Value Calculation** [at the time of sale]**:**

$12,506,250 + $910,762 + $35,266 = **$13,452,278**

46. Hence, the Final Price to Post-Closing TTM EBITDA implied multiple is:

$13,452,278 / $1,907,152 = **7.05**

47. Because this multiple is calculated based on the EBITDA period ending in June 2022, to assess its reasonableness, we looked for comparable transactions close to June 2022. Comparable transactions are used in the Market Approach because they provide objective benchmarks of company value for actual historical acquisition deals (Exhibit B, No. 10, p.449).

48. Home healthcare companies fall under Standard Industrial Classification (SIC) Code 8082 described as follows: "Establishments primarily engaged in providing skilled nursing or medical care in the home, under supervision of a physician"[18].

49. Therefore, we restricted our search of comparable transactions in DealStats database to those in SIC Code 8082. Dealstats contains 304 such transactions. However, many of these transactions are not applicable since they occurred either outside of the reasonable transaction time span or are not closely comparable to the Community's acquisition due to either revenue or profit characteristics.

50. Riveron Consulting reported that, in 2021, Community's revenues were $8,246,000 and Adjusted EBITDA of $1,722,000 (Exhibit A, No. 3, p. 7). Thus, we restricted our sample to historical acquisition targets from 2020 with revenues between $5 million and $20 million and non-negative net income. We have identified nine such transactions shown in Exhibit 1 below:

[18] https://www.osha.gov/sic-manual/8082

employstats
ECONOMICS • STATISTICS

**Exhibit 1: Comparable Transactions**

| Sale Date | Target Business Description | Net Sales | Operating Profit | Sale Price (MVIC) | EBITDA Multiple |
|---|---|---|---|---|---|
| 7/19/22 | Home Health Care Company | $8,303,539 | $684,745 | $6,250,000 | 9.1× |
| 3/31/22 | Non-Medical Home Care | $6,367,830 | $1,296,972 | $9,200,000 | 7.1× |
| 2/28/22 | Non-Medical Home Care / At-Home Senior Care | $8,759,009 | $1,079,586 | $10,000,000 | 9.3× |
| 5/31/21 | At-Home Senior Care Services | $7,291,000 | $807,000 | $4,860,000 | 6.0× |
| 7/1/20 | Home Health Care Services | $9,320,402 | $892,593 | $12,000,000 | 13.4× |
| Median (All) | | | | | 9.13× |

51. As shown in Exhibit 1, above, median multiples for MVIC/Net Sales and MVIC/EBITDA for the transactions uncovered in our search. MVIC is DealStats' abbreviation for Market Value of Invested Capital, which is defined as "MVIC is the total consideration paid to the seller and includes any cash, notes, and/or securities that were used as a form of payment plus any interest-bearing liabilities the buyer assumed.[19]", and thus it corresponds to the total price paid in an acquisition. Note that the median multiple for all transactions for MVIC/EBITDA is 9.13, which is higher than the 7.05 multiple we calculated for Community's acquisition.

52. Therefore, while we do not know the exact identity of the acquisitions reported in Exhibit 1, still, based on this evidence, it is unlikely that the Community's acquisition was over-valued because Community's acquisition multiple of 7.05 is

[19] https://www.bvresources.com/products/faqs/dealstats

actually lower than the median acquisition multiple we identified among comparable transactions in Exhibit 1 (9.13).

53. This conclusion is further bolstered by the robust growth profile of Community at the time of its acquisition. Solace's Acquisition Summary further argues for the following advantages of acquiring Community (Exhibit A, No. 5, p.1):

   a. Strong Trajectory for Growth —Community has a strong record of growth since being founded in 2018.
   b. Monthly hours expanded from 1,250 in January 2019 to over 13,500 in June 2021
   c. Scalable Platform for Continued Expansion
   d. Community is the largest PDN provider in Nevada on hours serviced and has a strong clinician base of nurses.
   e. Continued recruitment success will be critical to serving referral demand.
   f. Beach Head Acquisition — Nevada is one of the fastest growing states and Las Vegas is one of the fastest growing metros in the U.S., with an attractive climate and reimbursement market for PDN services.
   g. Referral Network — Community has a significant referral share with 3 of the 4 largest children's hospitals in Nevada at over 80% of their PDN volume.
   h. Strong relationships with other health systems and physician practices set a solid foundation for growth.

54. Riveron Consulting reports (Exhibit A, No. 3, p. 7) that Community's revenues for 2019, 2020, and TTM 2021 were $1,907,000, $5,200,000, and $8,246,00, respectively. This corresponds to 2021 revenue growth of 59%. Thus, at time of acquisition, Community had demonstrable high revenue growth.

55. Even if in the long-term Community's revenue growth rate were to slow to a lower rate (e.g., as one report suggests to a growth rate of about 10% in 2024[20]), as Solace's own expectations suggest (Exhibit A, No. 5), it would still have a value at time of sale in excess of its selling price.

56. Furthermore, a Morgan Stanley publication states that: "... growth *increases multiples* when returns are above the cost of capital and decreases multiples when returns are below the cost of capital."[21] Therefore, industry research indicates that the calculated transaction multiple of 7.05 for Community understates its value.

57. Therefore, because a.) the actual calculated transaction multiple for Community is lower than the median observed MVIC/EBITDA multiples in DealStats database and b.) because Community had very positive growth prospects at the time of purchase, we conclude that Community was not overpriced, and when compared to the other transactions in its sector it was likely underpriced.

[20] https://www.grandviewresearch.com/industry-analysis/home-healthcare-industry
[21] https://www.morganstanley.com/im/publication/insights/articles/article_valuationmultiples.pdf

employstats
ECONOMICS • STATISTICS

**Analysis Using the Income Approach**

58. In this section of our report, we present our estimates of Community's value using the Income Approach, incorporating the information available about the company and its industry as of mid-summer 2022.

59. The basis for the analysis is the data drawn from the acquisition-related documents such as Membership Interest Purchase Agreement (Exhibit A, No. 1), Riveron Consulting Quality of Earnings Report (Exhibit A, No. 3), and Auditor's Determination Report (Exhibit A, No. 4, dated March 6, 2025) and from publicly-available data sources mentioned further in the text.[22][23] The Auditor's Determination Report (Exhibit A, No. 4, dated March 6, 2025) does not mention the Government's Criminal Original or Superseding Indictments (Exhibit A, No.8 and No. 9, hereafter the Indictment)[24] which were filed against Mr. Lopez in March and September 2023, respectively.[25]

60. Furthermore, the Auditor, Mr. Renjilian, makes a reference to the Expert Report of Brad Wilson dated February 10, 2025 (Exhibit A, No, 4., p. 1). This is well after 2022, when it appears Solace was made aware of the DOJ's criminal investigation.

---

[22] We were provided financial documents for Solace for the period Oct 2022 to September 2023 (Exhibit A, nos.126-160.). We deemed this information unreliable for present purposes as we do not know how the acquisition of Community was incorporated in its operations and overall business model.
[23] We were also provided with a Pre-Sentencing Investigation Report (PSR) (Exhibit A. no. 166) and did not find information in the PSR applicable to our analysis.
[24] The Purchase Agreement (Exhibit A, No. 1, p. 9) stipulates that "The Auditor shall only decide the specific items under dispute by the Parties and its decision for each disputed amount must be within the range of values assigned to each such items in the Closing Statement and the notice of non-acceptance, respectively";
[25] The text of the Indictment clearly states that Mr. Lopez's alleged criminal activities occurred before the time of sale of Community Health Services LLC to Solace (Exhibit A, No. 9, p.5).

Mr. Wilson is the Expert retained by Solace to determine the appropriate magnitude of the True-Up Adjustment. Mr. Renjilian does not reference Mr. Wilson's consideration of the events stipulated in the Indictment (Exhibit A, No.7, and No. 8) regarding calculation of the True-Up Adjustment. Mr. Wilson, Solace's Expert, could have claimed the existence of contingent liabilities related to the undisclosed criminal prosecution of Mr. Lopez in his report but based on our review, it appears he did not.

61. Had Mr. Wilson mentioned this issue, Mr. Renjilian could have determined that the adjustment to the working capital to account for the impact of the Indictment (Exhibit A, No. 7 and No. 8) is necessary under the U.S. GAAP, as stipulated in the Accounting Standard Codification (ASC) promulgated by the U.S. Financial Accounting Standards Board. This adjustment could have been in the form of a contingent liability which would have reduced Community's working capital and, consequently, would reduce the True-Up Payment to Mr. Lopez[26]. Yet, there is no evidence presented that Mr. Renjilian did so.

62. Solace filed a complaint in the Court of Chancery of the State of Delaware on December 12, 2022 (See Exhibit A. no. 9). In this complaint, it is stated that

[26] For example, Mr. Wilson could have argued that the material impact of the undisclosed liability related to the criminal prosecution is a "Type 1 Subsequent Event" requiring an accrual of current contingent liability for the expected losses due to the indictment. Specifically, ASC 855-10-25-1 further stipulates that: " An entity shall recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements." Available at: https://asc.fasb.org ; Accessed on Aug 28, 2025

Solace was informed on February 25, 2022, that Community was under investigation (See Exhibit A. no. 9, p.13). This was not mentioned in Mr. Renjilian's report.

63. Furthermore, according to the testimony of Solace's CEO Ms. Darcie Peacock, Solace did not suffer losses from a complete closure of its business or lose its license in the context of the discussion of the indemnification clauses in the Purchase Agreement of Community by Solace (Exhibit A, No.6, p. 57).

64. Therefore, our analyses under either Market or Income Approaches do not incorporate any quantification of the impact of the non-disclosure of the Indictment by Mr. Lopez to Solace.

65. Based on our valuation analysis and lack of any quantification of the loss from non-disclosure of criminal prosecution in the Auditor's Report, we do not believe that the proceeds from the sale of Community were materially impacted by the non-disclosure of Mr. Lopez's criminal prosecution. Notwithstanding that Solace may not have pursued the acquisition had they known about the non-disclosure, they acquired a valuable business which was likely to provide continued future earnings.

66. Our estimates of value under the Income Approach assume the following:

    a. Expected growth rate in EBITDA to calculate forecasted EBITDA numbers, proxying for Community's future free cash flows. Since we do not have information on Community's expected future capital expenditures,

employstats
ECONOMICS • STATISTICS

we do not account for those and assume that forecasted EBITDA is a good approximation of its future free cash flows.[27]

b. Estimated discount rates to capture the riskiness of Community's future cash flow.

***Future EBITDA Growth Rate Assumptions***

67. It is our understanding that Community provided outpatient nursing services, in particular pediatric nursing services; in particular, Solace's Acquisition Summary states that "Community Home Healthcare is a Home Health Agency providing PDN [pediatric nursing], therapy, and caregiver services to pediatric and adult patients in southern Nevada"(Exhibit A, No. 5 p. 1).

68. We researched publicly available data on growth expectations in outpatient services of the healthcare market in 2022 and identified the following expected growth rates:

a. Grandview Research on U.S. Hospitals Market identifies the CAGR (Compounded Annual Growth Rate) of 9%. [28]

b. A report by HealthAffairs.org identified overall U.S. healthcare spending growth of 4.1%.[29]

---

[27] Riverton Consulting Quality of Earnings Report mentions that it backed out some *owner* capital expenditures as part of its adjustments, and not the company's (Exhibit A, No.3, p. 11).
[28] See https://www.grandviewresearch.com/industry-analysis/us-hospital-facilities-market
[29] https://www.healthaffairs.org/doi/10.1377/hlthaff.2023.01360

c. The expected growth rate for the healthcare support services industry is estimated to be 13.57%.[30]

d. The median and average value of these three rates is 9%, which is the rate of growth we will assume in our calculations for years 2023-2028[31], and we will assume a 3% terminal growth rate in perpetuity for the years that follow. The terminal growth rate is based on the overall expected U.S. inflation levels in 2022.[32]

69. We deem taking this approach to be reasonable because we cannot say with certainty which one of these reported growth rates is more applicable to Community Home Healthcare LLC. Furthermore, Solace's Acquisition Summary states that "Community has a strong track record of growth since being founded in 2018; monthly hours expanded from 1,250 in January 2019 to over 13,500 in June 2021…Nevada is one of the fastest growing states and Las Vegas is one of the fastest growing metros in the U.S., with an attractive climate and reimbursement market for PDN services…" (Exhibit A, No. 4, p.1).

70. Because a company's valuation must be calculated as an estimate of present values of its future cash flow, it is important to use an economically sound discount rate (cost of capital) to derive these present values (e.g., Exhibit B, No. 2, pp. 177-

---

30 https://pages.stern.nyu.edu/~adamodar/pc/archives/fundgrEB21.xls

31 As a robustness check, we also provide a calculation using 7% growth rate in part to account for likely wage increases that occurred after Solace completed its acquisition of Community.

32 https://www.foxbusiness.com/economy/inflation-report-drops-tuesday-economists-warn-prices-going-up

178). Professor Aswath Damodaran of New York University's Stern School of Business publishes estimated average cost of capital rates for public companies in various industries on his website[33]. In 2022, he estimated that the average industry cost of capital for the healthcare support services industry to be 5.33%.[34]

71. Therefore, the valuation literature (e.g., Exhibit B, No.3, p.488, Exhibit B, No. 2, p. 193) requires that an additional "small company risk premium" be added to the cost of capital calculation of smaller firms. According to a recent academic study on small-company valuation, this premium was 11.17% as calculated by valuation consulting firm Kroll (see Exhibit B, No. 6, p. 33). Therefore, the discount rate to account for the cost of capital which we employed for Community was equal to:

16.5% = 5.33% + 11.17%.

[33] Professor Aswath Damodaran is a Professor at the Stern School of Business of New York University. He is, for example, described as follows: "Aswath Damodaran is universally acknowledged as one of the world's pre-eminent authorities on valuation. . He is widely known as "the dean of valuation." https://globaladvisors.biz/2025/08/05/quote-aswath-damodaran-professor-valuation-authority/ ; Accessed on August 20, 2025

[34] https://pages.stern.nyu.edu/~adamodar/pc/archives/wacc21.xls

employstats
ECONOMICS • STATISTICS

72. In Exhibit 2, we present the results of our calculations:

**Exhibit 2: Discounted Cash Flow Valuation of Community Healthcare Services LLC as of June 30, 2022, under 9% Annual Growth Rate**

| Year | Jul-22 | Jul-23 | Jul-24 | Jul-25 | Jul-26 | Jul-27 | Jul-28 |
|---|---|---|---|---|---|---|---|
| EBITDA | $1,907,952 | | | | | | |
| Initial 5-year Growth Rate | | 9% | 9% | 9% | 9% | 9% | 3% |
| Terminal long-term Growth Rate | | | | | | | 3% |
| Forecasted EBITDA | | $2,079,668 | $2,266,838 | $2,470,853 | $2,693,230 | $2,935,621 | $3,023,689 |
| Discount Rate | | 16.5% | 16.5% | 16.5% | 16.5% | 16.5% | 16.5% |
| Discounted EBITDA | | $1,785,122 | $1,670,200 | $1,562,677 | $1,462,075 | $1,367,950 | |
| Terminal Value | | | | | | | $8,958,759 |
| **Total Estimated Enterprise Value** | | | | | | | **$16,806,784** |
| **Proceeds from Community Health Services LLC sale as of June 30, 2022** | | | | | | | **$13,452,278** |

73. As demonstrated in Exhibit 2, our estimated Enterprise Value of $16,806,784 at time of sale, is *higher* than the ultimate payment for the Enterprise Value Mr. Lopez received when he sold Community ($13,452,278). We are of the opinion that our estimate of Enterprise Value is higher because it more correctly captures the Community's growth expected at the time of the acquisition.[35]

[35] Furthermore, we do not believe that our Enterprise Value is subject to any additional adjustments, such as for example, Discount for Lack of Marketability (DLOM), since Solace acquired control of Community Health Services, LLC. When it comes to sales of *minority* interests, valuation literature requires that valuators apply DLOM to valuations of private companies (e.g., Exhibit B, No, 2, p.415). DLOMs are derived from restricted stock studies based on minority interests in public companies, and no such data exists for controlling interests (Exhibit B, No. 1. p. 414) such as that DLOM can be reliably

employstats
ECONOMICS • STATISTICS

74. In Exhibit 3, we repeat the valuation we have done in Exhibit 2 while changing the annual EBITDA growth rate for the first five years from 9% to a more conservative 7%. As can be seen, our estimated Enterprise Value for Community still substantially exceeds the Enterprise Value received of $13,452,278.

**Exhibit 3: Discounted Cash Flow Valuation of Community Healthcare Services LLC as of June 30, 2022, under 7% Annual Growth Rate**

| Year | Jul-22 | Jul-23 | Jul-24 | Jul-25 | Jul-26 | Jul-27 | Jul-28 |
|---|---|---|---|---|---|---|---|
| EBITDA | $1,907,952 | | | | | | |
| Initial 5-year Growth Rate | | 7% | 7% | 7% | 7% | 7% | 3% |
| Terminal long-term Growth Rate | | | | | | | 3% |
| Forecasted EBITDA | | $2,041,509 | $2,184,414 | $2,337,323 | $2,500,936 | $2,676,001 | $2,756,281 |
| Discount Rate | | 16.5% | 16.5% | 16.5% | 16.5% | 16.5% | 16.5% |
| Discounted EBITDA | | $1,752,368 | $1,609,471 | $1,478,227 | $1,357,684 | $1,246,972 | |
| Terminal Value | | | | | | | $8,166,467 |
| **Total Estimated Enterprise Value** | | | | | | | **$15,611,189** |
| **Proceeds from Community Health Services LLC sale as of June 30, 2022** | | | | | | | **$13,452,278** |

75. As stated earlier in this report, the growth prospects for Community are driven by both overall macroeconomic expectations for the healthcare industry in the U.S.

---

applied to controlling interest transactions. Furthermore, we do not apply a control premium to our calculations since we do not have sufficient information on how Solace was going to "synergistically" use the acquisition of Community which would justify even a higher purchase price (Exhibit B, No.2, pp.386-387). Synergies are one of "the most common motivations for a merger…[in] which the whole of the combined company will be worth more than the sum of its parts." (Exhibit B, No. 11, p. 413)

and by the unique positioning of the services that Solace acquired in Nevada by acquiring Community. Again, under either the 9% or 7% scenario growth rate, the value of Community [at the time of sale] exceeded the sale amount.

**Concluding Opinions**

76. Based on our knowledge, skill, experience, education, in the field of economics, accounting and company valuation, our opinions, within a reasonable degree of certainty in applying accepted valuation principles are as follows:

a. Based on our valuation analysis and lack of any quantification of the loss from non-disclosure of criminal prosecution in the Auditor's Report, we do not believe that the proceeds from the sale of Community were materially impacted by the non-disclosure of Mr. Lopez's criminal prosecution.

b. Based on the data and the analysis we utilize in this Report, the purchase price which was the agreed-upon value of Community was below that of documented purchase transactions of firms in the growing home health sector.

c. Based on the data and the analysis we utilize in this Report, Solace did not overpay in the purchase of Community.

employstats
ECONOMICS • STATISTICS

Executed on September 8, 2025

Roberto J. Cavazos Ph.D.

Mikhail V. Pevzner Ph.D.

employstats
ECONOMICS • STATISTICS

**Exhibit A–Case Documents Provided & Cited**

1. Membership Interest Purchase Agreement by and Among Community Home Health Care, LLC, Community Health Services, LLC, Edward Lopez, and Solace Healthcare Nevada, LLC, December 23, 2021 (JPMC_00013813.pdf).
2. Acquisition Proposal from Solace Pediatric Home Care, LLC to Community Home Healthcare, LLC, September 10, 2021 (EL00351.pdf)
3. Riveron Consulting Quality of Earnings Report, November 6, 2021 (RIVERON 000001.pdf).
4. In re Purchase Price Adjustment and True-Up Payment under the Membership Interest Purchase Agreement by and among Community Health Care LLC, Community Health Services, LLC, Edward Lopez, and Solace Healthcare Nevada, LLC, dated December 23, 2021. DETERMINATION REPORT OF AUDITOR M. TIMOTHY RENJILIAN (Purchase Agreement Audit 0004438.pdf)
5. Community Home Healthcare Acquisition Summary. Solace Pediatric Homecare. (Oakmark_0000643.pdf).
6. Trial Transcript of US vs. Eduardo Lopez, Case No. 2:23-cr-00055-CDS-DJA, Las Vegas, Nevada, Tuesday, April 1st, 2025, 1:15 pm-4:29 pm, Courtroom 6B, Jury Trial, Day 7, PM Session (testimony of Mr. Darcie Peacock)
7. ECF 049–9.6.23 Superseding Criminal Indictment Forfeiture Allegation 4920-9806-9578 v.1.pdf
8. ECF 001–03.15.23 4918-3140-0520 v.1.pdf
9. 2022 12 10 Verified Complaint (684084394.1).pdf

**Exhibit A Case Documents Provided**

10. 20220331 (CHS000013) LTR D.Peacock re Indemnification.pdf
11. 20220502 (CHS000075) LTR J.Rockers to M.Tratos re Indemnification Claim Notice.pdf
12. 20220420 (CHS000073) LTR M.Tratos to C.Wilson re Indemnification Claim Notice.pdf
13. 2024 03 22 [DKT 53-1] Ex A to Stipulation and [Proposed] Order for the Production and Exchange of Confidential and Highly Confidential Information.pdf

employstats
ECONOMICS • STATISTICS

14. 2024 03 22 [DKT 53] Stipulation and [Proposed] Order for the Production and Exchange of Confidential and Highly Confidential Information.pdf
15. 2024 03 26 [DKT 56] Granted (Stipulation and [Proposed] Order for the Production and Exchange of Confidential and Highly Confidential Information).pdf
16. 2024 07 10 [DKT 75] Plaintiff's Motion for Partial Judgment on the Pleadings.pdf
17. 2024 08 14 [DKT 89] [UNDER SEAL] Defendants' Brief in Opposition to Plaintiff's Motion for Partial Judgment on the Pleadings.pdf
18. 2024 08 19 [DKT 95] [CONFIDENTIAL FILING] Plaintiff's Reply Brief in Support of Its Motion for Partial Judgment on the Pleadings.pdf
19. 2024 07 10 [DKT 75-1] Proposed Order to Plaintiff's Motion for Partial Judgment on the Pleadings.pdf
20. 20250320 EML D.Prunty to B.Blake FW_ Settlement offer to Solace.pdf
21. 20250327 EML B.Blake to D.Prunty FW_ Settlement Agreement Community adv Solace (FINAL)_doc.pdf
22. 20250513 EML D.Prunty to J.Rockers FW_ Settlement offer to Solace.pdf
23. 20250327 EML B.Blake to D.Prunty FW_ Settlement Agreement Community adv Solace (FINAL) (1).pdf
24. 20240509 LTR J.Rockers to M.Tratos re Indemnification Claim Notice.pdf
25. 20230818 LTR J.Rockers to M.Tratos re Sellers' Indemnification Claim.pdf
26. 20250207 LTR J.Rockers M.Tratos re Indemnification Claim.pdf
27. 20250214 LTR M.Tratos to J. Rockers re Confidential Settlement Offer.pdf
28. 20240412 LTR B. Rabe to J. Rockers re Supplemental Indemnification Claim Notice.pdf
29. 20221017 (CHS000171) EML J.Rockers to M.Tratos re Confidential Settlement Communication.pdf
30. 20250318 EML B.Blake to D.Prunty FW_ Settlement offer to Solace.pdf
31. 20250221 LTR M.Tratos to J. Rockers re Response to Indemnification Letter.pdf
32. 20220826 (CHS000121) LTR J.Rockers to M.Tratos re Indemnification and WF Bank Account.pdf

33. 20220629 (CHS000108) LTR J.Rockers to M.Tratos re Bank Accounts and Indemnification Claim.pdf
34. 20220913 (CHS000124) LTR M.Tratos to J.Rockers re Response to 8.26.22 communication.pdf
35. 20220518 (CHS000079) LTR M.Tratos to J.Rockers re Indemnification Claim Notice.pdf
36. 20220518 (CHS000078) LTR J.Rockers to M.Tratos re Indemnification Claim Notice.pdf
37. 20250117 - CLA Expert Report - Exhibit List.pdf
38. 20250210 - Community Audit Rebuttal Brief.pdf
39. 20250221 - Rebuttal to Wilson payroll adjustments.docx
40. 20250221 - Consideration of triggering event.docx
41. 20250327 AGR [Executed] Global Settlement & Mutual General Release Agreement.pdf
42. 20250218 - CHS - AUDIT PRESENTATION - FINAL.pptx
43. 20230331 - Settlement Agreement (Solace & Community) re WF Bank Accounts.pdf
44. 20250210 - CLA Expert Rebuttal Report - Exhibit List.pdf
45. 20250117 - Community Audit Brief.pdf
46. 20250117 - CLA Expert Report - MIPA Calculations.pdf
47. 20250210 - CLA Expert Rebuttal Report.pdf
48. SOLACEHEALTHCARENV_0004912.pdf
49. SOLACEHEALTHCARENV_0004900.pdf
50. SOLACEHEALTHCARENV_0004909.pdf
51. SOLACEHEALTHCARENV_0004886.pdf
52. SOLACEHEALTHCARENV_0004896.pdf
53. RIVERON 000001.pdf
54. SOLACEHEALTHCARENV_0003451.pdf
55. SOLACEHEALTHCARENV_0003613.pdf

employstats
ECONOMICS • STATISTICS

56. Purchase Agreement Audit 0004438.pdf
57. JPMC_00013813.pdf
58. LVWF-DOJ-00000790.pdf
59. Oakmark_0000643.pdf
60. EL00351.pdf
61. 10.23.2023 - Pls Motion to Dismiss.pdf
62. 11.20.2023 - Amended Complaint.pdf
63. 12.15.2022 - Complaint.pdf
64. 12.6.2024 Order Implementing Court's Rulings.pdf
65. 04.13.2023 - Voluntary Dismissal of Counts IV and V of Complaint.pdf
66. 07.18.2024 - Pl Mot. for Partial Judgment on Pleadings.pdf
67. 12.13.2023 Pls Partial Motion to Dismiss.pdf
68. 01.23.2024 - Defendants' Partial Mot. to Dismiss.pdf
69. 03.21.25 Stipulation of Dismissal with Prejudice.pdf
70. 12.4.2023 - Defendants Answer and Amended Counterclaim.pdf
71. 08.21.2024 - Defendants Br. in Opp. to Pl Partial Judgment on Pleadings.pdf
72. 208.pdf
73. 229R.pdf
74. 210R.pdf
75. DEF Ex. 743.pdf
76. 233.pdf
77. DEF Ex. 751.pdf
78. DEF Ex. 750.pdf
79. 211.pdf
80. 143.pdf
81. 147.pdf
82. 141.pdf
83. 146.pdf

employstats
ECONOMICS • STATISTICS

84. 140.pdf
85. 149.pdf
86. 150.pdf
87. 157.pdf
88. 148.pdf
89. 20250117 - Community Audit Brief (1).pdf
90. 20250210 - CLA Expert Rebuttal Report - Exhibit List (1).pdf
91. 20250117 - CLA Expert Report - MIPA Calculations (1).pdf
92. 20250210 - CLA Expert Rebuttal Report (1).pdf
93. 20250210 - Community Audit Rebuttal Brief (1).pdf
94. 20250221 - Consideration of triggering event (1).docx
95. 20250221 - Rebuttal to Wilson payroll adjustments (1).docx
96. 20230331 - Settlement Agreement (Solace & Community) re WF Bank Accounts (1).pdf
97. 20250117 - CLA Expert Report - Exhibit List (1).pdf
98. 20250207 LTR J. Rockers - EXHIBIT C.pdf
99. 20250207 LTR J.Rockers - EXHIBIT B.pdf
100. 20250207 LTR J.Rockers - EXHIBIT A.pdf
101. CHS000602.pdf
102. CHS000641.xlsx
103. CHS000635.pdf
104. CHS000641.pdf
105. CHS000626.pdf
106. CHS000582.pdf
107. CHS000571.pdf
108. CHS000525.pdf
109. CHS000553.pdf
110. CHS000564.pdf

employstats
ECONOMICS • STATISTICS

111. CHS000517.pdf
112. CHS000476.pdf
113. CHS000502.pdf
114. CHS000437.pdf
115. CHS000474.pdf
116. CHS000471.pdf
117. CHS000426.pdf
118. CHS000470.pdf
119. CHS000424.xlsx
120. CHS000423.xlsx
121. CHS000423.pdf
122. CHS000424.pdf
123. CHS000425.xlsx
124. CHS000425.pdf
125. CHS000422.xlsx
126. CHS000404.pdf
127. CHS000422.pdf
128. CHS000415.pdf
129. CHS000397.pdf
130. CHS000392.pdf
131. SOLACEHEALTHCARENV_0005349.XLSX
132. JPMC_00122172.pdf
133. JPMC_00122159.pdf
134. SOLACEHEALTHCARENV_0005557.XLSX
135. SOLACEHEALTHCARENV_0005543.XLSX
136. SOLACEHEALTHCARENV_0005330.XLSX
137. SOLACEHEALTHCARENV_0005434.XLSX
138. SOLACEHEALTHCARENV_0005542.XLSX

employstats
ECONOMICS • STATISTICS

139. SOLACEHEALTHCARENV_0005344.pdf
140. SOLACEHEALTHCARENV_0005315.pdf
141. SOLACEHEALTHCARENV_0005313.XLSX
142. SOLACEHEALTHCARENV_0005143.XLSX
143. SOLACEHEALTHCARENV_0005328.pdf
144. SOLACEHEALTHCARENV_0005312.XLSX
145. SOLACEHEALTHCARENV_0005314.pdf
146. SOLACEHEALTHCARENV_0005190.XLSX
147. JPMC_00160714.XLSX
148. SOLACEHEALTHCARENV_0005181.pdf
149. SOLACEHEALTHCARENV_0005186.pdf
150. SOLACEHEALTHCARENV_0005144.XLSX
151. JPMC_00163234.XLSX
152. DEF Ex. 768.pdf
153. JPMC_00163235.pdf
154. JPMC_00160716.pdf
155. JPMC_00163234.pdf
156. JPMC_00160714.pdf
157. JPMC_00163233.pdf
158. JPMC_00124989.XLSX
159. JPMC_00160715.pdf
160. JPMC_00124990.pdf
161. JPMC_00124989.pdf
162. JPMC_00160713.pdf
163. JPMC_00122172.XLSX
164. JPMC_00122175.pdf
165. JPMC_00124988.pdf
166. PSR (Lopez-Signed) (9.04.2025).pdf

employstats
ECONOMICS • STATISTICS

**Exhibit B: Books and Treatises Relied Upon**


1. Hitchner, J. (2017). Financial Valuation, Applications and Models. Fourth Edition. Wiley
2. Pratt, S. (2008). Valuing a Business, The Analysis and Appraisal of Closely Held Companies. 5th edition, McGraw Hill
3. Trugman, G. (2022). Understanding Business Valuation, 5th edition, BVR
4. Nechay, A. (2024). How to Use EBITDA Multiples in a Medical Practice Valuation. Available at: https://nechayappraisals.com/how-to-use-ebitda-multiples-in-a-medical-practice-valuation/
5. Pratt, S. (n.d.) The Market Approach to Valuing Businesses (2nd edition, Chapter 9). Available at: https://edu.nacva.com/BVTC/Comp_Trans_and_Public_Comps_2013v2_Chapter_9.pdf
6. Galbraith, C. S. (2025). Size premium in small business valuation: Analysis of closely held firms. The Journal of Entrepreneurial Finance (JEF), 27(1), 31-46. Available at: https://www.econstor.eu/bitstream/10419/319786/1/1928271693.pdf
7. Discount for Lack of Marketability (2009). IRS Practice Aid. Available at: https://www.irs.gov/pub/irs-lbi/dlom.pdf ; Accessed on August 11, 2025.
8. Barenbaum, L., Schubert, W., & Garcia, K. (2015). Determining lack of marketability discounts: Employing an equity collar. The Journal of Entrepreneurial Finance (JEF), 17(1), 65-81. Available at: https://www.econstor.eu/bitstream/10419/197561/1/1663111006.pdf.
9. Rosenbaum, J., and J. Pearl. Investment Banking Valuation, Leveraged Buyouts and Mergers and Acquisitions, 2nd edition, Wiley.
10. Investments. Principles of Portfolio and Equity Analysis. CFA Institute Investment Series, 2011
11. Corporate Finance. A Practical Approach. CFA Institute Investment Series, 2nd edition