DICKINSON WRIGHT, PLLC
Mackenzie E. Robinson
Nevada Bar No. 16309
Email:  MRobinson@dickinson-wright.com
100 West Liberty Street, Suite 940
Reno, Nevada  89501-1991
Tel:     775-343-7500
Fax:    844-670-6009

DICKINSON WRIGHT, PLLC
Dan W. Goldfine (*pro hac vice*)
Email:  DGoldfine@dickinson-wright.com
1850 North Central Avenue
Suite 1400
Phoenix, AZ 85004-4568
Tel:     602-285-5000
Fax:    844-670-6009

DICKINSON WRIGHT, PLLC
Michael M. Beckwith (*pro hac vice*)
Email:  MBeckwith@dickinson-wright.com
615 National Avenue
Suite 220
Mountain View, CA 94043
Tel:     408-701-6200
Fax:    844-670-6009

*Attorneys for Defendant*
*Eduardo Ruben Lopez*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDUARDO RUBEN LOPEZ,<br><br>Defendant. | 2:23-CR-00055-CDS-DJA<br><br>**DEFENDANT'S MOTION FOR NEW TRIAL BASED ON *NAPUE* AND *BRADY/GIGLIO*** |

## I.   INTRODUCTION

Under the 2021 Conditional Leniency Agreement admitted at trial, Maxim was obligated to pay full restitution to everyone injured by the antitrust conspiracy; specifically, "to pay restitution to <u>any person</u> or entity injured as a result of the anticompetitive activity . . . in which

[it] was a participant." Gov. Ex. 174 (emphasis added).  Throughout trial, from opening to closing, the Antitrust Division told the jury that Maxim and Mr. Lubinsky would have to pay restitution to anyone injured as a result of the antitrust conspiracy.  Dkt. Nos. 576 at 11 (opening), 580 at 11 (Lubinsky direct); 650 at 127 (closing).

These claims were false.  On September 18, 2025, the Antitrust Division admitted in writing that Maxim is <u>only</u> "obligated to pay restitution to nurses it employed." September 18, 2025 Response to the Draft Presentence Investigation Report (PSR).[1]  Contrary to the Antitrust Division's statements at trial, as well as the 2021 Conditional Leniency Agreement it offered as evidence, Maxim is <u>not</u> being required to pay restitution to "any person" injured as a result of "the anticompetitive activity" it reported.  Tab A,[2] Gov. Ex. 174, 2021 Conditional Leniency Agreement.  Pardoning the full extent of Maxim's restitution raises two issue under *Napue* and *Brady/Giglio*:  (1) the import of the false statements elicited and used by the Antitrust Division during trial (even if unintentional), and (2) the suppression of impeachment evidence.[3]

Not only did the Antitrust Division mislead the jury, its misrepresentations and suppression harmed Mr. Lopez.  Because Maxim was, in fact, obligated only to pay partial restitution (that is, for its nurses, but not the nurses from Spring View/Epic/Aveanna and NurseCore), Mr. Lopez was entitled to (1) have that fact fairly presented by the Antitrust Division during trial and (2) be given that information in order to impeach Mr. Lubinsky, Maxim's employee and the lead antitrust conspiracy witness.  Mr. Lopez, however, was not permitted to argue the issue or impeach Mr. Lubinsky's testimony with the fact that his employer, Maxim, had a side-deal with the Antitrust Division—one that was materially different from what was presented to the jury.  Such argument and impeachment would not only call into question Mr. Lubinsky's testimony, but the testimony of other Maxim witnesses, as well as the integrity and transparency of the Antitrust Division's investigation and the merits of the prosecution overall.  With this information, the outcome at trial

---

[1] The parties previously met and conferred on this issue but have been unable to resolve the issue without court action.  LRC 12-2.
[2] The Tab reference corresponds to the attached respective exhibits.
[3] The Antitrust Division's use of the 2021 Conditional Leniency Agreement, both as substantive evidence and to vouch for Mr. Lubinsky, implicates both *Brady* and *Giglio*.

2

would likely have been different. Millions of dollars are at issue on the question of restitution. As such, this was a major impeachment issue for the critical Antitrust Division witness.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Legal Standard

Federal Rule of Criminal Procedure 33 allows a district court to vacate any verdict based on evidence discovered after trial. Fed. R. Crim. P. 33(a). "'A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal,' and the court may thus weigh the evidence itself and judge the credibility of witnesses." *United States v. Lopez*, 2025 WL 1695358, at *1 (D. Nev. June 17, 2025) (quoting *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). The defendant carries the burden to show a new trial is warranted. *Id.* (citing *United States v. Halali*, 2017 WL 3232566, at *2 (N.D. Cal. July 28, 2017)). A new trial is necessary on all counts, even if the basis for the new trial primarily relates to a single count, when the trial presentation weaved together events leading to the various convictions. *United States v. Bates*, 677 F. Supp. 3d 1200, 1217 (D. Nev. 2023).

### B. Relevant Facts

The Antitrust Division presented Mr. Lubinsky as the primary conspiracy witness to convict Mr. Lopez of violating the antitrust laws. According to the Antitrust Division's own presentation and argument, the credibility of Mr. Lubinsky's testimony was entirely wrapped up with the terms of the Antitrust Division's agreement with his employer, under which neither he nor Maxim would be prosecuted. So much so, that the Antitrust Division introduced the written agreement into evidence and repeatedly used it to bolster Mr. Lubinsky's testimony. The problem is that the Antitrust Division misrepresented its agreement with Maxim to the jury, suppressing its true nature, and only disclosing the true substance of the agreement after trial.

Mr. Lubinsky testified over three days of trial, providing insider commentary about the formation and functioning of the antitrust conspiracy. Without the jury believing Mr. Lubinsky, it is highly unlikely the Antitrust Division would have convicted Mr. Lopez of a wage fixing conspiracy that lasted from 2016 to 2019.

**1. The Antitrust Division referred to the leniency agreement in opening statement.**

From the start, the Antitrust Division sought to justify its decision to grant leniency, bolster Mr. Lubinsky's testimony, and provide other evidence of a conspiracy with its Exhibit 174, the purported 2021 Conditional Leniency Agreement. In opening, the Antitrust Division represented to the jury that Maxim and Lubinsky were benefiting from a program where, "a company and its employees won't be prosecuted" if they admit what they did and "they pay the victims for the losses they caused." Antitrust Division's Opening Statement, Dkt. 576, 11:21–23. Importantly, in its opening, the Antitrust Division misrepresented to the jury that Mr. Lubinsky and his company will "pay the victims for the losses they caused." *Id*. The Antitrust Division did not state that it would only seek restitution from Maxim for the nurses employed by Maxim. Without the knowledge of this limitation or side-deal, Mr. Lopez could not respond in opening, pointing out that the Antitrust Division had misinformed the jury and, in fact, had made a deal with Maxim and its employees (including Mr. Lubinsky) that would save Maxim millions of dollars, assuming it and Mr. Lubinsky cooperated in a manner acceptable to the Antitrust Division.[4]

**2. The Antitrust Division entered the leniency agreement into evidence.**

The misrepresentation during opening was not an isolated incident. The Antitrust Division repeatedly emphasized the evidentiary value of the misrepresented 2021 Conditional Leniency Agreement ("2021 Agreement") during trial. By introducing the 2021 Agreement as an exhibit, the Antitrust Division further exposed the jury to the misrepresentation during deliberations.[5] Direct Examination of Daniel Lubinsky, Dkt. 580, 11:12. In other words, the Antitrust Division asked the Court to allow the jury to review, and take with them into deliberations, a misleading exhibit. Due to the Antitrust Division's misrepresentation regarding the true nature of its

---

[4] Though the Antitrust Division initially claimed Maxim was obligated to compensate all of the victims of the conspiracy, it now admits that Maxim is only obligated to compensate its own employees. The difference is substantial. It appears Antitrust Division estimates non-Maxim nurses incurred losses totaling $5,311,316.18. Tab B, Excerpt of Antitrust Division's Responses to Draft Presentencing Report at 2.

[5] The Antitrust Division provided the jury with Maxim's signed admission, which they used to bolster Lubinky's testimony, implicitly arguing that Maxim already admitted guilt. *See e.g.*, Direct Examination of Daniel Lubinsky, Dkt. 580, at 12:3–23 (highlighting that Maxim had signed an agreement "in connection with the criminal violation" of antitrust laws for "fixing wages"); Tab A, Ex. 174, 2021 Agreement, at 2 (in reporting "a criminal violation" of antitrust laws, Maxim "took prompt and effective action to terminate its participation in the anticompetitive activity").

4

agreement with Maxim, Mr. Lopez could neither object to the 2021 Agreement nor diminish its import by pointing out to the jury how it was misleading or how Maxim benefited by providing Mr. Lubinsky as a witness.

### 3. The Antitrust Division referred to the leniency agreement with its key witness.

During direct examination, the Antitrust Division both vouched for Mr. Lubinsky's credibility and bolstered his testimony using the 2021 Agreement. Direct Examination of Daniel Lubinsky, Dkt. 580, 15:13–18; 13:22–17:17. During direct examination, the Antitrust Division also elicited apparently false testimony from Mr. Lubinsky by asking "[o]ther than this agreement that we've been talking about, are there any other agreements that you have with the Antitrust Division?" *Id.*, at 17:18–20. At the Antitrust Division's behest, Mr. Lubinsky testified (either knowingly or unknowingly) that no other agreements existed. *Id*. This left the jury with the impression that Maxim was flatly obligated to pay restitution to "any person or entity injured as a result of the anticompetitive activity being reported," as stated in the 2021 Agreement. *Id.* at 17:21; Tab A, Exhibit 174, 2021 Agreement, at ¶2(g). Mr. Lopez did not—and could not—impeach Mr. Lubinsky or others regarding the monetary benefits Maxim received under the actual agreement that the Antitrust Division had with Maxim (i.e., the agreement to pay only limited restitution).[6] Cross Examination of Daniel Lubinsky, Dkt. 597, 23:8–16.

Mr. Lopez could not impeach Mr. Lubinsky regarding the substantial financial benefits provided to Maxim because the government did not disclose that information until after trial. *Compare* Tab A, Exhibit 174, Maxim Leniency Agreement, at ¶2(g) (Maxim agreed "to pay restitution to any person . . . injured as a result of the anticompetitive activity . . . in which Applicant was a participant") *with* Tab B, Excerpt of Antitrust Division's Responses to Draft Presentencing Report (Maxim is only "obligated to pay restitution to nurses it employed"). Indeed, it appears Maxim has paid no restitution to date, as Mr. Lubinsky testified. Cross Examination of Daniel Lubinsky, Dkt. 599, 26:17–22.

---

[6] The Antitrust Division called several other Maxim witnesses as well, including, but not limited to, Ray Carbone, Maxim's Chief Financial Officer, Tara Campbell, Maxim's Treasurer, and Juan Rafael Barrett, the Director of Maxim's Seattle Office. Dkt. Nos. 605 at 133; 622 at 77; 624 at 68. Had Mr. Lopez known that the actual agreement meant millions of dollars in savings for Maxim if its employees cooperated, he could have impeached them.

**4. The Antitrust Division referred to the leniency agreement in closing argument.**

Whether intentionally or not, the Antitrust Division repeatedly and actively misrepresented Maxim's restitution obligation. At closing, the Government argued, "I want to be clear. It doesn't mean that [Maxim and Lubinsky] get a totally free pass . . . <u>they have to pay back the victims of their crime</u>, but it is true that they don't get prosecuted." Government's Closing Statement, Dkt. 650, 127:4–8 (emphasis added).[7]

**5. The Antitrust Division addressed Lubinsky's credibility in rebuttal argument.**

The Antitrust Division also leveraged its misrepresentation and suppression when undercutting the trial attorney's attempts at impeaching Mr. Lubinsky. In its rebuttal argument, the Antitrust Division stated:

> [L]et's talk about Mr. Lubinsky. There's only two doors. There's only two doors, ladies and gentlemen. Either Dan Lubinsky lied, completely lied about there being a crime, in which case, what do you have? You have a guy who didn't commit a crime, lied about it, decided to go along with this company on this whistleblower program, came into federal court, made up committing a federal crime, and *therefore perjured himself, and he does it, why? . . . That's what you ask yourself.*

Antitrust Division's Closing Statement, Dkt. 650, 182:18–183:3 (emphasis added). Setting aside the fact that testimony is not necessarily binary (i.e., all false or all true), the Antitrust Division's actual agreement with Maxim, and its substantial financial benefit, provides "the why" the Antitrust Division argued to the jury did not exist. Unknown to Mr. Lopez and the jury was the fact that Maxim would actually avoid paying millions of dollars in restitution to non-Maxim nurses if it cooperated in a manner the Antitrust Division found favorable.

**6. Maxim got leniency at a bargain.**

The value of the suppressed benefit provided to Maxim is substantial. From Maxim's perspective, not only would it and its employees avoid the burden of prosecution in exchange for cooperation the Antitrust Division found favorable, but it would receive leniency at a bargain. The significance of that bargain was underscored by Mr. Lubinsky's testimony that Maxim was the smallest of the conspirators during much of the relevant time. Direct Examination of Daniel

---

[7] Given that "their crime" was the conspiracy itself, this closing argument further demonstrates the Antitrust Division's misleading representation that Maxim was obligated to pay restitution to "any person injured" by the conspiracy, not just those that Maxim employed.

Lubinsky, Dkt. 584, 20:23–21:2 (Lubinsky testifying that Spring View was the largest agency in Las Vegas in 2016, NurseCore was second, and Maxim was third). Rather than paying over $5.3 million in restitution, Maxim could receive immunity for a fraction of that figure, all while avoiding significant legal costs associated with a prosecution. The economics are undeniable. They provided Maxim, through its agent, Mr. Lubinsky, a clear incentive to provide testimony favorable to the Antitrust Division—whether that testimony was true or not.

The Antitrust Division's failure to disclose the true nature of its agreement with Maxim deprived Mr. Lopez of the ability to argue and impeach regarding Maxim's substantial benefit and the corresponding incentives.

### C. The Antitrust Division violated *Napue* by using false testimony

A *Napue* violation warrants a new trial. *See United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014) ("A defendant's due process rights are violated when a conviction is obtained through the knowing use of false testimony."). "To establish a Napue violation, a defendant must show: (1) that the testimony was actually false, (2) that the [Antitrust Division] knew or should have known that it was false, and (3) that the testimony was material, meaning there is a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (quoting *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011)).

**1. The Antitrust Division elicited false testimony.**

The Antitrust Division elicited false testimony regarding its own 2021 Agreement with Maxim. As a preliminary matter, the Antitrust Division first discussed and then introduced the 2021 Agreement (its Exhibit 174), which was different from the actual agreement it had with Maxim. Antitrust Division's Opening Statement, Dkt. 576, 11:21–23; Direct Examination of Daniel Lubinsky, Dkt. 580, 11:12. Then, during direct examination, the Antitrust Division asked Mr. Lubinsky about the misleading 2021 Agreement. It specifically asked: "Other than this agreement that we've been talking about, are there any other agreements that you have with the Antitrust Division?" Direct Examination of Daniel Lubinsky, Dkt. 580, 17:18–20. At the Antitrust Division's urging, Mr. Lubinsky confirmed no other agreements existed. *Id.* at 17:21. Based on the post-trial disclosure, this statement was false. The Antitrust Division further clarified through

1  a leading question that no other promises or side agreements existed. *Id.* at 17:22–23 ("And does
2  anything else other than what we talked about here and that you've mentioned, any other promises
3  made to you?"). Again, Mr. Lubinsky confirmed no such promises or side agreements existed. *Id.*
4  at 17:24. The premise of the question and its answer were both false, as demonstrated by the
5  Antitrust Division's post-trial disclosure and written admission in its informal objections to the
6  PSR.[8]

### 2. The Antitrust Division knew or should have known it used false testimony.

The Antitrust Division used this testimony to explain to the jury that Exhibit 174 was the only agreement between Maxim and the Antitrust Division. However, it appears the Antitrust Division and Maxim maintained an undisclosed side agreement worth millions of dollars, pursuant to which Maxim would only be responsible for restitution relating to its own employees, rather than all victims of the conspiracy it reported. This benefit was contrary to what was stated in its Exhibit 174 (Conditional Leniency Agreement) and represented at trial. The Antitrust Division presumably knew what deal it made with Maxim and, thereby, knew or should have known such statements were false. To the extent that the Antitrust Division says it did not know the statement was false, discovery will be required.

### 3. The false statements were material.

With regard to materiality, the Antitrust Division used the misleading 2021 Agreement, and the false statements related to it, as part of its argument for conviction. Specifically, it used it to bolster its leading conspiracy witness and justify its decision not to prosecute Maxim and Lubinsky. Moreover, this false testimony (that there was only one agreement) prevented Mr. Lopez from arguing and impeaching Mr. Lubinsky's testimony with the fact that his employer had a side-deal with the Antitrust Division—one that was different from what was presented to the jury and that provided Maxim with greater benefit than the jury understood. Such argument and impeachment would not only call into question Mr. Lubinsky's testimony, but the testimony of other Maxim witnesses, as well as the integrity and transparency of the Antitrust Division's

---

[8] Whether Mr. Lubinsky knew this statement to be false is an open question.

1  investigation overall.  These false statements, which the Antitrust Division used, were material in
2  that there is a reasonable likelihood that they could have affected the judgment of the jury.
3       Whether intentionally or not, the Antitrust Division repeatedly misrepresented that Maxim
4  had agreed to pay full restitution to all its victims and suppressed, until after trial, that it had made
5  a special deal with Maxim and its employees that it was obligated only to pay restitution to its
6  nurses, saving Maxim millions in restitution.[9]
7       In its opening, the Antitrust Division said that Maxim and its employees would pay full
8  restitution.  Antitrust Division's Opening Statement, Dkt. 576, 11:21–23.  The Antitrust Division
9  later introduced the 2021 Agreement into evidence so the jury could consider it during
10 deliberations, leading them to believe that Maxim would pay restitution to "any person or entity
11 injured as a result of the anticompetitive activity being reported."  Direct Examination of Daniel
12 Lubinsky, Dkt. 580, 11:12; Tab A, Exhibit 174, 2021 Agreement, at ¶2(g).  The Antitrust Division
13 then used the misleading 2021 Agreement with Maxim to bolster Mr. Lubinsky's testimony.
14 Direct Examination of Daniel Lubinsky, Dkt. 580, 15:13–18.  It then went so far as to ask Mr.
15 Lubinsky if there were other agreements between the Antitrust Division and Maxim.  *Id.* at 17:18–
16 20.  In closing, the Antitrust Division argued that Maxim had agreed to pay restitution to all
17 victims: "I want to be clear.  It doesn't mean that [Maxim and Lubinsky] get a totally free pass.
18 They have to cooperate for years, <u>they have to pay back the victims of their crime</u>, but it is true
19 that they don't get prosecuted."  Antitrust Division's Closing Statement, Dkt. 650, 127:4–8
20 (emphasis added).  Accordingly, the Antitrust Division's use of materially false testimony
21 constituted a *Napue* violation and warrants a new trial.

22      **D.**     **The Antitrust Division violated *Brady* in suppressing benefits to Maxim**

23     A *Brady* violation also warrants a new trial.  *Bates*, 677 F.Supp.3d at 1209; *United States*
24 *v. Kohring*, 637 F.3d 895 (9th Cir. 2011) ("the appropriate remedy for a *Brady/Giglio* violation
25 will usually be a new trial").  *Brady* and its progeny impose on the Antitrust Division an
26 "affirmative duty to disclose evidence favorable to a defendant."  *Kyles v. Whitley*, 514 U.S. 419,

---

[9] Based on the information now provided, the Antitrust Division's intent and knowledge are unclear.  If the Antitrust Division puts its intent and knowledge at issue as a defense to its wrongful conduct, discovery from the Antitrust Division and Maxim, a third-party, will be necessary.

9

432 (1995) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)); *see* -*Giglio v. United States*, 405 U.S. 150, 155 (1972) (finding evidence of "any understanding or agreement" regarding a witness benefit would be relevant to credibility and the jury is entitled to know of it).  Here, Mr. Lopez must establish three elements to show a *Brady/Giglio* violation warranting a new trial:  (1) the suppressed evidence must be favorable to him; (2) the evidence must have been suppressed by the Antitrust Division, either willfully or inadvertently; and (3) the suppressed evidence must be material to his guilt or innocence.  *Bates*, 677 F.Supp.3d at 1209; *see also Kyles*, 514 U.S. at 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence").

### 1. The Antitrust Division suppressed evidence.

Whether intentional or not, the Antitrust Division suppressed evidence of the actual benefits Maxim received.  *Brady*, 373 U.S. at 87 (finding "suppression" of favorable evidence violates due process, "irrespective of the good faith or bad faith of the prosecution").  While at trial, the Antitrust Division represented to the jury that Maxim was obligated to pay restitution to "any person or entity injured as a result of the anticompetitive activity being reported."  However, after trial, it revealed that Maxim is only "obligated to pay restitution to nurses it employed."  Tab A, Exhibit 174, 2021 Agreement, at ¶2(g); Tab B, Excerpt of Antitrust Division's Responses to Draft Presentencing Report, at p. 2.  It appears that the Antitrust Division had knowledge of the true nature of its agreement with Maxim; yet, it did not reveal that information until after trial.

### 2. The suppressed evidence was favorable.

Favorable evidence is "any evidence" that tends to call the Antitrust Division's case "into doubt," including "impeachment material that is relevant to either guilt or punishment." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). The suppressed evidence (i.e., the actual benefits given to Maxim in exchange for its cooperation and the testimony of its employees) helped the Antitrust Division in three ways.  First, it allowed the Antitrust Division to claim that Maxim had agreed to pay restitution to "all" victims, which justified its decision to not to prosecute Maxim and its employees along with Mr. Lopez.  Antitrust Division's Opening Statement, Dkt. 576, 11:21–23.  Second, the suppression of the evidence allowed the Antitrust Division to bolster its leading conspiracy witness, who testified over the

course of three days, with supporting evidence in the form of Maxim's signed agreement. *E.g.,* Direct Examination of Daniel Lubinsky, Dkt. 580, 13:22–17:24. Finally, it allowed the Antitrust Division to vouch for Mr. Lubinsky's credibility without contradiction. *Id*. This evidence was favorable because without it (i.e., the details of the actual benefits given to Maxim), Mr. Lopez could not challenge these issues or fully impeach the leading conspiracy witness on the financial incentives to cooperate. Similarly, in closing, the suppression of evidence allowed the Antitrust Division to use the 2021 Agreement to deflect impeachment of Mr. Lubinsky and claim that he testified truthfully. Antitrust Division's Closing Statement, Dkt. 650, 182:18–183:3. Without this favorable evidence, Mr. Lopez was unable to fully challenge these arguments as well.

Mr. Lubinsky was the leading conspiracy witness. Without believing him, the jury would not have convicted Mr. Lopez. Impeaching him with the actual deal his employer struck with the Antitrust Division would have attacked his core credibility and diminished the Antitrust Division's repeated vouching. *See e.g., United States v. Yepiz*, 718 F. App'x 456, 466–67 (9th Cir. 2017) (undisclosed evidence of benefits provided to a government informant constituted a *Brady* violation). Mr. Lubinsky testified to all aspects of the conspiracy of conviction, including the existence of the conspiracy. He was the only witness to do so. *E.g.,* Direct Examination of Lubinsky, Dkt. 580, 57:23-25 ("that's where we had agreed upon keeping rates in line with one another."). Beyond Mr. Lubinsky's direct testimony regarding the existence of the conspiracy and Mr. Lopez's participation, the Antitrust Division relied on him to interpret and explain the other evidence relating to the conspiracy, including communications to which Lubinsky was not a party. *Id.* at 74:12–76:21. Lubinsky also interpreted and explained other documentary evidence presented, testifying to Mr. Lopez's state of mind. *E.g.,* Direct Examination of Lubinsky, Dkt. 584, 26:8–10 ("Q. So when the defendant said "sounds like a deal," what do you think he meant? A. That we agreed to pay 27 to 30 for RN.").[10] Because the suppressed impeachment evidence

---

[10] As further example, given the lack of corroboration (i.e., texts and emails), Mr. Lubinsky's testimony was essential to explaining Mr. Lopez's involvement in the conspiracy during the roughly 21 months he spent outside of Las Vegas. The Antitrust Division's arguments regarding the intent behind certain emails and text messages during that time relied heavily on testimony provided by Mr. Lubinsky, particularly those involving the claim that Mr. Lopez influenced Mr. Wyley.

11

could have drawn into question Mr. Lubinsky's testimony and interpretation of documentary evidence, it was not only favorable, it was critical.

### 3. The suppressed evidence was material.

"Suppressed evidence is material if 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011) (quoting *Kyles*, 514 U.S. at 435). That is, Mr. Lopez "does not need to prove that a different result would have occurred, just that there is 'a reasonable probability of a different result.'" *Id.* (quoting Id. *Kyles*, 514 U.S. at 434). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial[.]" *Kyles*, 514 U.S. at 434.

When examining a *Brady/Giglio* violation relating to a government witness's testimony, the Ninth Circuit engages in a two-step inquiry. *Wong*, 667 F.3d at 982. First, courts consider whether "there was a reasonable probability that the new evidence would have changed the way in which the jurors viewed [Mr. Lubinsky's or other's] testimony." *Id.* Second, courts consider whether "there was a reasonable probability that this change would have resulted in a different verdict." *Id.* The first step is satisfied where "the withheld evidence could have provided additional or alternative means of impeachment." *Id.* Withheld evidence is not to be ignored where it could have "provided the defense with a new and different ground of impeachment." *Id.* (quoting *Silva v. Brown*, 416 F.3d 980, 988 (9th Cir. 2005)). Thus, where withheld evidence opens "a new avenue of impeachment," such evidence is not to be ignored because, otherwise, the government could "satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative." *Id.* (internal citation and quotation mark omitted).

#### a. The suppressed evidence would have changed the jurors' views

Here, misrepresenting and suppressing the actual restitution agreement, allowed the Antitrust Division to both bolster Mr. Lubinsky's testimony and neuter his impeachment. There is a reasonably probability that had the Antitrust Division not suppressed the true nature of its deal with Maxim and its employees, the evidence "would have changed the way in which the jurors

12

viewed [Mr. Lubinsky's] testimony." *Wong*, 667 F.3d at 982 (quoting *Silva*, 416 F.3d at 988). The suppressed evidence would have "provided the defense with a new and different ground of impeachment." *Id*. As the Antitrust Division itself argued at closing, Mr. Lopez could not articulate what incentive Mr. Lubinsky had to provide false testimony. Antitrust Division's Closing Statement, Dkt. 650, 182:20–183:3 (Mr. Lubinsky "perjured himself, and he does it, why?"). The suppressed evidence (i.e., significantly better restitution benefits than presented to the jury) provided the very impeachment evidence the Antitrust Division argued did not exist. The hidden nature of the actual leniency agreement and its significant undisclosed benefit provided a new avenue of impeachment evidence that would have changed the way the jury viewed Mr. Lubinsky's testimony. Moreover, the suppressed evidence would have drawn into question the integrity and transparency of the Antitrust Division's case. If the suppressed evidence were available, the jury would have learned that Maxim actually was obligated to compensate only its own employees, achieving a substantial savings, while still being able to secure immunity and avoiding significant costs related to defending against a prosecution.

### b. There was a reasonable probability of a different result.

Given the centrality of Mr. Lubinsky to this conspiracy and the importance of his testimony in this case, there is a reasonable probability the disclosure of the suppressed evidence would have resulted in a different verdict. *Wong*, 667 F.3d at 982; *United States v. Yepiz*, 718 F. App'x 456, 466–67 (9th Cir. 2017). The Antitrust Division's conduct at trial informs materiality. In *Wong*, the Ninth Circuit noted, "[t]he prosecutor spent time during his summations discussing [the witness's] testimony and countering the attempted impeachment of him . . . a court could view this as further support for the proposition that [the witness] was central to the prosecution's cases." *Id.* at 982. The prosecutorial focus on Mt. Lubinsky's testimony demonstrates materiality. *Id.*

Here, Mr. Lubinsky was central to the prosecution. He was certainly the longest witness, testifying over the course of three days. Moreover, he was the sole insider witness the Antitrust Division called to testify about the existence and interworking of the antitrust conspiracy proven at trial. Although there was other evidence relating to the alleged conspiracy, the Antitrust Division relied on Mr. Lubinsky to explain and interpret every piece of evidence relating to the

13

conspiracy. In short, he was the Antitrust Division's "make-or-break witness." *Id.* (quoting *Maxwell v. Roe*, 628 F.3d 486, 507–08 (9th Cir. 2010)).

Indeed, "the damage the suppressed impeachment evidence could cause [is] 'best understood by taking the word of the prosecutor.'" *Id.* (quoting *Kyles*, 514 U.S. at 444). Not only did the Antitrust Division identify the specific value of the hidden evidence—i.e., providing the "why" Mr. Lubinsky would provide false testimony—the Antitrust Division repeatedly tried to maintain Mr. Lubinsky's credibility as its central witness. Antitrust Division's Closing Statement, Dkt. 650, 182:18–183:3; Antitrust Division's Opening Statement, Dkt. 576, 11:21–23; Direct Examination of Daniel Lubinsky, Dkt. 580, 15:13–18; Antitrust Division's Closing Statement, Dkt. 650, 127:4–8. The Antitrust Division's emphasis on maintaining Mr. Lubinsky's credibility "bolsters the conclusion that disclosure of the impeachment evidence may have significantly damaged the prosecution's case." *Id.* (quoting *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005)). Simply put, the Antitrust Division knew maintaining Lubinsky's credibility was critical to its case. It failed to disclose evidence that would have allowed Mr. Lopez to effectively impeach Mr. Lubinsky's credibility, the credibility of other Maxim witnesses, and the Antitrust Division's investigation overall. In denying Mr. Lopez access to that impeachment evidence, Mr. Lopez did not receive a fair trial and there is a reasonable probability of a different result.[11]

**E. The necessary remedy is a new trial on all counts.**

Although the withheld evidence and false testimony relates most directly to the Sherman Act conviction contained in Count One of the Superseding Indictment, a new trial must be ordered on all counts as the wire fraud was closely intertwined with the antitrust violation. As in *Bates*, the Antitrust Division here interwove the antitrust count and the wire fraud counts so to make it impossible to determine whether the jury's determination of guilt on the wire fraud counts can be

---

[11] The Antitrust Division's informal objections to the PSR possibly gives rise to a second potential *Brady* violation for failure to disclose. Specifically, the Government may have told Solace witnesses that it would seek additional restitution on Solace's behalf at sentencing, despite the fact that Solace appears to have resolved all its restitution claims with Mr. Lopez through a civil settlement. As mentioned in its informal objections to the PSR, the Antitrust Division now plans to seek additional restitution on behalf of Solace at sentencing. If Solace was informed of this before trial, it may have been valuable impeachment evidence that was not disclosed to the defense. To fully develop this issue, discovery will be needed of the Antitrust Division regarding what took place prior to trial.

14

separated. *Bates*, 677 F.Supp.3d at 1217. The Antitrust Division previously argued in response to a severance motion, "[i]f Defendant had not engaged in the price-fixing conspiracy, he would not have hidden the existence of the conspiracy, and the government's investigation of that crime, from Solace, and, therefore, he would not have committed the wire fraud." Dkt. 180 at p. 5. As the Antitrust Division stated, the strength of the wire fraud counts substantially depended on the strength of the antitrust count. Accordingly, the concealed evidence and false testimony directly relating to and undermining Count One necessitates a new trial on all counts.

### F. Procedural Posture

The defense is prepared to proceed to sentencing. It will file its sentencing memorandum and other sentencing documents today, as anticipated, and it is prepared to argue the contested sentencing issues on October 9, 2025. However, the defense asks that this motion be fully briefed and argued prior to the imposition of sentence. While a continuance will likely be necessary for either a contested sentencing hearing or simply for the imposition of the sentence itself, the continuance should be no longer than needed to address this motion.

///

///



### III. CONCLUSION

For the reasons stated above, Mr. Lopez respectfully asks the Court to grant the present Motion and enter the proposed order attached as Tab C.

*DATED this 2nd day of October, 2025.*

DICKINSON WRIGHT, PLLC

*/s/ Michael M. Beckwith*
Mackenzie E. Robinson
Email: MRobinson@dickinson-wright.com
100 West Liberty Street, Suite 940
Reno, Nevada  89501-1991
Tel:	775-343-7500

DICKINSON WRIGHT, PLLC
Dan W. Goldfine (*pro hac vice*)
Email: DGoldfine@dickinson-wright.com
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004-4568
Tel:	602-285-5000
Fax:	844-670-6009

DICKINSON WRIGHT, PLLC
Michael M. Beckwith (*pro hac vice*)
Email: MBeckwith@dickinson-wright.com
615 National Avenue, Suite 220
Mountain View, CA 94043
Tel:	408-701-6200
Fax:	844-670-6009

*Attorneys for Defendant
Eduardo Ruben Lopez*



# CERTIFICATE OF SERVICE

I certify that I am an employee of Dickinson Wright PLLC and that on October 2nd, 2025, pursuant to Federal Rule of Civil Procedure 5(b), I served a true and correct copy of the foregoing **DEFENDANT'S MOTION FOR NEW TRIAL BASED ON *NAPUE* AND *BRADY/GIGLIO*** on the parties through the Court's CM/ECF e-filing system to the following:

Jeffrey Cramer
Mikal Jenna Condon
Andrew Mast
Paradi Javandel
Conor Bradley
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA  941092
Tel: 415.934.5300
Fax: 415.934.5399
andrew.mast@usdoj.gov

Sigal Chattah
Interim United States Attorney
District of Nevada
Richard Anthony Lopez
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: 702.388.6551 / Fax: 702.388.6418
tony.lopez@usdoj.gov

*Attorneys for the United States*

                                                  */s/ Sherette W. Duffus*
                                          Employee of Dickinson Wright, PLLC

