UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff<br><br>v.<br><br>Eduardo Ruben Lopez,<br><br>           Defendant | Case No. 2:23-cr-00055-CDS-MDC<br><br>**Court's Order Sustaining in Part and Overruling in Part the Objections filed by Both Parties as to Calculating the "Amount of Loss" to be Applied to Lopez's Sentencing Guidelines** |

       On October 9, 2025, defendant Eduardo "Edward" Lopez's sentencing hearing was initiated. Mins., ECF No. 750. At the conclusion of the October 9th hearing, the court resolved other outstanding matters,[1] and advised the parties it would issue a written order resolving the government's objection to the Presentence Investigation Report (PSR) regarding the "amount of loss" they contend should be applied to Lopez's sentencing guidelines under U.S.S.G. § 2B1.1(b)(1). *See* Govt's Obj. #1, PSR, ECF No. 717 at 35–36; *see also* Govt's Sent. Mem., ECF No. 726 at 22–29; Reply to Def. Sent. Mem., ECF No. 734 at 6–9. Lopez contends that his base offense level should not be increased under that guideline because there was no loss to the victim. *See* Def.'s Sent. Memo, ECF No. 725 at 9–19; Reply to Govt's Sent. Memo, ECF No. 735 at 3–5.

       Having considered the objections, arguments, and relevant case law, the court sustains the government's objection #1 in part and overrules in part the objections filed by both parties for the reasons set forth herein.

---

[1] The other outstanding matters include selecting a date to continue the hearing, setting a briefing schedule on an outstanding, third-party motion to quash subpoena, and scheduling the proposed defense expert to testify at the start of the continued hearing.

I.     **Summary of the parties' arguments**

In his sentencing memorandum, Lopez argues that the PSR correctly identified the offense level under the guidelines for his wire fraud as a 7 because the wire fraud did not result in any actual or intended loss to the victim. Def.'s Sent. Mem., ECF No. 725 at 9–19. Lopez relies on Application Note 3(E) to U.S.S.G. § 2B1.1 to argue that "the defendant must receive credit for the fair market value of the property or services provided to the victim before the fraud was discovered." *Id.* a 10 (citing *United States v. Martin*, 796 F.3d 1101, 1108–09 (9th Cir. 2015)). He asserts that because the value of his former company, Community Home Healthcare (CHH), "exceeded the amount [the victim] paid due to the fraud," the victim suffered no loss, and thus there should be no sentencing enhancement pursuant to § 2B1.1(b) added to his base offense level. *Id.* at 12. Then, during the October 9th hearing, Lopez emphasized that he was relying on U.S.S.G. § 2B1.1(a), Application Note 3(B)(5), to argue that the court should find no actual or intended loss. He also reiterated his argument that there was no loss because the value of CHH exceeded the amount the victim paid to Lopez. And he further argued that his lack of intent to cause "loss" to Solace is confirmed by the purchase agreement's "true-up" process. *See id.* at 11–17.

The government agrees that Lopez's base offense level is 7 but argues that the base offense level should be increased by 20 levels. ECF No. 726 at 22–29. They argue that the PSR "mistakenly concludes that there is no loss—actual or intended—in this case" and further errs in accepting Lopez's "contention that he must receive credit for the fair market value of CHH." *Id.* at 24–27. The government avers that the intended loss for the wire fraud is readily "ascertainable" because, here, Lopez entered into the Purchase Agreement to sell CHH for $12.5 million. *Id.* at 23–27. The government also argues that the victim "could have incurred [a] $12.5 million loss but for the Antitrust Division's decision not to charge [the company]." *Id.* They further argue that there was substantial "actual loss" to the victim because they incurred $3.8 million dollars in legal expenses from responding to the government's investigation into Lopez's fraud. *Id.* at 27–28.

## II. Discussion

The Ninth Circuit and the guidelines advise the courts that, when calculating a defendant's applicable offense level, they should take into account "all the harm that result[s] from" the criminal activity, U.S.S.G. § 1B1.3(a)(3), as well as "the full scope of the defendant's fraudulent conduct is taken into account when calculating the intended loss." *United States v. Tulaner*, 512 F.3d 576, 578 (9th Cir. 2008). However, "the court need only make a reasonable estimation of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C).

The parties do not dispute that under U.S.S.G. § 2B1.1(a)(1), Lopez's base offense level is 7. The crux of the parties' dispute is what, if any, "loss" applies under U.S.S.G. § 2B1.1(b)(1). The Application Notes to § 2B1.1(b)(1) define "loss" as "the greater of actual loss or intended loss." *Id.* at § 2B1.1(b)(1)(A). That Application Notes also state that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *Id.* at § 2B1.1(b)(1)(B).[2] The Application Notes also provide the following definitions:

> (i) "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> (ii) "Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
>
> (iii) "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.
>
> (iv) "Reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."

*Id.* at § 2B1.1(b)(1)(C)(i)–(iv).

---

[2] This definition is the same in both the 2024 and 2025 versions of sentencing guidelines manual.

As recently explained by the Ninth Circuit, the term "'loss' is genuinely ambiguous." *United States v. Yafa*, 136 F.4th 1194, 1197 (9th Cir. 2025). That is because the term "loss" "can mean different things in different contexts." *Id.* at 1198 (citing *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023)); *see also United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (noting that "a review of dictionaries reveals that 'loss' can have a range of meanings," rendering that guideline ambiguous).

Indeed, this case presents another example of how resolving the question of "loss" can be challenging. At trial, the government proved, beyond a reasonable doubt,[3] that Lopez devised a scheme to take money from Solace by failing to disclose DOJ's anti-trust investigation into his former business, CHH, and that this omission was intentional and material. As a result of Lopez's successful scheme, he gained over $10 million via wire transfer.

Lopez maintains that there was no "loss" because the value of his former company and subject of his fraud, CHH, was worth far more than the victim paid for it. Therefore, he contends, there was no "loss" under the guidelines. Stated otherwise, Lopez essentially argues "no financial harm, no loss." On the other hand, the government argues there was substantial "loss" because Lopez's intended loss was the anticipated proceeds from off-loading a "dirty company" on to the victim, Solace. At the time the sale was made, the purchase price was over $12 million. The government further argues that but for the government's decision not to charge Solace for purchasing a company that was under investigation for Sherman Act violations, CHH could have been rendered worthless, and that impact could have collaterally injured Solace's sister businesses, who could have lost their licensing and other rights, which in turn would have caused even further financial loss for Solace—all because of Lopez's fraud.

---

[3] The government bears the burden of proving loss for the purposes of § 2B1.1 by a preponderance of the evidence. *See United States v. Zuniga*, 66 F.3d 225, 228 (9th Cir. 1995). The government proved both the amount and the fact that wire transmission occurred at trial, so they have also met their burden for sentencing purposes.

Lopez's "no financial loss, no harm" argument is untenable because it's directly at odds with the requirement that courts impose a sentence that reflects the seriousness of the offense and the defendant's culpability. *See* U.S.S.G. § 2B1.1. Defrauding a company of millions of dollars alone is serious; here, the potential collateral consequences of Lopez's fraud were also significant. If the court were to accept Lopez's "no financial harm, no loss" argument, then any person could commit a fraud without any real consequence, so long as the fraud was committed upon a valuable company. That is not only contrary to the guidelines and the purpose of sentencing, but it would also result in a sentence that completely fails to account for the defendant's culpability.

On the other, the government's request that I calculate not only the purchase price for CHH, but also additional fees incurred by Solace ,seems unreasonable based on the facts of this case.[4] The government argues that Solace suffered additional financial loss because it had to get involved in this criminal action once DOJ's investigation came to light. ECF No. 761 at 5–8. They argue that those additional costs qualify as "pecuniary harm" as defined under the guidelines. But those costs were incurred after the fraud was complete. While the court can take into account all "relevant conduct" when calculating loss,[5] for the reasons explained below, the court declines to apply any additional monies paid by Solace that resulted from Lopez's fraud.

---

[4] The government argues that Solace suffered additional financial loss because it had to get involved in this criminal action once DOJ's investigation came to light. ECF No. 761 at 5–8. Those additional costs arguably qualify as "pecuniary harm" under the guidelines' definition. But because those costs were incurred after the fraud was complete and are appropriate when the court is applying "intended loss" to determine the specific offense characteristic under § 2B1.1(b)(1). The court declines to apply any additional monies to the loss calculation as it would improperly expand utilizing "gain" to calculate the "loss" amount under the guidelines. The court notes that even if the court applied these additional costs incurred by Solace, it would not change the guideline calculation.

[5] Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant … that occurred during the commission of the offense of conviction," U.S.S.G. § 1B1.3(a)(1)(A), and "all harm that resulted from [such] acts and omissions." U.S.S.G. § 1B1.3(a)(3).

5

   Although distinguishable, *Yafa* guides the resolution of the parties' dispute over what, if any, "loss" amount applies here. In *Yafa*, the district court found the full amount of loss attributable to the defendants to be "exceedingly difficult to calculate," so it utilized the "gain as [the] proxy for a portion of the total loss" attributable to Yafa's criminal activities pursuant to Application Note 3(B). *Yafa*, 136 F.4th at 1197. In calculating the gains attributable to Yafa and his co-defendant, the district court then relied on trial evidence together with the "actual loss established by the Government" to arrive at a loss amounts for attributable to each defendant. *Id.* In affirming the district court, the Ninth Circuit held Application Note 3(B)'s instruction to use a defendant's gain was a reasonable interpretation of "loss."

   Here, the full amount of loss the victim could have suffered is not just exceedingly difficult to calculate—it's impossible. At trial, the evidence demonstrated that Lopez intended to off-load CHH to Solace without ever disclosing DOJ's wage-fixing investigation to them. Solace witnesses made clear that if they had known about DOJ's investigation, they likely would not have purchased CHH. *See* Trial Tr., Day 2 PM, ECF No. No. 576 at 83 (Solace's financial due diligence lead testifying that if Solace had "heard any version of the truth from Eddie Lopez" regarding the criminal investigation, then "all activities [] relate[d] to making an acquisition of CHH would have immediately come to a halt."); Trial Tr., Day 9 AM, ECF No. 622 at 66 (Stephanie Pao, Webster's Chief Financial Officer, testifying for the defense that DOJ's investigation into CHH was a "complete nonstarter," and that if the company had "known that there was a federal criminal investigation [into CHH] going on, we absolutely would not have allowed the company to proceed with further diligence or to consummate the closing of this transaction."); Trial Tr., Day 7 AM, ECF No. 611 at 120 (Darcie Peacock, Solace's former CEO, testifying that had she heard the truth about DOJ's investigation into CHH, Solace would have "walk[ed] away from the deal.").

6

The Solace witnesses also testified that purchasing CHH, without knowledge of DOJ's investigation, could have resulted in Solace and its sister companies losing required licensing which could have resulted in significant collateral consequences. *See* Trial Tr., Day 7 AM, ECF No. 611 at 120 (Darcie Peacock testifying that a criminal antitrust indictment or conviction could have cost its licensing); Trial Tr., Day 6 PM, ECF No. 606 at 52–53 (Bennet Crosby testifying that a criminal investigation could affect licensing, which in turn, could prevent the company from providing services). Indeed, the collateral losses from such an occurrence could have been significant but never came to fruition. For that reason, the actual or intended loss is immeasurable. Because the loss is almost impossible to calculate, I am to use "the gain that resulted from the offense as an alternative measure of loss." *See* U.S.S.G. § 2B1.1, cmt. n.3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it cannot be reasonably determined.").

"Although U.S.S.G. § 2B1.1 is silent as to the appropriate valuation date for a loss determination . . . the actual loss to the victims at the time of the fraud, as opposed to the time of trial or sentencing, best captures [a defendant's] culpability." *United States v. Crandall*, 525 F.3d 907, 915 n.8 (9th Cir. 2008). Here, Lopez's fraud was complete on December 23, 2021,[6] when Solace wired him $10.459 million for the purchase of CHH, so that is the date I use to calculate the loss here. ECF No. 726 at 17. And while the Purchase Agreement called for a sale price of $12.5 million, Solace never sent additional funds to Lopez after December 23, 2021. I therefore decline to consider the additional two-plus million dollars that was part of the actual purchase price for CHH as part of the loss calculation. Last, I decline to include the post-fraud expenses incurred by Solace as a result of DOJ's investigation because I am utilizing Lopez's "gain," not the "intended loss," so it would be improper to include them. *See United States v. Popov*, 742 F.3d

---

[6] *See United States v. Tulaner*, 512 F.3d 576, 580 (9th Cir. 2008) (collecting cases recognizing the "'unique characteristic' of wire fraud. . .that it is **complete** when a transmission is made to further the overall scheme to defraud.") (emphasis added)).

911, 915 (9th Cir. 2014) (citing U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) to explain that "intended loss" includes "intended pecuniary harm that would have been impossible or unlikely to occur").

Ultimately, Lopez gained $10.459 million for his fraud,[7] so that is the amount I use to calculate the increase to his base offense level under U.S.S.G. § 2B1.1(b)(1). *United States v. Abouammo*, 2022 U.S. Dist. LEXIS 226993, at *6 (N.D. Cal. Dec. 16, 2022) (utilizing gain to calculate the loss, and discussing other cases where the Ninth Circuit has used gain to measure loss in the context of fraud). That amount of gain results in a 20-level increase to Lopez's base offense level. *See* U.S.S.G. § 2B1.1(b)(1)(K).

Dated: November 5, 2025

_____
Cristina D. Silva
United States District Judge

---

[7] While seemingly abandoned during oral argument at the October 9, 2025 sentencing hearing, for clarity, I overrule Lopez's contention that he should somehow be credited for any loss he caused pursuant to U.S.S.G. § 2B1.1, Application Note 3(E)(1). *See* ECF No. 725 at 10–11. That application note applies when money is returned to a victim *before* the offense was detected. U.S.S.G. § 2B1.1 cmt. n.3(E)(i). There is no evidence Lopez returned any money *before* Lopez's fraud was discovered.